## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WILLIAM G. MOORE, JR.,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL HARTMAN, *et al.*,<br><br>Defendants. | Civil Action No. 92-2288<br>Judge Beryl A. Howell |
| WILLIAM G. MOORE, JR.,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Civil Action No. 93-0324<br>Judge Beryl A. Howell<br>(Consolidated Cases) |

## TABLE OF CONTENTS

I.    BACKGROUND ........................................................................................................ 5

  A.  Factual Overview ................................................................................................... 5

  B.  Procedural History ................................................................................................ 10

      1.  Plaintiff's Initiation of Two Lawsuits ......................................................... 11

      2.  Key Judicial Decisions ................................................................................ 12

      3.  Pre-Trial Motions in Limine....................................................................... 26

      4.  Trial ............................................................................................................. 27

II.   LEGAL STANDARDS ........................................................................................... 29

  A.  Law Applicable to FTCA Claim........................................................................... 29

      1.  Federal Rule of Civil Procedure 52(a) Applicable to Findings and Conclusions
      by the Court................................................................................................. 30

  B.  Federal Rule of Civil Procedure 59 Applicable to Plaintiff's Motion for New Trial ....... 31

III.  FINDINGS OF FACT FOR PLAINTIFF'S FTCA CLAIM ............................................. 34

  A.  Initiation and Progression of Investigation into Illegal Scheme ...................................... 34

1.   Brief Overview of Pertinent Components of USPS ................................. 34

2.   USPS Automation Program.................................................................. 36

3.   Summer of 1985 Initiation of Investigation of BOG Vice Chairman Voss .............. 39

4.   Plaintiff and REI's Dealings with USPS Through Summer 1985............................ 44

B.   Investigation of Plaintiff ......................................................................... 52

1.   November 1985 Interview with AEG Officials.......................................... 53

2.   November 20, 1985 Interview of Plaintiff and Subordinates...................... 54

3.   Postal Inspectors Learn of Relationship between REI and GAI ............... 55

4.   January 6, 1986 Firing of Postmaster General Carlin ............................... 56

5.   Postal Inspection Service Request for Initiation of Grand Jury Investigation .......... 57

6.   April 1986 Confession of William Spartin About Illegal Scheme............. 59

7.   April 8, 1986 Postal Inspector Interview with Plaintiff's Subordinates.................. 62

8.   May 1986 Guilty Plea and Cooperation by Vice Chairman Voss.............. 63

9.   July 25–26, 1986 Follow-up Interviews of Plaintiff and Subordinates and Review
of Plaintiff's Notebooks......................................................................... 68

10.  Subsequent Interviews of Co-Conspirators .............................................. 70

C.   Consideration of Indictment by D.C. U.S. Attorney's Office .......................... 80

D.   Plaintiff's Alleged Damages ..................................................................... 85

IV.   CONCLUSIONS OF LAW ON PLAINTIFF'S FTCA CLAIM ...................................... 90

A.   Postal Inspectors Did Not Procure Indictment Against Plaintiff........................ 91

1.   Postal Inspectors Did Not Violate Rule 6(e) ........................................... 93

2.   Mr. Spartin's Testimony Did Not Cause Indictment of Plaintiff ............................. 107

3.   Interview Summaries Did Not Cause Mr. Spartin to Implicate Plaintiff ................. 108

4.   Mr. Spartin's Opinion Did Not Procure Indictment .................................... 111

B.   Plaintiff Failed to Prove Absence of Probable Cause .................................... 113

1.   Plaintiff Has Not Rebutted Indictment's Presumption of Probable Cause.............. 115

2.   Indictment Against Plaintiff Was Supported by Probable Cause............................ 120

C.   Postal Inspectors Did Not Act With Malice ............................................... 123

1.   Alleged USPS Animosity Towards REI and Plaintiff.............................. 127

2.   Initiation of Investigation of REI and Plaintiff Was Warranted.............. 131

3.   Subpoenas Issued to REI ...................................................................... 134

4.   Documents Prepared by Postal Inspectors............................................... 137

D.   FTCA Judgment Entered in Favor of United States ..................................... 145

V.   THE FTCA JUDGMENT BAR.................................................................. 146

VI.   MOTION FOR NEW TRIAL .................................................................... 149

A.   Procedural Rulings Prior to Trial .................................................................................. 150

B.   Evidentiary Rulings ...................................................................................................... 153

    1.   Exclusion of Indemnification Evidence ................................................................ 153

    2.   Exclusion of Prior Judicial Opinion ..................................................................... 160

    3.   Plaintiff's Country Club Membership ................................................................... 164

    4.   Admission of Hearsay Evidence............................................................................ 167

C.   Jury Instructions............................................................................................................ 172

    1.   Concert of Action Instruction ................................................................................ 172

    2.   Probable Cause Instruction .................................................................................... 176

    3.   Inducement Instruction .......................................................................................... 178

D.   Judicial Conduct............................................................................................................ 186

    1.   Questioning of Witnesses ...................................................................................... 187

    2.   Instruction Concerning Deposition Questions....................................................... 188

    3.   Instruction Following Summation ......................................................................... 189

VII.   CONCLUSION................................................................................................................ 194

## MEMORANDUM OPINION

Over twenty years ago, the plaintiff, William G. Moore, Jr., filed these consolidated cases after his acquittal on serious felony charges.  The ensuing years of litigation generated no fewer than sixteen judicial opinions and, more recently, a four-week concurrent jury and bench trial, in which the plaintiff sought over $235,000,000 for lost compensation, emotional and reputational damages.  The jury returned a verdict for the defendants.  The plaintiff now seeks a new jury trial on his claim against four living and one deceased former United States Postal Inspectors for retaliatory inducement to prosecution, under *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971), Pl.'s Mot. for New Trial ("Pl.'s Mot."), Case No. 92-2288, ECF No. 511, and judgment in his favor on his claim against the United States for malicious prosecution, under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671 *et seq.  See generally* Pl.'s Proposed

Findings of Fact ("Pl.'s FOF"), ECF No. 126-1; Pl.'s Proposed Concl. of Law ("Pl.'s COL"), ECF No. 127.

Other Judges on this Court previously dismissed the plaintiff's *Bivens* claim against the Postal Inspectors twice and his FTCA claim against the United States three times, but the two claims at issue at trial and addressed in this Memorandum Opinion were revived each time on appeal. *See Moore v. Hartman*, Nos. 92-CV-2288 (NHJ), 93-CV-0324 (NHJ), 1993 WL 405785 (D.D.C. Sept. 24, 1993) (*1993 Decision*) (granting motion to dismiss the plaintiff's *Bivens* and FTCA claims), *aff'd in part, rev'd in part sub nom. Moore v. Valder*, 65 F.3d 189 (D.C. Cir. 1995) (*Moore I*) (affirming dismissal of *Bivens* malicious prosecution claim, reversing dismissal of *Bivens* retaliatory prosecution claim and dismissal of FTCA claim);  *Moore v. Valder*, No. 92-CV-2288, Mem. Op. (D.D.C. Feb. 5, 1998) (*1998 Decision*) (denying summary judgment on *Bivens* claim against the Postal Inspector defendants, granting summary judgment on the *Bivens* claim against federal prosecutor, and granting summary judgment on the FTCA claim against the United States), *aff'd in part, rev'd in part sub nom. Moore v. United States*, 213 F.3d 705 (D.C. Cir. 2000) (*Moore II*) (affirming dismissal of *Bivens* retaliatory prosecution claim against federal prosecutor and FTCA abuse of process claim against the United States, and reversing dismissal of FTCA malicious prosecution claim against United States); *Moore v. Hartman*, 569 F. Supp. 2d 133, 137 (D.D.C. 2008) (*2008 Decision*) (granting summary judgment on the *Bivens* claim against the Postal Inspectors and the FTCA claim against the United States), *rev'd, Moore v. Hartman*, 644 F.3d 415, 426 (D.C. Cir. 2011) (*Moore V*) *vacated sub nom. Hartman v. Moore*, 547 U.S. 250 (2012) (vacating *Moore V* and remanding); *Moore v. Hartman*, 704 F.3d 1003 (D.C. Cir. 2013), *cert. denied*, 547 U.S. 250 (2013) (*Moore VI*) (reinstating *Moore V*).  This prolonged procedural history is set out below, after a brief overview of these cases, to provide

context, first, for the factual findings and legal conclusions reached by this Court on the

plaintiff's FTCA malicious prosecution claim against the United States and, second, for

resolution of the plaintiff's motion for a new trial on his *Bivens* retaliatory inducement to

prosecution claim against five former Postal Inspectors.

For the reasons discussed below, the Court reaches the same conclusion as the jury that

heard the plaintiff's *Bivens* claim: The plaintiff has failed to prove, by a preponderance of the

evidence, his FTCA claim of malicious prosecution by the United States.  Moreover, the plaintiff

is not entitled to un-do the jury verdict against him and re-do in a new trial his *Bivens* claim for

retaliatory prosecution against the former Postal Inspectors.

## I.    BACKGROUND

Set out below is a brief overview of the factual background underlying these cases as

well as a summary of the lengthy procedural history.

### A.  Factual Overview

In November 1989, another Judge on this Court granted the plaintiff's motion for a

directed verdict of acquittal, under Rule 29 of the Federal Rules of Criminal Procedure, on

criminal charges, *inter alia*, that he engaged in a conspiracy to defraud the United States, in

violation of  18 U.S.C. § 371.  *United States v. Recognition Equip., Inc.*, 725 F. Supp. 587, 587-

88 (D.D.C. 1989).  Rather than end the litigation between the parties, however, the plaintiff's

acquittal triggered over twenty years of continuing litigation culminating in the concurrent bench

and jury trial before this Court.

As detailed in the factual findings set out in Part III, *infra*, in July 1985, the Chief Postal

Inspector opened an investigation into possible corruption at the highest level of the United

States Postal Service ("USPS").  Over the course of the next three years, Postal Inspectors

uncovered an illegal bribery and kickback scheme in which Peter Voss, the Vice Chairman of the

USPS Board of Governors ("BOG"), took bribes from an outside consulting group to use his influence on a key subcommittee of the BOG to award a sole source contract for up to $400,000,000, to the consultants' client.  If the scheme were successful, the Vice Chairman expected a percentage kickback from the sole source contract.  The consultants' client and the source of the bribe monies paid to the BOG Vice Chairman was Recognition Equipment, Inc. ("REI"), a Dallas, Texas company headed by the plaintiff.

When the plaintiff took over as Chief Executive Officer ("CEO") of REI in 1982, he initiated a multi-pronged campaign to increase the company's business with USPS and, specifically, to obtain a sole source contract from USPS for the purchase of REI's mail sorting equipment, which used a different technology than that widely deployed by USPS.  As part of what the plaintiff himself described as "aggressively pursu[ing] [the] contract," 6/25/14 AM Tr. at 97,[1] the plaintiff (1) met with the highest management levels within USPS, including the Postmaster General and BOG members; (2) engaged members of the Texas congressional delegation to pressure USPS to alter its choice of mail-sorting technology and to introduce a bill designed to make REI the sole procurement contract winner; (3) testified before congressional committees and contributed to press reports critical of USPS's mail-sorting technology; and (4) hired, internally to REI, a new Vice President of Sales and Marketing, Robert W. Reedy, who was subsequently indicted with the plaintiff, to enhance the company's government contracting effort, as well as outside consultants to facilitate obtaining USPS contracts.  At the recommendation of, and under pressure from, the corrupt BOG Vice Chairman, the plaintiff hired a small, Detroit-based consulting group, called Gnau and Associates, Inc. ("GAI"), at rates

---

[1] Citations to the transcript of the trial, held from June 23, 2014 to July 21, 2014, include the trial date, morning or afternoon session, transcript page and the witness, where not otherwise clear from the context of the sentence.  Only portions of the trial transcripts are filed on the docket and, consequently, no ECF number is provided for the transcripts.  *See generally* Dkt. Case No. 92-2288.

and terms far more expensive than comparative arrangements with REI's other outside consultants.  The plaintiff's aggressive efforts to obtain a sole source contract for USPS mail-sorting equipment has been the centerpiece of his theory that he was targeted for prosecution due to his First Amendment protected activities.  The public aspect of his campaign may have also made him an obvious target for the corrupt BOG Vice Chairman as a potential source of illegal payments, in return for steering to REI the USPS business so publicly and aggressively sought by the plaintiff.

In April 1986, a GAI employee, William Spartin, entered into a cooperation and non-prosecution agreement and unveiled the illegal bribery and kickback scheme to the Postal Inspectors.  The following month, in May 1986, the BOG Vice Chairman pleaded guilty to criminal charges arising from his receipt of illegal payments from GAI, which had served as the conduit to funnel fees paid to GAI by REI to the BOG Vice Chairman.  In the ensuing months, two additional co-conspirators from GAI, John Gnau and Michael Marcus, pleaded guilty, in October 1986 and January 1987, respectively, to charges relating to the illegal scheme.

Rather than rest on their laurels with the revelation of the illegal bribery and kickback scheme and the successful convictions of three co-conspirators, the Postal Inspectors, under the direction of the Chief Postal Inspector, continued their investigation by following the corrupt money to its source.  This led the Postal Inspectors directly to REI, which had retained the convicted consultants under a lucrative retainer arrangement and which stood to benefit from the sole source contract that was one of the goals of the illegal scheme.  As the plaintiff himself admitted during his testimony in this case, the connection between the conspirators and his company, REI, "looked suspicious," 6/25/14 AM Tr. at 24, and presented such a "lousy set of

circumstances," *id.* at 25, that even the plaintiff agreed the investigation of REI and himself "would certainly be justified by the circumstances," *id.* at 26.

Between the time of the guilty pleas of three co-conspirators in the illegal scheme and October 1988, Postal Inspectors collected additional documentary and other evidence, which they presented to the U.S. Attorney's Office for the District of Columbia ("DC USAO") in support of an indictment of the plaintiff, REI and Mr. Reedy.  The DC USAO spent over a year considering whether to indict the company and two of its officers, holding at least seventeen internal meetings about this issue and providing defense counsel for the plaintiff and his co-defendants the opportunity to present, in writing and orally, reasons against an indictment. Nevertheless, after a meeting on September 22, 1988, between the then-U.S. Attorney for the DC USAO and defense counsel, the U.S. Attorney approved the indictment.  Less than a month after this meeting, in October 1988, the grand jury returned the indictment, charging REI, the plaintiff and Mr. Reedy as co-conspirators in the illegal scheme.

As noted, the plaintiff and his co-defendants were acquitted at the criminal trial after the trial court concluded that the government had presented insufficient evidence in its case-in-chief "to establish a prima facie case that the Defendants conspired to defraud the United States." *Recognition Equip., Inc.*, 725 F. Supp. at 587.  Notably, in what may have been a strategic blunder, the trial prosecutor, former Assistant U.S. Attorney ("AUSA") Joseph Valder testified at the trial of the instant matter that he had held back evidence regarding a substantial number of missing pages from the notebook, labeled "Postal," in which the plaintiff recorded notes about the USPS contracting effort, from the government's case-in-chief and, consequently, this evidence was not before the trial court for consideration during resolution of the Rule 29 motion for a judgment of acquittal.  7/17/14 AM Tr. at 30 (Valder testifying: "we had made a conscious

judgment not to introduce in our case in chief in the criminal trial the fact of missing—Mr. Moore's missing pages from his 'Postal' notebook.  It's a litigation strategy to hold it back for what we expected to be a vigorous cross-examination of Mr. Moore.  So Judge Revercomb didn't have that fact before him or that set of information, but that was huge in the inspectors' judgment, the reviewers' judgment that Mr. Moore or someone under his direction or someone at the corporation had intentionally torn out" pages from his notebook).  These missing pages from the plaintiff's notebook raised significant suspicion, due to information that participants in the illegal conspiracy had purged their files to cover-up their illegal scheme.  7/11/14 AM Tr. at 37-38 (Hartman testimony); 7/14/14 PM Tr. at 69 (Kormann testimony).

Following his acquittal, the plaintiff has relentlessly pursued damages claims against five Postal Inspectors, who had varying degrees of involvement in the investigation of the illegal bribery and kickback scheme, and against the United States.  From the plaintiff's perspective, his five years of service in the U.S. Army and six years of service as CEO of a relatively small public company[2] were poised to catapult him into a future career as CEO of a Fortune 100 or 500 company and for eligibility to be Secretary of Defense.  6/25/14 AM Tr. 62, 64.  These career aspirations were quashed, according to the plaintiff, because of his indictment and warranted the damages he sought of over a quarter *billion* dollars.[3]  The past twenty-five years of consideration

---

[2] At the time the plaintiff served as CEO of REI, the company was not on the "Fortune 500" list of the largest publicly traded companies, according to the plaintiff's own damages expert, who computed the plaintiff's potential compensation loss from REI based upon rankings of companies smaller than those on the Fortune 500 list. *See* 6/27/14 AM Tr. at 40-41 (Dr. Fanara testifying that the damages requested for lost compensation were reasonable because the number was within the range of what CEO's were making at Fortune 800 companies until 1999 and then Fortune 500 companies from 2000-2004).

[3] This damages claim was less than half the amount of up to $688,636,410 initially requested by the plaintiff, who also sought reputational, emotional, physical distress and punitive damages on top of that amount. *See* Pre-Trial Statement, Pl.'s Itemization of Damages from Defs., at 9-8, ECF 438.  Plaintiff's counsel reduced the damages claim during consideration of the defendants' pretrial motion to exclude evidence regarding the plaintiff's stock-related damages.  Pl.'s Supp. Mot. *in Limine*, at 1, ECF 480 (stating "in an effort to streamline his damages case, Moore is no longer seeking to recover as damages the loss in value of the shares of REI stock that he owned at the time of his indictment").  With respect to the reduced damages claim of over a quarter billion dollars, the

of the plaintiff's claims by the District Courts of the Northern District of Texas and the District

of Columbia, the Court of Appeals for the D.C. Circuit on six separate appeals, and the U.S.

Supreme Court on two appeals, left two claims for trial: the plaintiff's *Bivens* claim for

retaliatory inducement to prosecution against five Postal Inspectors and an FTCA action for

malicious prosecution against the United States.

### B.  Procedural History

Two years after his acquittal, the plaintiff filed, in the Northern District of Texas, a

*Bivens* action for retaliatory prosecution against six Postal Inspectors and the AUSA who

represented the government at trial, and an FTCA action against the United States.  From the

initiation of these lawsuits through 2008, two separate Judges on this Court concluded that the

plaintiff's claims should be summarily resolved in favor of the defendants.  *See 1993 Decision*

(Holloway Johnson, J.); *2008 Decision* (Urbina, J.).  Each time, the district court's summary

disposition rulings in favor of the defendants on the two claims at issue in the trial were reversed

by the D.C. Circuit.  *See Moore I*; *Moore II*; *Moore IV*.  After the second remand, the district

court denied the defendants' motion for summary judgment, *Moore v. Hartman*, Case No. 92-

2288, Order, dated Aug. 8, 2003, ECF No. 283, and reconsideration with respect to the FTCA

claim, *Moore v. Hartman*, Case No. 92-2288, dated Aug. 30, 2004, ECF No. 296, which

decisions were affirmed on appeal, *see Moore IV*.  The Supreme Court, however, vacated the

appellate decision and remanded the case to the D.C. Circuit for further consideration in light of

a decision in an unrelated case.  *Hartman*, 132 S. Ct. 1740.  Upon reconsideration, the D.C.

Circuit, in 2013, reinstated its prior 2011 holding, *see Moore VI*, prompting this matter to

proceed to trial on the plaintiff's *Bivens* retaliatory inducement to prosecution claim against the

---

plaintiff elicited testimony from his proffered damages expert that this damage calculation represented a "very
conservative number."  6/27/14 AM Tr. at 40 (Dr. Fanara testimony).

Postal Inspectors and his FTCA malicious prosecution claim against the United States.  After

hearing four weeks of evidence, the jury returned a verdict in favor of the defendant Postal

Inspectors on the plaintiff's *Bivens* retaliatory prosecution claim.[4]  *See* Jury Verdict, ECF No.

507.

     This procedural history is more fully discussed below.

### 1. *Plaintiff's Initiation of Two Lawsuits*

     In November 1991, the plaintiff and his wife, Blanche K. Moore, filed a civil action in

the United States District Court for the Northern District of Texas against six Postal Inspectors

and an AUSA.[5]  None of these defendants were senior level managers or even supervisors within

the USPS, the Postal Inspection Service or the DC USAO but, instead, were front-line agents and

the trial prosecutor, who participated in the investigation and prosecution of the perpetrators of

the illegal scheme.  Although this complaint asserted five causes of action, only the Fifth Cause

of Action, under *Bivens*, for retaliatory prosecution due to the plaintiff's exercise of his First

Amendment rights survived the subsequent years of litigation to reach a jury.[6]  This claim

---

[4] The jury deliberations took approximately one day, with deliberations beginning late in the afternoon on Friday, July 18, 2014 and concluding the next trial day, in the middle of the afternoon of Monday, July 21, 2014. *See* 7/18/14 Tr. at 240 (noting that the jury retired to deliberate on Friday, July 18, at 3:28 p.m.); Jury Note 3 (stating that the jury had reached a verdict, on Monday, July 21, 2014 at 3:15 p.m.), ECF No. 504.

[5] This original *Bivens* complaint named the following seven defendants: AUSA Joseph B. Valder and six Postal Inspectors, Michael Hartman, Frank Kormann, Robert Edwards, Pierce McIntosh, Daniel Harrington and Norman Robbins.  After the matter was transferred to this Court, Mr. Harrington was terminated as a defendant on April 24, 1996, upon notice of his death.  *See* Case No. 92-2288, Notice of Suggestion of Death, ECF No. 56 (defendant Harrington terminated on April 24, 1996).  Although former Postal Inspector Norman Robbins is also deceased, the plaintiff decided nevertheless to proceed against him at the jury trial with the substitution of Mr. Robbins' personal representative.  *See* Pre-Trial Statement at 2 n.2, ECF No. 438.  Given the duration of this litigation, AUSA Valder and the Postal Inspectors named as defendants have been long retired from their respective government jobs.

[6] The district court in the Northern District of Texas winnowed down the plaintiffs' *Bivens* claims by, *inter alia*, dismissing Mrs. Moore's claims, and then transferred the case to this Court, after concluding that personal jurisdiction over the Postal Inspectors was lacking in Texas.  *See Moore v. Valder, et al.*, Civ. No. 3-91-cv-2491-G (N.D. Tex. June 29, 1992), ECF No. 54; *Moore, et al.*, Civ. No. 3:91-cv-02491-G (N.D. Tex. Sept. 21, 1992), ECF No. 55.

alleged that "the defendants attempted to punish Plaintiff William G. Moore, Jr., because he directed criticism against the USPS, thereby depriving the Plaintiffs of their rights to free expression and to petition the government for redress of grievances guaranteed by the First Amendment of the United States Constitution." *Bivens* Compl. ¶ 36 ("Fifth Cause of Action"), Civ. No. 3:91-cv-02491-G (N.D. Tex. filed Oct. 14, 1992), ECF No. 1.

Shortly after the *Bivens* action was transferred to this Court, the plaintiff and his spouse filed a second complaint in the Northern District of Texas seeking damages against the United States under the FTCA for the same allegedly unlawful conduct with the identical causes of action set out in the *Bivens* action. *See* FTCA Compl.; *Moore, et al. v. United States*, Civ. No. 3:92-cv-02129-R, at 2 n.1 (N.D. Tex.), Mem. & Order, dated September 21, 1992, ECF No. 55. This case was also transferred to this Court and consolidated with the plaintiff's *Bivens* action. *See* Stipulated Order, Case No. 93-0324 (D.D.C. Mar. 3, 1993) (consolidating cases). Only the Second Cause of Action for malicious prosecution in the FTCA complaint survived for trial.

### 2. *Key Judicial Decisions*

The plaintiff's claims have received consideration from Judges and Justices at every level of the federal judicial system, resulting in multiple judicial opinions. This body of case law frames the issues for the conclusions of law on the plaintiff's FTCA claim and evaluating the plaintiff's motion for a new trial on his *Bivens* claim, necessitating review of the key decisions in this lengthy procedural history.

### a. 1993 District Court Dismissal of Claims

In 1993, the first Judge on this Court to consider the plaintiff's claims dismissed both suits. Specifically, the Court dismissed the plaintiff's *Bivens* claim for malicious prosecution against the defendant Postal Inspectors for failure to assert more than "bare allegations of malice," which were insufficient "to subject government officials either to the costs of trial or to

the burdens of broad-reaching discovery." *1993 Moore*, 1993 WL 405785 at *3-4 (internal

quotations and citation omitted).  As support for the plaintiff's contention that he was prosecuted

to punish him for "aggressive lobbying" of the USPS and Congress to adopt REI's technology

and "for suggesting qualified candidates for the position of Postmaster General," the plaintiff

offered six sources of purported "direct evidence:" "(1) the complaint itself, (2) the indictment in

Moore's criminal case, (3) the testimony of Frank Bray at Moore's criminal trial, (4) Judge

Revercomb's opinion entering a judgment of acquittal, (5) Moore's own affidavit, and (6) an

affidavit executed by William Hittinger, a member of REI's board of directors." *Id.* at *4.  The

district court found that the first five evidentiary sources amounted to indirect evidence

providing "only inferential proof of malice" insufficient to support the heightened standard

required for a *Bivens* action.  *Id.*  The last item of evidence, the Hittinger Affidavit, recounted a

lunch time conversation at which AUSA Valder and two of the defendant Postal Inspectors were

present.  According to the affidavit, AUSA Valder allegedly stated "that the merits of the case or

whether the persons involved were guilty or not did not concern him.  He explained that it was

important to him that he win the case because he wanted to get a track record or some notoriety

which would help him obtain a good position in private practice." *Id.* at *5.  This evidence could

not save the plaintiff's malicious prosecution *Bivens* claim against the Postal Inspectors because,

although the court deemed this affidavit to be direct evidence of AUSA Valder's alleged

improper motivation, "it provide[d] no evidence of the Inspectors' intent." *Id.* at *5 ("Nothing in

the affidavit suggests that the Inspectors shared [AUSA] Valder's alleged motivations.").  Given

the insufficiency of the proffered evidence, the court dismissed the *Bivens* malicious prosecution

claim against the Postal Inspectors.  *Id.* at *6.

The court also dismissed the FTCA claims brought against the government, finding that the claims of constitutional violations of the First Amendment and the Fifth Amendment were barred by sovereign immunity since only common law tort claims were cognizable under the FTCA, *id.* at *7, and the remaining common law claims for malicious prosecution, false arrest and abuse of discretion were barred by the discretionary function exception to the FTCA, *id.* at *9.  In applying the discretionary function exception, the court examined the plaintiff's allegations of prosecutorial misconduct "relating to the presentation of evidence to the grand jury," "fail[ure] to disclose *Brady* material," and that the "government harassed and intimidated witnesses," *id.* at 8, and concluded that the alleged misconduct was so "closely linked to the exercise of prosecutorial discretion," *id.*, that "the discretionary function exception thus exempt[ed] the United States from liability for all the common law claims alleged in both the plaintiff['s] lawsuits." *Id.* at *9.[7]

Upon concluding that (1) the *Bivens* claims against the Postal Inspectors failed to meet the heightened pleading standard required for malicious prosecution tort claims, (2) the claimed constitutional violations against the United States were precluded by the FTCA, and (3) the common law claims against the United States, under *Bivens* and the FTCA, were barred by the

---

[7] The court looked behind the plaintiff's hyperbolic characterization of the evidence noting, for example, that the plaintiff's allegation about the government's "falsified" evidence, "did not involve the actual fabrication of evidence, but instead merely refer[red] to the government's failure to include exculpatory evidence in witnesses' statements—the same conduct of which the plaintiff[] complain[s] elsewhere." *1993 Decision*, 1993 WL 405785, at *8 n.4.  The plaintiff argued strenuously against application of the discretionary function exception, contending that failing to present exculpatory evidence did not fall within  the discretionary function exception to liability because: (1) "the *United States Attorneys' Manual* states that a 'prosecutor must . . . disclose such evidence to the grand jury,'" *id.* at *8 n.5, and (2) even assuming the discretionary function exception applied to AUSA Valder's conduct, the Postal Inspectors were not shielded from liability for their independent actions, *id.* at *9 n.6.  The court rejected both arguments, explaining, first, that the Manual "provides only internal Department of Justice guidance" and "is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal;" *id.* at *9 n.5; and, second, that "the relevant inquiry" was not "which federal official carrie[d] out a given action, but whether the action implicates a discretionary function . . . no matter whether the challenged decisions are made during the investigation or prosecution of offenses," *id.* at * 9 n.6 (internal quotations and citations omitted).

discretionary function exception, the court granted the defendants' motions to dismiss the consolidated actions brought by the plaintiff.

### b.   1995-2000 Appellate Reversal of First Dismissal of Claims, Followed by District Court's Second Dismissal of FTCA Claim

On appeal, the D.C. Circuit affirmed in part and reversed in part the *1993 Decision*. *Moore I*, 65 F.3d at 197.  First, the D.C. Circuit affirmed the dismissal of the *Bivens* malicious prosecution claim against (1) AUSA Valder since "absolute immunity shield[ed] Valder from liability for the decision to prosecute Moore," *id.* at 192, and (2) the Postal Inspector defendants because "it had not been clearly established that malicious prosecution violates any constitutional or statutory right" and, therefore, "qualified immunity defeat[ed] Moore's malicious prosecution claim," *id.* at 195-96.  While the *Bivens* malicious prosecution claim was dismissed as to all defendants, the D.C. Circuit reversed the dismissal of the *Bivens* retaliatory prosecution claim in Fifth Cause of Action in the *Bivens* complaint as to all of the defendants.  *Id.* at 196.  With respect to AUSA Valder, the Circuit acknowledged that "a prosecutor enjoys absolute immunity from section 1983 liability when he acts as an advocate by engaging in activities intimately associated with the judicial phase of the criminal process."  *Id.* at 193 (internal quotations and citation omitted).  As a result, "Valder's prosecutorial immunity insulate[ed] him from liability for his unquestionably advocatory decision to prosecute Moore" as well as "from liability for allegedly concealing exculpatory evidence from the grand jury and for allegedly manipulating evidence before the grand jury to create a false impression of what Moore knew about the alleged fraudulent schemes."  *Id.* at 194.  Nevertheless, the Circuit found that AUSA Valder had "not met his burden of establishing that absolute immunity protect[ed] him from potential liability for the other instances of misconduct alleged," *id.*, including allegations that he (1)

"intimidated and coerced witnesses into changing their testimony to incriminate Moore," *id.* at

191, and (2) "disclos[ed] grand jury testimony to unauthorized third parties," *id.* at 192, 197.

The Court opined that neither of these alleged actions would be the type of advocatory conduct

that would shield a prosecutor from liability.  *Id.* at 194-95.

Regarding the defendant Postal Inspectors, the D.C. Circuit found that the plaintiff's

retaliatory prosecution claim "alleg[ed] the violation of clearly established law" with sufficient

factual allegations "to meet any applicable heightened pleading standard" required for a viable

*Bivens* claim.  *Id.* at 196.  Specifically, the Circuit pointed to the allegations in the complaint

that: (1) "[i]n publicly criticizing the USPS Moore unquestionably exercised his first amendment

rights," and (2) "[t]wo of the postal inspectors, who reported to USPS management, heard and

did not repudiate Valder's declaration that Moore's innocence was irrelevant to the prosecution

he intended to pursue," referring to the lunch conversation recounted in the Hittinger Affidavit.

*Id.*  As a result, the Court reversed the dismissal of and remanded the Fifth Cause of Action in

the *Bivens* complaint for retaliatory prosecution against all of the defendants.

Finally, the Circuit affirmed in part and reversed in part the district court's dismissal of

the plaintiff's FTCA claim against the United States.  The discretionary function exception

shielded the United States from "Moore's claims that Valder and the postal inspectors pressured

witnesses into incriminating him, concealed and distorted exculpatory evidence to create a false

impression of what he knew about the fraud schemes and withheld material exculpatory

information from him after the grand jury returned an indictment." *Id*. at 197.  By contrast,

"[d]isclosing grand jury testimony to unauthorized third parties" was found not to be a

"discretionary activity nor . . . inextricably tied to matters requiring the exercise of discretion."

*Id*. at 197.  Thus, the D.C. Circuit concluded that the district court erred in dismissing the FTCA

claim in its entirety for lack of subject matter jurisdiction, since not all of the plaintiff's allegations of misconduct fell under the FTCA "discretionary function" exception.  *Id.*  In reversing and remanding the FTCA claim for malicious prosecution against the United States, the Circuit "express[ed] no view whether the allegation is otherwise cognizable under the FTCA or whether it is supported by the evidence."  *Id.*

In sum, in its 1995 decision, the Circuit affirmed the dismissal of the *Bivens* malicious prosecution claim against all defendants, but reversed both the dismissal of the *Bivens* retaliatory prosecution claim against all defendants, and the dismissal of the FTCA malicious prosecution claim against the United States based upon the alleged unauthorized disclosure of grand jury testimony.

On remand, the district court for the second time dismissed the *Bivens* claim for retaliatory prosecution against AUSA Valder as well as the FTCA claim for malicious prosecution against the United States.  *See 1998 Decision.*[8]  The plaintiff appealed the dismissal of his claims and the D.C. Circuit addressed the case for a second time.

### c. 2000 – 2004 Appellate Reversal of District Court's Second Dismissal of FTCA Claim

---

[8] The district court concluded that AUSA Valder was entitled to summary judgment on the plaintiff's *Bivens* retaliatory prosecution claim because the AUSA's decision to prosecute the plaintiff was protected by absolute immunity.  *See 1998 Decision* at 17-24.  Although acknowledging that the only allegation in the FTCA claim for malicious prosecution that could survive the discretionary function exception was that "AUSA Valder and the Postal Inspectors violated Federal Rule of Criminal Procedure 6(e)(2) . . . by giving Spartin and former Postmaster General Paul Carlin access to the Grand Jury testimony of other witnesses for the purpose of influencing Spartin's testimony and for the apparent purpose of assisting Carlin, a private plaintiff, to pursue civil litigation . . .," FTCA Compl. ¶ 26, the court nevertheless determined that this allegation could not support a claim for malicious prosecution and abuse of discretion against AUSA Valder.  *1998 Decision*, No. 92-CV-2288, at 32-43.  The court reasoned that malicious prosecution and abuse of discretion claims arise from conduct of "investigative or law enforcement officers of the United States government," and "investigative or law enforcement officer means any officer" of the United States who is "empowered by law to execute searches, seize evidence, or make arrests for violations of Federal Law."  *Id.* (citing 28 U.S.C. § 2680(h)).  Since federal prosecutors do not fit within this definition, the court dismissed the FTCA malicious prosecution and abuse of discretion claims against the United States.  *Id.* at 31-32, n.20-21.

In 2000, the D.C. Circuit affirmed the district court's decision to dismiss the plaintiff's *Bivens* retaliatory prosecution claim against AUSA Valder and the FTCA abuse of process claim against the United States, but reversed the dismissal of the FTCA malicious prosecution claim against the United States.[9] *Moore II*, 213 F.3d at 710, 713. The FTCA malicious prosecution claim required proof of four elements under local law: "(1) the defendant's initiation or procurement of a criminal proceeding against the plaintiff; (2) absence of probable cause for the proceeding; (3) malicious intent on the part of the defendant; and (4) termination of the proceeding in favor of the plaintiff." *Id.* at 710 (citations omitted). The Court first noted the significant obstacles to satisfying the first element of the malicious prosecution claim in this case since "none of Valder's conduct can be the basis for a malicious prosecution claim against the government because he is not an investigative or law enforcement officer" and, other than "the conduct of the postal inspectors in disclosing grand jury material," the "remainder of the postal inspector's conduct fell within the FTCA's discretionary function exception." *Id.* Thus, to satisfy the first element that the defendants procured the indictment, the plaintiff must establish "'a chain of causation' linking the defendant's actions with the initiation of criminal proceedings," which the plaintiff tried to show by alleging that "the postal inspectors' releasing of grand jury testimony to Spartin . . . caused Spartin to incriminate him, which led to his indictment and then his prosecution." *Id.* Since the plaintiff did not allege that the defendant Postal Inspectors made any misrepresentations to the grand jury, however, he needed to show that "but for the postal inspectors' disclosure of grand jury testimony to Spartin, he would not

---

[9] The Circuit affirmed the dismissal of the *Bivens* abuse of process claim against all defendants, explaining that an abuse of process tort requires an allegation of "grand jury [] misuse[]" and the plaintiff did not allege that the Postal Inspectors "used the grand jury for an improper purpose." *Moore II*, 213 F.3d at 713. This decision resolved the plaintiff's *Bivens* abuse of process claim against all defendants.

have implicated Moore before the grand jury." *Id.* at 711.[10]   "On the other hand, if Moore would

have been indicted and prosecuted anyway, even without the postal inspectors' alleged

misconduct and Spartin's testimony, then the United States cannot be held liable."  *Id.* at 712.

Since "the case [was] still at the pleading stage" where "there is no telling how the evidence will

turn out" and the "complaint sufficiently set forth the first element of the malicious prosecution

tort," the Circuit remanded the FTCA malicious prosecution claim.  *Id.*

On remand, the Postal Inspectors again moved for summary judgment on the plaintiff's

*Bivens* retaliatory prosecution claim, arguing that qualified immunity shielded them from suit

because the prosecution of the plaintiff was supported by probable cause.  Defs.' Mot. for Summ.

J., *Moore v. Hartman*, Case No. 92-2288 (D.D.C. July 30, 2001), ECF No. 254.  Alternatively,

they argued that summary judgment was proper because the plaintiff had not produced sufficient

evidence of retaliatory motive.  *Id.*  The district court denied the Postal Inspectors' motion in a

one-paragraph order, citing material disputed facts "surrounding the presentation of evidence to

the grand jury and the disclosure of grand jury testimony as to a key prosecution witness."

Order, *Moore v. Hartman*, Case No. 92-2288 (D.D.C. Aug. 5, 2003), ECF No. 283.

On interlocutory appeal, the D.C. Circuit affirmed the denial of summary judgment on

the plaintiff's *Bivens* retaliatory prosecution claim, rejecting both grounds posited by the

defendant Postal Inspectors.  *Moore v. Hartman*, 388 F.3d 871, 872-3 (D.C. Cir. 2004) (*Moore*

*III*).  With respect to the first ground, the Court cited an earlier decision in *Haynesworth v.*

*Miller*, 820 F.2d 1245 (D.C. Cir. 1987), stating that "[n]owhere does [that decision] suggest that

---

[10] The Circuit disagreed with the district court's view that "[e]ven if . . . Spartin's testimony 'caused' the indictment, this would not satisfy the first element because a grand jury indictment cannot by itself initiate a prosecution," *Moore II*, 213 F.3d at 711 (quoting *1998 Decision*, No. 92-CV-2288, at 36-37), concluding instead that a "criminal proceeding is a prerequisite to the malicious prosecution tort.  If the proceeding starts with a grand jury indictment and the defendant procured the indictment, the first element of the tort is satisfied," *id.*

lack of probable cause is an element of the claim, nor does its silence imply such a requirement."

*Moore III*, 388 F.3d at 878.  Rather, "[t]he standard *Haynesworth* articulated is this: once a

plaintiff shows protected conduct to have been a motivating factor in the decision to press

charges, the burden shifts to the officials to show that they would have pursued the case anyway.

Given that probable cause usually represents only one factor among many in the decision to

prosecute—some others being the strength of the evidence, the resources required for the

prosecution, the relation to enforcement priorities, and the defendant's culpability—there is no

reason to expect that the mere existence of probable cause will suffice under *Haynesworth* to

protect government officials from liability."  *Id.*  Accordingly, the Circuit held that lack of

probable cause is not required to establish a *Bivens* retaliatory prosecution claim in this Circuit.

*Id.* at 879 ("several other circuits require lack of probable cause in retaliatory prosecution actions

. . . these cases, however, are not the law of this circuit—*Haynesworth* is") (citations omitted).

With respect to the second ground on which the defendant Postal Inspectors sought

summary judgment, the Court explained that, while "[q]ualified immunity generally shields

public officials from civil damages insofar as their conduct does not violate clearly established

statutory or constitutional rights of which a reasonable person would have known," *id.* at 872-73

(internal quotations and citations omitted), this was not the circumstance presented.  Instead, "the

clearly established law of this circuit barred government officials from bringing charges they

would not have pursued absent retaliatory motive, regardless of whether they had probable cause

to do so."  *Id.* at 872.  As applied in this case, the Court found that "what the inspectors were

doing—prosecuting a case they otherwise would have left alone—violated the First

Amendment."  *Id.* at 885.  Thus, the Court affirmed the district court's finding that the defendant

Postal Inspectors were not entitled to qualified immunity on the plaintiff's *Bivens* retaliatory

prosecution claim and remanded the case "reassur[ing] *both* sides" that "the next step, presumably, will be preparation for trial." *Id.* at 886 (emphasis in original).

### d. 2006 Supreme Court Review Requiring Proof of No-Probable Cause for FTCA Malicious Prosecution Claim

The next step, however, was not trial but rather consideration by the Supreme Court, which agreed with the defendant Postal Inspectors that "want of probable cause must be alleged and proven" to establish that a prosecution was induced in retaliation for protected speech. *Hartman v. Moore*, 547 U.S. 250, 252 (2006).  Moreover, the Supreme Court placed the onus on the plaintiff to "show that the criminal action was begun without probable cause for charging the crime in the first place." *Id.* at 258.  In reaching this conclusion, the Supreme Court reasoned that "the need to prove a chain of causation from animus to injury, with details specific to retaliatory-prosecution cases, . . . provides the strongest justification for the no-probable-cause requirement." *Id.* at 259.  The Court recognized that proving this causal connection is difficult, *id*. 261-265, but nevertheless specifically stated that "a plaintiff like Moore must show that the nonprosecuting official acted in retaliation, and must also show that he induced the prosecutor to bring charges that would not have been initiated without his urging." *Id.* at 262.  Accordingly, having found absence of probable cause to be an element of the plaintiff's claim, the Supreme Court reversed and remanded the action.[11]

### e. 2007-2009 Appellate Reversal of District Court's Dismissal of Both *Bivens* and FTCA Claims

On remand to the district court, the defendants moved for summary judgment on the two claims remaining—the *Bivens* claim of retaliatory prosecution against the Postal Inspectors and the FTCA malicious prosecution claim against the United States—on the ground that "the

---

[11] This Supreme Court decision is discussed in more detail, *infra*, Part VI. C.3., in connection with the plaintiff's motion for a new trial.

plaintiff cannot prove the absence of probable cause." *2008 Decision*, 569 F. Supp. 2d at 134. While recognizing that "[o]rdinarily, when the facts are in dispute, the question of probable cause is one for the jury," the district court concluded that, in this case, "[a] valid indictment conclusively determines the existence of probable cause to bring charges against a suspect." *Id.* at 137. "Because the plaintiff is unable to establish lack of probable cause," *id.* at 134, the court granted summary judgment to the defendants and dismissed both the plaintiff's *Bivens* retaliatory prosecution claim against the Postal Inspector defendants as well as the FTCA malicious prosecutions claim against the United States. *Id.* at 141.

On appeal, in its fourth opinion pertaining to this action, the D.C. Circuit again disagreed with the district court's reasoning for dismissing the plaintiff's claims and remanded the case. *Moore v. Hartman*, 571 F.3d 62, 65 (D.C. Cir. 2009) (*Moore IV*). With regards to the *Bivens* claim, the Circuit explained that "[u]nder the Supreme Court's decision, the three elements of a retaliatory prosecution claim are that: (1) the appellant's conduct allegedly retaliated against or sought to be deterred was constitutionally protected; (2) the government's bringing of the criminal prosecution was motivated at least in part by a purpose to retaliate for or to deter that conduct; and (3) the government lacked probable cause to bring the criminal prosecution against the appellant." *Id.* at 65 (citing *Hartman*, 547 U.S. at 265-66 and *Moore II*, 213 F.3d at 709 (describing the first two elements of a retaliatory prosecution claim)). Likewise, the Circuit recognized that a malicious prosecution claim requires, among other elements, proof of "lack of probable cause for the underlying prosecution." *Id.* at 66 (citations omitted).

The Circuit rejected the district court's finding that an indictment is conclusive evidence of probable cause and held that an indictment is *prima facie* evidence of probable cause and merely creates a presumption, which may then be rebutted by contrary evidence. *Id.* at 67-68.

The case was remanded with instructions to "take into account the rebuttable presumption in favor of probable cause" and "consider whether appellant has offered enough evidence to create a genuine issue of material fact as to the legitimacy, veracity, and sufficiency of the evidence presented to the grand jury." *Id.* at 69.  Under this standard the plaintiff needed to "present evidence that the indictment was produced by fraud, corruption, perjury, fabricated evidence, or other wrongful conduct undertaken in bad faith" to overcome the *prima facie* evidence of probable cause presented by the indictment.  *Id.*

### f.      2010-2013 District and Circuit Courts' Denial of Summary Judgment on Both *Bivens* and FTCA Claims

Upon remand, all defendants moved again for summary judgment on both the *Bivens* retaliatory prosecution and FTCA malicious prosecution claims, arguing that even under the Circuit's "newly articulated standard" the plaintiff could not establish lack of probable cause for his indictment.  *Moore v. Hartman*, 730 F. Supp. 2d 174, 177 (D.D.C. 2010) (*2010 Decision*). Specifically, the defendants contended that "no evidence" shows that the alleged improper conduct of the defendants "resulted in the grand jury indictment" and, in any event, "probable cause existed to prosecute [the plaintiff]." *Id.* at 178.  The court denied the defendants' renewed motion for summary judgment because of the existence of "a genuine issue of material fact as to whether the government lacked probable cause to prosecute him." *Id.* at 175.  This conclusion rested on the following evidentiary proffer, from which a "reasonable factfinder could conclude the government procured the plaintiff's indictment through wrongful conduct undertaken in bad faith and that the government lacked probable cause to prosecute the plaintiff," *id.* at 179 (internal quotation and citations omitted): (1) "'the prosecutor made statements to grand jury witnesses to 'not reveal' certain portions of their testimony to the grand jury;'" (2) "'senior attorneys in the U.S. Attorney's Office allegedly stated in memoranda that the government's

evidence against [the plaintiff] was 'extremely thin,' and openly questioned whether charges should be brought against [him];'" (3) "'the postal inspectors stated in a memorandum after the grand jury investigation that witnesses could testify that [the plaintiff] was not aware of the conspiracy;'" and (4) "'the postal inspectors improperly showed GAI Officer Spartin other witnesses' grand jury statements, intimidated Spartin by threatening to prosecute his son and tearing up his plea agreement, and lobbied the U.S. Attorney's Office to prosecute [the plaintiff].'" *Id.* (brackets in original; quoting *Moore IV*, 571 F.3d at 65).

The defendant Postal Inspectors appealed the denial of summary judgment on the *Bivens* claim, on grounds that, even if probable cause were lacking, their mistaken belief that probable cause was present – "termed 'arguable probable cause'"– entitled them to qualified immunity. *Moore V.* 644 F.3d at 422.  Although in the Fourth Amendment context, arguable probable cause "shields a defendant from a Fourth Amendment wrongful prosecution claim as well as a Fourth Amendment arrest claim," the D.C. Circuit concluded in its fifth opinion in this case that "arguable probable cause does not apply to a First Amendment retaliatory inducement to prosecution case because probable cause is not an element of the First Amendment right allegedly violated."  *Id.* at 423 ("Unlike the Fourth Amendment claim, however, the First Amendment does not itself require lack of probable case in order to establish a retaliatory inducement to prosecution claim."); *id*. at 426 ("we conclude that the doctrine of arguable probable cause does not apply to a First Amendment retaliatory inducement to prosecution claim.").  The Circuit stressed that, per the Supreme Court's 2006 holding, "'probable cause' (not *arguable* probable cause) must be pleaded and proven as an element of a plaintiff's case in order to establish a causal link between those inducing the prosecution and the prosecutors themselves" – and "[w]hether the Postal Inspectors had probable cause is a disputed issue of fact

to be decided by the jurors at trial." *Id*.  Accordingly, the Circuit affirmed the district court's

conclusion that the Postal Inspectors were not entitled to qualified immunity on the grounds of

arguable probable cause.  *Id.*

The Postal Inspectors appealed this ruling that they were not entitled to qualified

immunity to the Supreme Court, which, on June 11, 2012, vacated the 2011 D.C. Circuit opinion

in *Moore V* and remanded the case with instructions to give the matter further consideration in

light of the decision in *Reichle v. Howards*, 132 S. Ct. 2088 (2012); *see Hartman*, 132 S.Ct.

2740.  In *Reichle*, the Supreme Court found that its 2006 *Moore v. Hartman* decision and

subsequent appellate decisions had muddied the legal waters and "injected uncertainty into the

law governing retaliatory arrests," *id*. at 2096, making it unclear to a reasonable person, at the

time of the alleged First Amendment retaliatory arrest in the *Reichle* case, that "an arrest

supported by probable cause could [still] give rise to a First Amendment violation," thereby

entitling the officer in *Reichle* to qualified immunity.  *Id.* at 2097.

On remand, in a single page opinion, the D.C. Circuit provided its final word before trial

on this matter, reinstating the 2011 opinion in *Moore V,* with the following explanation:

> Because retaliatory arrest and retaliatory prosecution are distinct constitutional violations
> and because the precedent in *this* Circuit clearly established in 1988, when the challenged
> conduct by the Postal Inspectors took place, the contours of the First Amendment right to
> be free from retaliatory prosecution, nothing in *Reichle* changes our conclusion that the
> absence-of-probable-cause requirement is not "an element of a First Amendment
> retaliation violation."  *Moore V*, 644 F.3d at 424.  If the Postal Inspectors believe that the
> Court in *Reichle* meant to decide what it refused to decide in *Hartman* and bring to a halt
> this three decades old case involving evidence that, unlike in *Reichle* where probable
> cause was conceded, 'comes close to the proverbial smoking gun," *Moore v. Hartman*,
> 388 F.3d 871, 884 (D.C. Cir. 2004) ('*Moore III*'), they are free to once again petition for
> certiorari and ask the Supreme Court if it wishes to end this saga.

*Moore V*, 704 F.3d at 1004.[12]  The defendants took the Circuit up on its invitation, again petitioning the Supreme Court for *certiorari*, which request was denied in October 2013.  The case then proceeded to the jury trial on the plaintiff's remaining two *Bivens* and FTCA claims.[13]

### 3.   *Pre-Trial Motions in Limine*

Prior to trial, the parties filed multiple motions *in limine*, regarding, *inter alia*, at least eighteen separate evidentiary issues.  *See, e.g.*, Defs.' Omnibus *Motion in Limine*, ECF No. 417, 419; Pl.'s Mot. Concerning Source of Payment of Any Judgment, ECF No. 422; Pl.'s Mot. to Exclude References to "Presumption" of Probable Cause, ECF No. 420; Defs.' Mot. to Exclude the Testimony of Pl.'s Damages Experts, ECF No. 418; Pl.'s Mot. to Exclude Certain Testimony by Defense Expert Witness Jerald Udinsky, ECF No. 423.  These pre-trial motions were promptly resolved in order for the trial to commence on June 23, 2014.  *See* Minute Order, dated June 17, 2014; Minute Order, dated June 20, 2014.  The plaintiff seeks to re-litigate three of the pretrial motions *in limine* as part of his motion for a new trial, which motion challenges the rulings: (1) excluding indemnification evidence; (2) granting the defendants six rather than three preemptory challenges; and (3) excluding a prior judicial opinion.  *See, infra,* Part VI. A. and B.1. & 2.

---

[12] Although the Circuit noted that "the absence-of-probable-cause requirement is not 'an element of a First Amendment retaliation violation,'" *Moore VI*, 704 F.3d at 1004, the lack of probable cause must still be pled and proven as an element of a *Bivens* action for retaliatory inducement to prosecution.  In *Moore V*, the Circuit addressed whether the probable cause requirement was inherent in the "First Amendment right allegedly violated." *Moore V*, 644 F.3d at 423.  Although probable cause does not inhere in an individual's First Amendment right, as opposed to an individual's Fourth Amendment right, the lack of probable cause must nevertheless "be pleaded and proven, as an element of a plaintiff's case" for retaliatory inducement to prosecution because of its relation to the causation inquiry.  *Moore V*, 644 F.3d at 424 (citing *Hartman*, 547 U.S. at 265–66)).

[13] This case was reassigned to the presiding Judge on June 2, 2014, *see* ECF No. 108, due to recusal of the prior Judge and shortly before the scheduled trial date. That recusal prompted the plaintiff to move to vacate several prior adverse pre-trial rulings, which motion was granted.  *See* Minute Order, Case No. 92-2288 (D.D.C. June 6, 2014), ECF No. 453.

### 4.  Trial

At the concurrent four week FTCA bench and *Bivens* jury trial the plaintiff presented a total of twenty-three witnesses, only eleven of whom provided live testimony, and over 200 trial exhibits.[14]  For the majority of his witnesses, the plaintiff presented lengthy portions of depositions by screening videotapes of the depositions or reading aloud from the deposition transcripts.[15]  The plaintiff presented the testimony of: (1) the plaintiff; (2) the five Postal Inspector defendants, via pretrial depositions; (3) two former colleagues of the plaintiff at REI;[16] (4) Peter Voss, the former Vice Chairman of USPS BOG, who was convicted for his participation in the illegal scheme, via *de bene esse* deposition;[17] (5) the former Chairman of the USPS BOG, the former Postmaster General and other senior managers at USPS;[18] (6) former AUSA Valder, via pretrial deposition, and one of his supervisors from the DC USAO;[19] (7) Charles Stillman, the plaintiff's defense counsel at his criminal trial; (8) Helene Goldberg, a

---

[14] The list of exhibits admitted into evidence by the plaintiff and by the defendants are docketed at Case No. 93-324, ECF Nos. 121, 122, respectively.

[15] The plaintiff chose to present deposition testimony from seven witnesses -- the five defendant Postal Inspectors, former AUSA Valder and former Chief Postal Inspector Charles Clauson-- even though these witnesses were available to testify live and, in fact, testified live on the defense case. The plaintiff initially indicated in the Joint Pretrial Statement that the deposition testimony would only be offered if the witness were "not available for live testimony," JPTS, Annex A at 3-5, ECF No. 438-1, but then designated significant portions of the depositions to use instead of the live testimony. The defendants objected to the plaintiff's designation of these witnesses' depositions, since the plaintiff had made no showing of the witnesses' unavailability.  JPTS, Annex E, generally, ECF No. 438-5.  Nevertheless, the Court permitted the plaintiff to present these witnesses' deposition testimony, *see* Fed. R. Civ. P. 32(a) (1) and (a) (2); Fed. R. Evid. 611(a), 803(d) (2), despite the fact that this litigation strategy prolonged the trial by necessitating the presentation of these witnesses twice to the jury – first, on the plaintiff's case, by deposition, and then again on the defense case, by live testimony – and despite the well-recognized fact that live testimony is usually preferable to the tediousness of presentation of lengthy depositions.

[16] These witnesses were William C. Hittinger, the plaintiff's friend and member of the REI Board of Directors, who testified via pretrial deposition, and Frank Bray, the vice president and manager of Postal Programs at REI, who testified live.

[17] Over the defendants' objection, the plaintiff's motion to take the *de bene esse* deposition of Peter Voss shortly before trial was granted. Minute Order, June 6, 2015.

[18] These witnesses were Paul Carlin, former Postmaster General; James Jellison, former Senior Assistant Postmaster General; Charles R. Clauson, former Chief Postal Inspector; and John R. McKean, former Chairman of the BOG, all of whom testified via pretrial deposition.

[19] Charles Leeper, former Deputy Chief of Special Prosecutions at the DC USAO, testified live.

former Director of the Constitutional and Specialized Torts Branch at the Department of Justice, who testified via deposition as the government's witness under Federal Rule of Civil Procedure 30(b)(6);[20] and (9) five witnesses on the alleged damages sustained by the plaintiff, including three persons proferred as experts under Federal Rule of Evidence 702, as well as the plaintiff's son and a long-time friend.[21]

The defendants presented over 100 trial exhibits and the testimony of nine witnesses, including the live testimony of the four living defendant Postal Inspectors, former AUSA Valder, two former supervisors from the DC USAO,[22] and a witness proffered as a damages expert.[23]

Following presentation of the twenty-six unique witnesses and admission of 305 trial exhibits, the jury returned a verdict for the Postal Inspectors, finding that the plaintiff had failed to prove by a preponderance of the evidence that he was criminally prosecuted in retaliation for his First Amendment protected activities.  Thereafter, the parties filed approximately 400 pages of proposed findings of fact as well as their respective proposed conclusions of law on the FTCA claim, and the plaintiff moved for a new jury trial.  *See* Pl.'s Mot., ECF No. 511; Pl.'s COLs, ECF No. 125; Defs.' Proposed Concls. of Law ("Defs.' COLs"), ECF No. 127; Defs.' Errata on its Proposed Concls. of Law (Defs.' Errata COLs"), ECF No. 128; Pl.'s Reply in Supp. of COLs ("Pl.'s Reply COLs"), ECF No.131.

The plaintiff's FTCA claim for malicious prosecution is addressed first before turning to the plaintiff's motion for a new jury trial on the *Bivens* claim for retaliatory prosecution.

---

[20] At the time of her video-taped deposition, Ms. Goldberg was retired but under contract with the Department of Justice to provide testimony in this matter.

[21] As discussed more fully, *infra*, in Part III.D., the witnesses proffered by the plaintiff as his damages experts were Dan Cruse, who has worked as an executive recruiter, and two economists, Dr. Charles Betsey and Dr. Philip Fanara.

[22] The two former DC USAO supervisors called to testify in the defense case were H. Marshall Jarrett, former Chief of the Criminal Division, and Paul L. Knight, former Chief of Special Prosecutions.

[23] The defendants' damages expert was Dr. Jerald Udinsky, a financial and rehabilitation economist.

## II.   LEGAL STANDARDS

### A.  Law Applicable to FTCA Claim

The United States, as a sovereign, is absolutely immune from suit and, unless Congress has unequivocally consented to permit a cause of action, no court has jurisdiction to entertain a claim against the United States.  *United States v. Sherwood*, 312 U.S. 584, 586-87 (1941); *United States v. Testan*, 424 U.S. 392, 399 (1976).  Congress created a limited waiver of sovereign immunity of the United States by enacting the FTCA, the provisions of which must be strictly construed in favor of the United States.  *See Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 261 (1999); *United States v. Mitchell*, 445 U.S. 535, 538 (1980); *United States v. Kubrick*, 444 U.S. 111, 117-18 (1979); *Tri-State Hosp. Supply Corp. v. United States*, 341 F.3d 571, 575 (D.C. Cir. 2003); *Girdler v. United States*, 923 F. Supp. 2d 168, 186 (D.D.C. 2013).

The FTCA creates liability for certain torts committed by agencies of the United States or their employees "in the same manner and to the same extent as a private individual under like circumstances . . . ."  28 U.S.C. § 2674; *see Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 217-18 (2008) ("In the FTCA, Congress waived the United States' sovereign immunity for claims arising out of torts committed by federal employees.").  The Supreme Court has explained that "the effect of the Tort Claims Act is to waive immunity from recognized causes of action, not to visit the Government with novel and unprecedented liabilities."  *United States v. Brown*, 348 U.S. 110, 112-13 (1954) (internal quotation marks and citation omitted).

Generally, the FTCA does not allow for malicious prosecution claims against the United States.  28 U.S.C. § 2680(h) ("The provisions of this chapter and section 1346(b) of this title shall not apply to . . . [a]ny claim arising out of . . . malicious prosecution . . .").  An exception exists, however, "with regard to acts or omissions of investigative or law enforcement officers."  *Id.*  The D.C. Circuit has concluded that the Postal Inspectors involved in the investigation of the

plaintiff are "investigative or law enforcement officers," within the meaning of the FTCA. *Moore II*, 213 F.3d at 710-11, n.4.

When the exception does apply, the liability of the United States for the negligent or wrongful acts or omissions of its employees, acting within the scope of their employment, is determined "in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1); *see also FDIC v. Meyer*, 510 U.S. 471, 478 (1994) (noting that Supreme Court has "consistently held that § 1346(b)'s reference to the 'law of the place' means law of the State – the source of substantive liability under the FTCA" ) (collecting cases). In this case, the D.C. Circuit has already concluded that "[w]ith respect to Moore's FTCA action against the United States for malicious prosecution and abuse of process, 'the law of the place where the act or omission occurred' is controlling,'" and that "District of Columbia law must be consulted." *Moore II*, 213 F.3d at 710.[24]

### 1. *Federal Rule of Civil Procedure 52(a) Applicable to Findings and Conclusions by the Court*

Pursuant to Federal Rule of Civil Procedure 52(a), "[i]n an action tried upon the facts without a jury," the Court must "find the facts specially and state its conclusions of law separately." FED. R. CIV. P. 52(a)(1); *see Ascom Hasler Mailing Sys., Inc. v. U.S. Postal Serv.*, 885 F. Supp. 2d 156, 164 (D.D.C. 2012); *Foxtrap, Inc. v. Foxtrap, Inc.*, 671 F.2d 636, 638–39 n.1 (D.C. Cir. 1982); *FTC v. Beatrice Foods, Inc.*, 587 F.2d 1225, 1230 n.1 (D.C. Cir. 1978); *D.C. Fed'n of Civic Ass'ns v. Volpe*, 459 F.2d 1231, 1259 n.19 (D.C. Cir. 1971). The "[f]indings and conclusions may be incorporated in any opinion or memorandum of decision the court may

---

[24] The FTCA requires as a jurisdictional predicate that the plaintiff exhaust his administrative remedies. *See* 28 U.S.C. § 2675(a); *McNeil*, 508 U.S. at 107; *GAF Corp.*, 818 F.2d at 904. In this case, the defendants do not dispute that the plaintiff has exhausted his administrative remedies. *See* FTCA Compl. ¶ 48 ("On October 24, 1991, plaintiffs submitted claims to the United States Department of Justice and the United States Postal Service for the damages alleged in this Complaint. On April 27, 1992, the Department of Justice, acting on its own behalf and on behalf of the United States Postal Service, rejected the plaintiffs' claims."); Answer ¶ 48 ("Admitted").

file." *Defenders of Wildlife, Inc. v. Endangered Species Scientific Auth.*, 659 F.2d 168, 176 (D.C. Cir. 1981).

In setting forth the findings of fact, the court need not "address every factual contention and argumentative detail raised by the parties," *Mayaguez v. Corporacion Para El Desarrollo Del Oeste*, 824 F. Supp. 2d 289, 295 (D.P.R. 2011), or "discuss all evidence presented at trial," *Wachovia Bank N.A., Nat. Ass'n v. Tien*, No. 13-11971, 2014 WL 7399064, at *4 (11th Cir. Dec. 31, 2014). Instead, according to the Advisory Committee Notes for Federal Rule 52, "a judge need only make brief, definite, pertinent findings and conclusions upon the contested matters; there is no necessity for over-elaboration of detail or particularization of facts." *Caffey v. Togo*, 159 F.3d 635 (D.C. Cir. 1998) (internal quotation marks omitted); *see Fasolino Foods Co. v. Banca Nazionale del Lavoro*, 961 F.2d 1052, 1058 (2d Cir. 1992) ("[a]ll that is required by Rule 52(a) is that the trial court provide findings that are adequate to allow a clear understanding of its ruling").

Moreover, the court "[f]indings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous . . ." FED. R. CIV. P. 52(a)(6); *see Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573 (1985) ("Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.") (internal quotations and citation omitted); *Occidental Petroleum Corp. v. SEC*, 873 F.2d 325, 340 (D.C. Cir. 1989) (the "clear error" standard applies at least with regards to "the particularized factual findings that underlay the district court's determination").

**B. Federal Rule of Civil Procedure 59 Applicable to Plaintiff's Motion for New Trial**

Under Federal Rule of Civil Procedure 59, following a jury trial, the court may grant a motion for a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." FED. R. CIV. P. 59(a)(1)(A).  Rather than define the precise circumstances justifying a new trial, Rule 59 turns to case law and permits a new trial in those circumstances traditionally viewed as permitting a new trial.  *ABM Marking, Inc. v. Zanasi Fratelli, SRL*, 353 F.3d 541, 543 (7th Cir. 2003) ("Rule 59(a), in a bit of a circular way, allows new trials in cases where new trials have been traditionally allowed at law.").  "The court has the power and duty to order a new trial whenever, in its judgment, this action is required in order to prevent injustice."  11 *Charles Alan Wright & Arthur R. Miller, et al.*, FED. PRAC. & PROC. CIV. § 2805 (3d ed. 2012).  Accordingly, motions for a new trial are granted only when "the court is convinced that the jury verdict was a 'seriously erroneous result' and where denial of the motion will result in a 'clear miscarriage of justice.'"  *In re Lorazepam & Clorazepate Antitrust Litig.*, 467 F. Supp. 2d 74, 87 (D.D.C. 2006) (citation omitted); *see also Rice v. Dist. of Columbia*, 818 F. Supp. 2d 47, 60 (D.D.C. 2011) ("The standard for granting a new trial is not whether minor evidentiary errors were made but rather whether there was a clear miscarriage of justice."); *Nyman v. FDIC*, 967 F. Supp. 1562, 1569 (D.D.C. 1997) (same).

The high threshold for a new trial reflects the "well-settled" principle that "Rule 59 is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple.'"  *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 (2d Cir. 1998); *see also Aero Int'l, Inc. v. U.S. Fire Ins. Co.*, 713 F.2d 1106, 1113 (5th Cir. 1983).  "Although parties may certainly request a new trial or amended findings where clear errors or manifest injustice threaten, in the absence of such corruption of the judicial processes, where litigants have once battled for the court's decision, they should neither be

required, nor without good reason permitted, to battle for it again." *Int'l Ore & Fertilizer Corp. v. SGS Control Servs., Inc.*, 38 F.3d 1279, 1287 (2d Cir. 1994) (internal quotations and citation omitted).  Moreover, a Rule 59 motion is not the appropriate vehicle to revisit the strategic litigation decisions of counsel at trial.

"The authority to grant a new trial . . . is confided almost entirely to the exercise of discretion on the part of the trial court." *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36, (1980); *McNeal v. Hi-Lo Powered Scaffolding, Inc.*, 836 F.2d 637, 646 (D.C. Cir. 1988) ("The decision whether to grant a motion for a new trial is ordinarily 'entrusted to the sound discretion of the trial court.'" (quoting *Grogan v. Gen. Maint. Serv. Co.*, 763 F.2d 444, 447 (D.C. Cir. 1985)).  In exercising this discretion, the court must "be mindful of the jury's special function in our legal system and hesitate to disturb its finding." *Long v. Howard Univ.,* 512 F. Supp. 2d 1, 6 (D.D.C. 2007) (internal quotation marks and citations omitted).

The Supreme Court has made clear that "'[a litigant] is entitled to a fair trial but not a perfect one,' for there are no perfect trials." *McDonough Power Equip. v. Greenwood*, 464 U.S. 548, 553 (1984) (quoting *Brown v. United States*, 411 U.S. 223, 231-232 (1973)).  This principle is predicated on the sound pragmatic reasons that "[t]rials are costly, not only for the parties, but also for the jurors performing their civic duty and for society which pays the judges and support personnel who manage the trials.  It seems doubtful that our judicial system would have the resources to provide litigants with perfect trials, were they possible, and still keep abreast of its constantly increasing caseload." *Id.*  Thus, a "district court in passing on a motion for a new trial . . . must be guided by what substantial justice requires and must disregard errors that were harmless." FED. PRAC. & PROC. CIV., *supra*, § 2882.

### III.    FINDINGS OF FACT FOR PLAINTIFF'S FTCA CLAIM

The parties presented evidence on the plaintiff's FTCA claim over four weeks of trial. To facilitate review of this voluminous record, the findings of fact are divided into four sections: (1) the initiation and progression of the criminal investigation into the bribery and kickback scheme involving the Vice Chairman of USPS' BOG and others; (2) the investigation of the plaintiff and his co-defendants; (3) the consideration given within the DC USAO to bringing criminal charges against the plaintiff and his co-defendants; and (4) the plaintiff's alleged damages that he claims to have sustained as a result of being indicted.

### A.  Initiation and Progression of Investigation into Illegal Scheme

The plaintiff chose over twenty years ago to sue not only the United States under the FTCA but also the lowest level government employees involved in the investigation and prosecution of the criminal charges against him, despite the fact that virtually every significant step of this investigation leading to the indictment was approved by supervisory personnel.  To provide context for the actions taken by the Postal Inspectors and their supervisors, the Court first describes the structure of the USPS, including the allocation of responsibilities within USPS for the award of contracts, and the USPS procurements that were underway when this investigation began, before turning to the criminal investigation at issue in this lawsuit.

### 1.  Brief Overview of Pertinent Components of USPS

The USPS is structured with an eleven-person BOG, comprised of nine governors appointed by the President, the Postmaster General ("PMG") and the Deputy Postmaster General ("DPMG").  7/8/14 AM Tr. at 72-73 (Carlin testimony).  The PMG is appointed by the nine governors and then the nine governors and the PMG select the DPMG.  *Id.*  The PMG is the head of the USPS executive committee and the top manager within USPS.  Once named, the PMG is a

member of the BOG for all matters except rate-setting and classifications.  7/1/14 AM Tr. at 31

(Jellison Dep. testimony); 7/8/14 AM Tr. at 73 (Carlin testimony).

Two USPS committees figured in the investigation of the bribery and kickback scheme at

issue in this case:  BOG's Technology and Development Committee ("Technology Committee")

and USPS management's Capital Investment Committee ("CIC").  During the relevant time

period of the conspiracy, the Technology Committee had four members: Vice Chairman Peter

Voss, Ruth Peters, George Camp, and DPMG Jackie Strange.  7/8/14 AM Tr. at 24 (Carlin

testimony); 7/10/14 AM Tr. at 99 (Clauson testimony).  The Technology Committee was tasked

at the Board level with providing guidance on technology procurement issues within the USPS.

7/8/14 AM Tr. at 40 (Carlin testimony); 7/1/14 PM Tr. at 34 (Jellison Dep. testimony).  By

contrast, the CIC drew its members from senior USPS management and had the responsibility of

deciding on all major capital investments.  7/1/14 PM Tr. at 34 (Jellison Dep. testimony).  While

"smaller procurements were approved and handled on lower levels," significant contracts for

over approximately $10 million dollars, required CIC's approval.  7/10/14 AM Tr. at 99-100

(Clauson testimony); *see also* 7/1/14 PM Tr. at 58 (Jellison Dep. testimony that: "if it were over

$5 million, it had to go to the board for approval.").

The Postal Inspection Service is a USPS component with the mission of investigating

waste, fraud and abuse within this government agency.  Clauson Dep. at 16, Sept. 3, 1999 ("[t]he

Postal Inspector is charged with responsibilities of carrying out the audit and criminal

investigative and security missions of the United States Postal Service"); 7/8/14 AM Tr. at 58

(Carlin testimony).  As such, Postal Inspectors are federal law enforcement officers and

authorized to carry firearms and make arrests.  7/10/14 AM Tr. at 84 (Clauson testimony).  With

respect to criminal matters, the Postal Inspection Service operates highly independently of USPS

management.  7/8/14 AM Tr. at 58-59 (Carlin testimony); 7/10/2014 AM Tr. at 135-36 (Clauson testimony).

### 2.  *USPS Automation Program*

From the 1970s to the early 1980s, the USPS began an automation program to transition from sorting mail by hand to use of automated mail sorting machines.  As part of this process, in 1980, the USPS decided to use optical character reading ("OCR") equipment that could identify key information in addresses to facilitate mail routing and delivery.  Pl.'s Ex. 538 ¶ 1 (Stipulated Facts).  Machines capable of reading a single line of the zip code at the bottom of an address were known as single-line optical readers ("SLOCR").  *Id.* ¶ 2.  In "Phase I" of the USPS' mail automation process, which began in 1980, SLOCR machines were purchased from Pitney Bowes and Burroughs Corporation.  *Id.*  To implement Phase I most effectively, in the early 1980s, the USPS urged customers to use nine-digit ZIP codes ("ZIP+4"), which would provide sufficient routing information on the last line of an address to allow SLOCR machines to sort mail more granularly.  *See* 7/7/14 AM Tr. at 36 (Jellison Dep. testimony); Robert Edwards Dep. 72, Feb. 15, 2000.  As the plaintiff recognized, the USPS urged adoption of the nine-digit Zip codes because "it simplified the automation strategy, and the problem [USPS was] having is they had tremendous amount of mail and . . . all these employees who had to sort it."  6/24/14 AM Tr. at 117 (Plaintiff testimony).

At the time that USPS deployed the SLOCR machines, the technology for multi-line OCR machines ("MLOCR"), which could "read" more than the single, bottom line in an address, was still in the developmental stages.  Indeed, USPS had invested almost $70,000,000 in REI for research and development of MLOCR machines.  6/24/14 AM Tr. at 104-05 (Plaintiff testimony: "I think we had received up to that point somewhere between 50 to 70 million dollars over a number of years in development funds . . ..");  6/25/14 AM Tr. at 70 (Plaintiff testimony: "And

the postal service had given us, prior to my arrival, close to $70 million to build machines.").  In addition, by 1983, the USPS had deployed five of the REI prototype MLOCR machines in various field offices for testing.  Pl.'s Ex 25 at 32 (U.S. Office of Technology Assessment report, dated June 1984 ("OTA Report")).  In the view of USPS, these field tests confirmed continuing operational concerns with the REI machines and, consequently, the USPS did not believe that REI's MLOCR machines were a viable option for mass deployment.  7/1/14 PM Tr. at 6 (Jellison Dep. testimony: "Q: You were opposed to going with REI, weren't you, Mr. Jellison? A: Not with REI. With the read machine they were offering as a multi-line machine").  At the same time, however, customers were not adopting the use of Zip+4 as projected by USPS, which reduced the performance of, and efficiency savings from, SLOCR machines.  7/15/14 PM Tr. at 101 (Edwards testimony); 6/24/14 AM Tr. at 117 (Plaintiff testimony).

Despite the slow adoption of Zip+4, in January 1984, the BOG approved funding for "Phase II" of its automation strategy, which included the purchase of additional SLOCR machines.  Pl.'s Ex. 538 ¶ 7 (Stipulated Facts).

Six months later, in June 1984, the United States Office of Technology Assessment issued a report entitled, "Review of Postal Automation Strategy, A Technical and Decision Analysis, A Technical Memorandum," in response to congressional requests "to conduct a comparative technical and economic analysis" of SLOCRs and MLOCR machines.  Pl.'s Ex. 25 at 1 (OTA Report).  The OTA Report acknowledged that "multi-line OCR may not have been a technically viable alternative 3 or 4 years ago when USPS made its initial decision to go with single-line OCRs," *id.* at 3, and that "[i]n the 1976-1980 period, when the basic USPS automation program was developed, the single-line optical character reader was, in the opinion of USPS, the only proven equipment," *id.* at 16.  The OTA Report noted that "[i]n the late

1970's, USPS procured one multi-line OCR from REI" that "did not satisfy USPS performance requirements, but the single-line OCRS of five foreign manufacturers did." *Id.* at 32.  The OTA Report found that, with USPS research and development support, "REI has developed one of the leading multi-line OCRs on the world market," *id.* at 8, and that "USPS test data indicate that the multi-line OCR performance is now [as of June 1984] fully competitive with single-line OCR performances," *id.* at 32.  Given that MLOCRs "offer[] a significant technical performance advantage over [SLOCRs] in processing 5-digit ZIP mail to the 9-digit level," *id.* at 33, the OTA Report recommended a "strategy offering the greatest economic return to USPS," namely: that "USPS proceed with the Phase II single-line OCR procurement, but simultaneously initiate release-loan testing…on single- to multi-line conversion, and then convert all single-line OCRs to multi-line as soon as possible, regardless of the level of Zip+4 use," *id.* at 3.

Consistent with the recommendation in the OTA Report to "proceed with the Phase II [SL]OCR procurement," on July 9, 1984, the BOG referred the matter of the Phase II automation procurement to the BOG's Technology Committee.  Pl.'s Ex. 538 at ¶ 10 (Stipulated Facts).  The contract for Phase II of the automation program to supply 403 SLOCR machines, at a cost of $200,000 each, was awarded, on July 10, 1984, to Electrocom Automation, Inc. ("ECA"), a domestic company that licensed the OCR technology from a German company, AEG-Telefunken ("AEG").  *Id.* at ¶ 11.

One year later, however, under the direction of PMG Paul Carlin, the USPS made a "mid-course" correction in the procurement process.  This mid-course correction provided for two additional phases of the automation program: Phase IIA would involve "the development and testing of a retrofit kit to enable the Phase II single-line OCRs to read multi-line, that is four lines of the address rather than just the last line of the address . . . In addition, a Phase III plan was

instituted which involved development and testing of a completely new multi-line machine to replace existing Phase I OCRs."  Pl.'s Ex. 229 at 58 (ZIP+4/Automation Investigative Report to Congress, dated Jan. 1987, by Postal Inspection Service ("ZIP+4 Report")).

### 3.  Summer of 1985 Initiation of Investigation of BOG Vice Chairman Voss

In January 1985, USPS came under new leadership when Paul Carlin succeeded William Bolger as Postmaster General.  Pl.'s Ex. 538 ¶ 12 (Stipulated Facts).  Under pressure to reduce operational losses and increase mail sorting automation in the face of low adoption of Zip+4 codes, PMG Carlin announced a mid-course correction on July 12, 1985 and, consistent with the OTA Report recommendation, further announced, on August 5, 1985, "that the next automation procurements would be decided by competitive testing, in two phases: Phase IIA would involve retrofitting ECA's existing SLOCRs with MLOCR capabilities, and Phase III would involve the purchase of new MLOCRs."  Pl.'s Ex. 538 ¶¶ 15, 16 (Stipulated Facts).  The contract for the Phase III purchase of new MLOCRs was estimated to be up to $400 million dollars.  7/10/14 AM Tr. at 93 (Clauson Testimony).  Set against this backdrop of procurement decisions, certain events occurred in the early summer of 1985 that raised the concern of PMG Carlin and the Chief Postal Inspector ("CPI") Charles Clauson about possible corrupt dealings on the BOG.

### a.  June 1985 CIC Meeting

At a June 1985 meeting of the CIC attended by CPI Clauson, who was a CIC member, DPMG Jackie Strange, who served as a member of BOG's Technology Committee, made an announcement that made "people in the room . . . aghast . . . and shocked" and "thirty years later [it was] still edged in [their] mind[s]."  7/10/14 AM Tr. at 100-01 (Clauson testimony).[25]  Ms. Strange advised that the CIC "would not be asked for a decision on [the OCR] procurement," *id.*

---

[25] CPI Clauson recalls that this was the first CIC meeting attended by Ms. Strange.  7/10/14 AM Tr. at 101 (Clauson testimony).

at 100, because the Technology Committee had decided to give a sole source procurement contract, without competition, to REI, *id.* at 101.   CPI Clauson testified that Ms. Strange's announcement was particularly disturbing because "the technology committee of the board specifically, is telling us [referring to the CIC] they want approval of this. They're telling us, not asking us to give them approval [for] . . .  sole source procurement."  *Id.* at 109.

After this meeting, CPI Clauson instructed Postal Inspector Dan Harrington to investigate what was going on within the Technology Committee.  7/10/14 AM Tr. at 102-03 (Clauson Testimony).  CPI Clauson  told Postal Inspector Harrington "that [he] wanted to really start checking out with greater intensity what was going on here, what the . . . technology committee of the Board of Governors was up to, who they were in contact with . . .[j]ust an inquiry to check out to see what was going on here."  *Id.* at 102-03.[26]  CPI Clauson testified that his "suspicions were directed directly at Voss."  *Id.* at 103.  His "suspicion" grew because he "saw Voss get himself assigned to the . . . technology committee . . . saw him place a person as the head of [the] technology committee who was generally considered incompetent, a person he could easily manipulate.  *Id.* at 108.

A few days after the CIC meeting, Ms. Strange "called [CPI] Clauson to her office for another reason . . . [a]nd at the conclusion of a brief discussion . . .she got up, closed the door and began talking about [the OCR] procurement."  *Id.* at 111.  Ms. Strange "indicated that Voss had threatened her regarding complying with his preference to give a sole source procurement contract to REI and that "he had misrepresented himself as speaking for the [BOG] in attempting to maneuver these preferences to actual commitment of a contract."  *Id.* at 115; *see* Defs.' Ex. 19 (Memorandum of Interview of Jackie Strange, dated July 18, 1985, by CPI Clauson ("Strange

---

[26] As noted, *supra*, at n. 5, the plaintiff originally named Postal Inspector Harrington as a defendant in the *Bivens* action, but he was subsequently dismissed after his death.

Interview")).  While "she had no evidence whatsoever of personal gain on the part of any

persons involved in the [OCR Procurement] process" Ms. Strange expressed "her belief that no

person would go to the extremes that Voss had gone to in an attempt to influence the

procurement without some personal gain."  *Id.* at 115; *see* Defs.' Ex. 19 (Strange Interview).

That same day, CPI Clauson arranged for Ms. Strange to speak to Postal Inspector Harrington

about Vice Chairman Voss' involvement in the OCR procurement process.  *Id.* at 116.

Ms. Strange's information that "she was being personally threatened" by Vice Chairman

Voss to award REI a sole source contract, highlighted for CPI Clauson the need to investigate

Vice Chairman Voss and he subsequently assigned additional inspectors.  *Id.* at 117.[27]  At this

time, the focus of the investigation was Vice Chairman Voss, not the plaintiff.  *Id.* at 118;

7/15/14 PM Tr. at 79-80 (Edwards testimony).

### b.  PMG Carlin's Suspicions Aroused

Just as CPI Clauson's suspicions had been heightened by Ms. Strange's announcement of

the BOG Technology Committee's direction to the CIC about awarding a sole source contract to

REI, PMG Carlin was concerned about the Technology Committee's focus on a single vendor,

REI, in the procurement process.  7/8/14 AM Tr. at 40-41 (Carlin testifying: "And I have to say

that in no other instance was the board so insistent on providing a contract to a specific

individual as this one."); *id.* at 119-20 (Carlin testifying: Peter Voss and Ruth Peters "in effect

became spokesmen for that organization"); *id.* at 120 (Carlin testifying: "you had one member of

the board who was in effect acting as if he was a surrogate for a single vendor and doing unusual

---

[27] The ZIP+4 Report to Congress describes the "quickly assembled" task force as consisting of "Regional Chief Inspector Joseph M. Kelly, along with Inspector Edwards and Inspector Bruce Chambers."  Pl.'s Ex. 229 at 294.  In addition to DPMG Strange, the inspectors interviewed H. Currie Boswell, another USPS manager, who corroborated information about pressure applied by Vice Chairman Voss to award a sole source contract to REI and who "advised the Inspectors that Governor Voss had made comments to others that their careers in postal management could be adversely affected if they did not support him on the MLOCR issue."  *Id.* at 294.

things").  Indeed, soon after Paul Carlin succeeded PMG William Bolger as USPS' PMG, Vice

Chairman Voss pressured PMG Carlin to meet with GAI as representatives of REI in January

1985.  7/8/14 AM Tr. at 121 (Carlin testifying that he agreed to meet with GAI because Vice

Chairman Voss "insisted").   Also at Vice Chairman Voss' request, PMG Carlin inspected REI's

MLOCR prototype equipment in Chicago.  *Id*. at 23 (Carlin testifying that at request of "Peter

Voss, a member of the board," he looked at prototype of REI machine "located in Chicago post

office" and "the day-to-day operating officials . . . said it's a nice machine.  It just doesn't help

us.  We don't use it at all."); *id*. at 44 (Carlin testifying "at the request of Peter Voss I did look at

. . . one of five that had been provided by REI.  What I found was that it was a nice machine.  It

just didn't work at that time in an operating environment.  And the operating people told me we

have too much mail coming through.  We just can't keep trying to mother this thing along.").

PMG Carlin described the depth of involvement in the procurement process of BOG

members as "highly unusual" and "out of the ordinary."  7/8/14 AM Tr. at 118.  This left the

distinct impression on him that "particularly one member . . .  seemed to me had a vested interest

in the outcome."  *Id.* at 56.  When PMG Carlin announced the mid-course correction in July,

1985, Vice Chairman Voss pushed for a sole source contract to be awarded to REI. 7/8/14 AM

Tr. at 23-24, 40-41 (Carlin testimony).  After he began cooperating, Vice Chairman Voss

confirmed that "he responded to the pressures of Gnau and Associates, Inc. and Recognition

Equipment, Inc. by pressuring Postmaster General Carlin and management to either award a sole

source contract to Recognition Equipment, Inc. or test the competing machines within the next

60 days" because he "believed that a tightened test schedule would favor Recognition

Equipment, Inc."  Defs.' Ex. 65 at 11 (Interview Summary of Peter E. Voss presented to grand

jury on August 28, 1986 ("Voss G.J. Interview Summary")); *see also* Pl.'s Ex. 165 at Bates

SMFC3 11402 ("Factual Foundation Supporting Guilty Pleas" of Peter Voss, dated May 30, 1986, stating: "During May, June and July 1985, Peter Voss encouraged, recommended and instructed the Deputy Postmaster General that USPS purchase the MLOCR system from the Dallas corporation" and "to bypass the established review/approval process").  PMG Carlin testified that he "had been a member of the senior management since postal reorganization for 15 years at that point.  Never once do I recall any single procurement, a company that was trying to get a contract, approaching and trying to manipulate the Board of Governors.  This was the sole exception."  7/8/14 AM Tr. at 118.

PMG Carlin was apparently not alone in observing suspicious conduct by BOG members. He testified about being "alerted by counsel to the Board of Governors that there was skullduggery going on and that somebody could go to jail."  7/8/14 AM Tr. at 50 (Carlin testimony).  Due to his concerns, PMG Carlin asked CPI Clauson to take the "highly unusual" step of assigning a Postal Inspector to monitor the new procurement phases instituted with the July 1985 mid-course correction, 7/8/14 PM Tr. at 57 (Carlin testimony), and ensure the process "was as fair and straightforward as it should be," *id*. at 117.  PMG Carlin publicly announced this measure in a July 14, 1985 memorandum to the BOG.  *Id.* at 56; Pl.'s Ex. 73 (PMG Carlin Memorandum to BOG, dated July 14, 1985).

To carry out PMG Carlin's instruction for a dedicated Postal Inspector to monitor the next procurement phases in the USPS automation program, CPI Clauson assigned Postal Inspector Edwards "to monitor the procurement of multi-line equipment."  7/15/2014 AM Tr. at 79 (Edwards testimony); Edwards Dep. at 25-26, Feb. 15, 2000.  Postal Inspector Edwards testified that, when given this assignment, CPI Clauson did not ask him to look into REI, and he

"did not care which vendor won the [OCR Procurement] competition, [he] simply wanted the most reliable, accurate, lowest cost vendor to win legitimately,"  7/15/14 AM Tr. at 79-80.

In sum, by July of 1985, after being informed by Ms. Strange that Vice Chairman Voss used threats to persuade her to comply with his desire to award a sole source multi-million dollar OCR procurement contract to REI, CPI Clauson had decided to open an investigation into the conduct of members of the BOG Technology Committee, particularly Vice Chairman Voss.  The concerns of PMG Carlin about the need to protect the procurement process only compounded CPI Clauson's suspicions.

### 4.  *Plaintiff and REI's Dealings with USPS Through Summer 1985*

By July 1985, when CPI Clauson assigned Postal Inspectors to begin an investigation into BOG's Technology Committee and Vice Chairman Voss, the plaintiff had been REI's CEO for slightly over three years.  In that time, he had undertaken a multi-pronged effort to increase USPS's purchases of REI's MLOCR machines.  The critical underpinning of the plaintiff's claim of malicious prosecution is that he was targeted for criminal investigation and prosecution due to those efforts and, in particular, the plaintiff's public criticism of USPS management for choosing to deploy SLOCR technology in the early 1980's.  In the plaintiff's view, his aggressive pursuit of USPS business for REI generated animosity towards him and his company by USPS management and resulted in his indictment.  In evaluating the merits of this claim, a brief review of the historical business dealings between REI, the plaintiff and the USPS is helpful.

Significantly undercutting the plaintiff's view that USPS animosity towards the plaintiff was due to his public criticism of the USPS automation program is the evidence presented by the plaintiff at trial showing that *before* the plaintiff had engaged in any First Amendment protected activity, REI already had a "strained" relationship with USPS.  6/24/14 AM Tr. at 112 (Plaintiff

testimony).   Indeed, he testified that upon becoming CEO of REI in 1982, he set out to fix the company's relationship with USPS, since REI was on the brink of bankruptcy and increasing the postal business was one way to help turn the company around.  6/24/14 AM Tr. at 100-10.  The plaintiff testified that his strategy to stabilize REI financially was "[n]ot at all" dependent on getting USPS business and that his decision "was whether we are going to pull the plug on postal or we were going to double down."  6/24/14 AM Tr. at 110; *id.* 6/25/14 PM Tr. at 66 (Plaintiff testifying that: "I was trying to . . . decide whether to fish or cut bait with the postal service.").

 Shortly after he joined REI, the plaintiff reached out to then PMG William Bolger to "kind of try to smooth things out."  6/24/14 AM Tr. at 114 (Plaintiff testimony).  PMG Bolger agreed to meet with the plaintiff about the state of REI's technology, *id.* at 115, and even suggested that REI might benefit from using a consulting firm, *id.* at 120.  As reported in a Postal Inspector memorandum summarizing a November 20, 1985 meeting with the plaintiff, the plaintiff advised that PMG Bolger had "cited the past arrogance of REI management, but indicated there was no reason they could not do business in the future."  Pl.'s Ex. 105 at 2.

At the time of the plaintiff's meeting with PMG Bolger in early 1982, USPS had already made a multi-year, multi-million dollar research and development investment in REI and had purchased about five REI prototype machines that were installed in various USPS field locations. *Id.* at 117-18; Pl.'s Ex. 25 at 32 (OTA Report noting that "USPS has provided enough support over the last 14 years to [REI] (of Dallas, Texas) such that REI has developed one of the leading multi-line OCRs on the world market").  The plaintiff admitted that "there were some criticism" of the performance of REI's MLOCR machines but attributed that to deficient air-conditioning at some locations.  6/24/14 AM Tr. at 118, 133.  While the plaintiff did not believe the criticisms to be "a show-stopper to us," this was apparently not a view shared by USPS, which had

experienced scheduling delays and other issues with REI's performance.  *See, e.g.*, 7/1/14 PM

Tr. at 20 (Jellison testifying: "we did not want to buy the machine that [REI] had.  The machine

was not up to date technologically, and we did not want to buy more of those machines."); 7/8/14

AM Tr. at 116 (Carlin testifying that he inspected an REI prototype machine in Chicago and "[i]t

was not operating"); Pl.'s Ex. 291 at Bates SMFC4 00006 ("Details of Offense" prepared by

Postal Inspectors, reporting that "[t]he USPS experience with REI was marred by cost overruns,

delays in delivery of contracted services and unsatisfactory performance of machines after

installation."); Defs.' Ex. 55 at 4 (Postal Inspectors' Preliminary Report, dated February 1986,

noting that "[t]he REI-USPS relationship, however, had been unsatisfactory and prone to cost

overruns, missed delivery schedules and equipment that was not state of the art.").

Rather than focus on fixing the problems perceived by USPS with REI's MLOCR

machines, the plaintiff pushed forward with finding ways to secure more business.  *See, e.g.*,

Pl.'s Ex. 196 at 10 (Interview Summary of Michael Marcus presented to grand jury on Oct. 23,

1986 ("Marcus G.J. Interview Summary") reporting Marcus statement that, at GAI's first

meeting at REI Headquarters, "it was apparent that REI wished to continue a political approach .

. . based on Robert Reedy's instruction to stay away from the technical details and statistics when

discussing the REI multi-line machine with USPS management").  Indeed, the plaintiff did not

testify about doing anything to address any perceived problems with the operations of REI's

MLOCR machines.  Instead, REI hired a Washington, D.C.-based consulting firm, Hill &

Knowlton, to "go after a lot of government business, including postal" and to "understand better

the various procurement strategies of government agencies.  6/24/14 AM Tr. at 119 (Plaintiff's

testimony).

In addition, the plaintiff testified that he lobbied Congress "fifty" times on this issue. *Id.* at 123-24. The plaintiff wanted members of Congress to "understand that [REI] had the only machine–I know it was American built–that could satisfy the long-term needs of the postal service to process mail" and that was the "theme that [the plaintiff] kept hitting." *Id.* at 124. He also testified critically before Congressional committees about USPS' commitment to SLOCR machines because he "didn't think the ZIP +4 projections were anywhere near reasonable and [that the USPS] had to fall back and go to the multi-line approach." *Id.* at 127.

In both August and November 1983, the plaintiff wrote to PMG Bolger urging the USPS to reconsider deployment of SLOCR technology. Pl.'s Ex. 11 (Letter, dated August 24, 1983, from plaintiff to Bolger); Pl.'s Ex. 16 (Letter, dated November 14, 1983, from plaintiff to Bolger). In response to the latter letter, the plaintiff recalled that PMG Bolger indicated that a study by the Congressional Office of Technology Assessment ("OTA") "was coming" to evaluate the automation project and that the plaintiff "should kind of hold off [his] criticisms." 6/24/14 AM Tr. at 127-28. In fact, the plaintiff testified that he was aware of the OTA study and had communicated his critical views about USPS' choice of SLOCR technology with the members of Congress who had requested the study, or their staffs. *Id.* at 131. Indeed, according to another witness, OTA staff preparing the OTA Report "had been very well briefed by REI," which "had a heavy influence on the perception that these guys got." 7/1/14 PM Tr. at 45 (Jellison Dep. testimony). When the OTA Report was issued in June, 1984, the plaintiff "felt vindicated" and "because [REI] had the only multi-line machine that was deployable," he thought REI was "in a position to get some business." 6/24/2014 AM Tr. at 132- 134.

As noted, *supra*, in Part III. A.2., the OTA Report, had recommended continued purchase of SLOCR machines, but with a plan to convert such machines to MLOCR. Consistent with part

of this recommendation, USPS moved forward in purchasing additional SLOCR machines by

awarding a contract in July 1984 to ECA.  *See* Pl.'s Ex. 538 ¶ 11 (Stipulated Facts). Nonetheless,

in the plaintiff's view, USPS management was "ignoring our technology," 6/24/14 PM Tr. at 14,

and he and his REI team then began to "double down" on their pursuit of USPS business.  In

fact, faced with the USPS decision to purchase additional SLOCR machines, the plaintiff advised

PMG Bolger that REI was going to lobby Congress and "go directly to his Board of Governors."

6/25/14 AM Tr. at 94-95 (Plaintiff's testimony).

  The plaintiff did "go directly" to the BOG.  In a July 1984 letter to Vice Chairman Voss,

the plaintiff complained about "USPS management… dig[ging] in its collective heals" to

purchase SLOCR machines incorporating "foreign developed technology which is substantially

inferior to proven technology available in this country."  Pl.'s Ex. 31 (Letter, dated July 2, 1984,

from plaintiff to Vice Chairman Voss).[28]  The plaintiff further recommended that the "current

Phase II procurement" be "split . . . along 90-10 lines," which "would mean that my company

would receive funds to build an additional 30-40 multi-line readers similar to the five (5)

machines currently installed and operating in various post office locations today."  *Id*.  The

plaintiff also spoke directly to Vice Chairman Voss in July 1984 and, during that conversation,

Vice Chairman Voss told the plaintiff to "[s]tay in the game" because "[c]onditions have been

changing" and "[t]hey are favorable to you guys."  6/25/14 AM Tr. at 83-87 (Plaintiff

testimony).  Vice Chairman Voss also told the plaintiff that he was "making points, taking heat,

---

[28] The plaintiff's perspective that USPS management, including most prominently, James Jellison, who served at this time as Senior Assistant Postmaster General in charge of the automation program, staunchly advocated only SLOCR technology is belied by other evidence presented at trial. Contrary to the plaintiff's view, Mr. Jellison testified, via deposition, that he wanted to adopt MLOCR technology but, at the time the original purchase of SLOCR equipment was made, no company had operational MLOCR equipment, *see* 7/1/14 PM Tr. at 5-6, 25-26, 31, 38-39, 61-62, 64-65, and REI's machines were "not up to date technologically, and we did not want to buy more of those machines," *id.* at 20.

and working for you," *id.*, which comments were documented by Vice Chairman Voss's administrative assistant in her handwriting on the top of that the plaintiff's July 1984 letter. 7/10/14 PM Tr. at 92 (Hartman testimony); Pl.'s Ex. 31 (Letter, dated July 2, 1984, from Plaintiff to Voss).[29]

### a. September 3, 1984 Meeting of Vice Chairman Voss with REI Vice President Robert Reedy

As part of REI's effort to pursue a USPS contract aggressively, Mr. Reedy met with Vice Chairman Voss on September 3, 1984 at a restaurant in Dallas, Texas.[30]  At the meeting, Vice Chairman Voss recommended that REI hire GAI to help "improve our business with the Postal Service."  6/24/14 PM Tr. at 16 (Plaintiff testimony).  By this time, John Gnau from GAI had arranged with Vice Chairman Voss that "Voss would receive a commission equal to 30% of the fees generated by Voss' referrals."  Defs.' Ex. 65 at 2 (Peter Voss Interview Summary presented to grand jury on August 28, 1986 ("Voss G.J. Interview Summary")).  Afterwards, Frank Bray discussed the dinner meeting with Mr. Reedy, and told the Postal Inspectors that Mr. Reedy described Vice-Chairman Voss as wanting a private place out of public view and appearing nervous about being seen with Mr. Reedy.  Pl.'s Ex. 262 at 262 (Tr. of Frank Bray Grand Jury testimony, dated July 16, 1987 ("Tr. Bray G.J. testimony"), stating "Mr. Reedy reported to Frank

---

[29] Sharon Peterson, Vice Chairman Voss' administrative assistant, reported to the Postal Inspectors during the course of the criminal investigation that Peter Voss only became an advocate on the MLOCR issue after he made a kickback arrangement with GAI and had targeted REI as a potential source of the bribery funds. Pl.'s Ex. 535 at 4 (Sharon Peterson Interview Summary presented to the grand jury on September 19, 1986 ("Peterson G.J. Interview Summary"), stating "Peter Voss targeted [REI] as a client of GAI," sometime after he arranged with John Gnau to receive a 30% share of all fees Gnau received as result of clients referred by Voss); *id*. at 11 ("Peter Voss' targeting of REI as a potential client of GAI preceded Voss' active advocacy of multi-line as later demonstrated when he directed management to make a sole source award to REI.").

[30] The facts are murky about how this meeting was arranged.  Mr. Voss testified that Mr. Reedy called him to invite him to dinner, Pl.'s Ex. 160 at 4 (Memorandum of Interview of Peter Voss, dated May 9, 1986); Pl.'s Ex. 214 at 14 (Tr. of Peter Voss Grand Jury testimony, dated Aug. 28, 1986) ("Tr. Voss G.J. testimony")), while Frank Bray testified that Vice Chairman Voss initiated the contact with REI and the dinner meeting, Pl.'s Ex. 262 at 35 (Tr. of Frank Bray Grand Jury testimony, dated July 16, 1987 ("Tr. Bray G.J. testimony"), stating that the dinner meeting in September 1984 was arranged when "Voss had telephoned Reedy at Reedy's residence to schedule the meeting).

Bray that Voss appeared a little uncomfortable during the meeting and Voss sought a table

outside the hearing distance of other patrons").  When Mr. Reedy reported to the plaintiff about

the dinner meeting, the plaintiff instructed Mr. Reedy "don't drop the ball on this one," referring

to the hiring of GAI, since he did not want to "make Peter Voss mad at us."  6/24/14 Tr. PM Tr.

at 17 (Plaintiff testimony).  Indeed, after the dinner meeting, Vice Chairman Voss contacted the

plaintiff and Mr. Reedy on several occasions to ask about the status of hiring GAI.  6/24/14 PM

Tr. at 23 (Plaintiff testifying that Voss may have contacted him by telephone indicating "[h]e

was interested in not hanging this guy Gnau out to dry, let's get something done one way or the

other.").

### b.  Early 1985 Retention by REI of GAI

Following a meeting at REI headquarters in January 1985 with John Gnau, REI retained

GAI in February 1985, with a written agreement back-dated to January 15, 1985, on the

following terms: GAI would be paid one percent of any revenue generated from the USPS, and

$30,000 in three installments of $10,000 each, which amount would be deducted from the "one

percent override on the revenue associated with the contract."  6/24/14 PM Tr. at 20-21 (Plaintiff

testimony); 6/25/14 AM Tr. at 23 (Plaintiff testimony); Pl.'s Ex. 51 (REI's contract with GAI).

The GAI retainer agreement was subsequently increased to $22,000 per month.  6/25/14 AM Tr.

at 23-24 (Plaintiff testimony).  In comparison, REI was paying its other "prestigious" consultant,

Hill & Knowlton, $5,000 per month.  6/25/14 AM Tr. at 24, 66 (Plaintiff testimony).  The

plaintiff explained that the increased monthly retainer to GAI was due to an "expanded set of

responsibilities and actions that we required of them, yes."  6/25/14 AM Tr. at 24.  During the

Postal Inspectors' investigation, subpoenas were issued to ascertain the nature of these expanded

responsibilities assigned by REI that warranted the doubling of GAI's monthly retainer to an

amount that was quadruple the amount paid to REI's other, well-established Washington, D.C.-based consultant.

### c.  July 1985 Lobbying by Plaintiff for "Buy American" Amendment

In July 1985, the plaintiff traveled to Washington, D.C. to meet with members of Congress about the so-called "Buy American" amendment sponsored by the Congressman from the plaintiff's home district.  6/24/14 PM Tr. at 38 (Plaintiff testimony).  This amendment essentially required USPS to spend at least $200,000,000, by October 1, 1985, "for the acquisition of American-designed technology for automation of mail processing." Pl.'s Ex. 78 (Amendment to H.R. 3036 sponsored by Rep. Frost, dated July 25, 1985).  REI was the only American firm at the time of the proposed amendment that made "American-designed technology" for OCR machines and, consequently, if the Frost "Buy American" amendment passed, the USPS would have had a single source to meet the requirements of the amendment and would have been required to buy REI machines. *See* 6/25/14 PM Tr. at 99-101 (Plaintiff testimony).  Indeed, the plaintiff testified that he wanted enactment of the amendment "to make sure we got some postal business."  *Id.* at 37.  This amendment was never acted on by the House of Representatives.  *Id.* at 101 (Plaintiff's testimony).

According to PMG Carlin, this amendment, if enacted, would not have affected the procurement process since USPS used non-appropriated funds for procurement and the amendment only imposed conditions on appropriated funds used to support mailing for non-profit organizations and the blind.  7/8/14 at 70 (PMG Carlin testifying: "[o]ur Appropriations Act was a limited amount of money, approximately a billion dollars, and it was for the purpose of providing free mailing to the blind, free mailings to the Congress and to some other non-profit organizations.  That's all that it applied to.").

**B. Investigation of Plaintiff**

PMG Carlin testified that as part of the July 1985 mid-course correction to the USPS automation program, he envisioned competitive testing of the available technology for the next procurement phases. Rather than disregard REI's machines out of any animosity, he "wanted a competitive process so that we would have two machines going side by side and we get the best, pick the best of them. Now, I was not clear at the beginning whether it would be one or we choose both of them. I had no position on that. I just wanted to make sure that the Postal Service received equipment that worked all of the time. And worked as intended and at the best price." 7/8/14 AM Tr. at 119. He also wanted to ensure that the process was above-board and, to this end, requested from CPI Clauson the dedicated monitoring by a Postal Inspector. CPI Clauson has assigned Postal Inspector Edwards to this task. In the Fall of 1985, Postal Inspector Edwards was "still focused largely on the procurement and the need to have it go according to the procurement regulations." Edwards Dep. at 292, Feb. 15, 2000. Postal Inspectors Hartman, Kormann, and McIntosh were subsequently assigned to the investigation.[31] When Postal Inspector Hartman joined the investigation, Postal Inspector Edwards told him that "[u]p until that point, there was an investigation or review of potentially improper activity by a particular Board of Governor member, Peter Voss. And also suspect activity by another governor, Ruth Peters." 7/10/14 PM Tr. at 40-41 (Hartman testimony).

The Postal Inspectors then became aware of an allegation made by AEG that "William Moore, the CEO of Recognition Equipment, Incorporated had proposed a deal to split two

---

[31] While Postal Inspector Edwards was the first Postal Inspector assigned to the investigation, 7/15/14 PM Tr. at 79 (Edwards testimony), Postal Inspector Hartman was assigned to assist in the investigation in October 1985. *Id.* at 91-92; Edwards Dep. at 26, Feb. 15, 2000. A month later, when the investigation expanded to focus on the plaintiff, Mr. Reedy, and REI, Messrs. Kormann and McIntosh were assigned to the investigation. Edwards Dep. at 26-27, Feb. 15, 2000. The parties agree that the only role Mr. Robbins played in the investigation was administering a polygraph examination to William Spartin in December of 1986.

contracts, one for REI and one for AEG Telefunken." *See* 7/10/14 PM Tr. at 41 (Hartman

testimony). AEG officials had filed a similar complaint with the German Embassy. 7/14/14 PM

Tr. at 23 (Hartman testimony). This allegation posed an obvious risk of undermining the

competitive testing of equipment envisioned by the mid-course correction and, as part of PMG

Carlin's direction to monitor closely the procurement process for the automation program, the

Postal Inspectors turned their attention to this allegation about the plaintiff.

### 1. November 1985 Interview with AEG Officials

In early November 1985, the Postal Inspectors interviewed AEG officials regarding their

allegation that the plaintiff had proposed a deal to split the OCR procurement contracts. 7/10/14

PM Tr. at 43-44 (Hartman testifying: "the general topic of the interview with the officials from

AEG" was "[the plaintiff's] offer of a compromise or deal where REI would get the phase three

multi line stand-alone agreement. And AEG Telefunken would receive the phase [II]A

conversion agreement to split the two contracts between the two companies."). According to

AEG, the plaintiff threatened that if AEG did not agree to the deal, the plaintiff "could kill the

phase [II]A conversion program." 7/10/2014 PM Tr. at 45 (Hartman testimony).

Following the meeting with AEG representatives, the Postal Inspectors sought guidance

from two supervising attorneys at the United States Department of Justice ("DOJ")'s Public

Integrity and Fraud sections. Postal Inspector Hartman testified that they met with the DOJ

attorneys for "advice, guidance, [to] determine whether or not we could possibly start a grand

jury investigation" because "[a]t that time, we had limited experience in antitrust matters" and

whether the plaintiff's offer was "an antitrust violation." 7/10/14 PM Tr. at 44-45. According to

the Postal Inspectors' memorandum to their supervisor, CPI Clauson, summarizing the DOJ

meeting, the attorneys did not believe "that a federal criminal act had occurred on the basis of

direct evidence we have at this time," but "were positive and supportive of our efforts to date."

Defs.' Ex. 51 at 1.  One of the DOJ attorneys even presciently opined that "[g]ratuities…will be forthcoming." *Id.*  The DOJ attorneys recommended that the inspectors continue the investigation and suggested certain investigatory steps, including "investigating vendor's (REI) intention and capability of actually competing on Phase II conversion" and analyzing documents "to detect and establish a pattern of irregular, possibly unethical behavior and possible perjury . . .." *Id.*

In accordance with the DOJ attorneys' instructions, the Postal Inspectors continued their investigation by conducting interviews with persons within USPS and REI involved in the automation program and gathering documentary evidence based on the leads they garnered through these interviews.

### 2. November 20, 1985 Interview of Plaintiff and Subordinates

On November 20, 1985, Postal Inspectors Hartman and Edwards interviewed the plaintiff at REI headquarters in Dallas, Texas regarding AEG's allegations. 7/10/14 PM Tr. at 51 (Hartman testimony).  REI's Vice President of Sales and Marketing, Robert Reedy and REI's Vice President of Distributors Sales and Manager of Postal Programs, Frank Bray, were also present at this interview.  *Id.*  Postal Inspector Hartman asked "Mr. Moore, Mr. Reedy and Mr. Bray if any of them had ever met with or spoken to a Board of Governors member on an individual basis. In other words, one on one." *Id.* at 56.  This question was prompted by suspicions about whether Vice Chairman Voss "had some sort of financial relationship or reason that he was pushing so hard for a sole source contract with REI." *Id.*  "[I]f Voss does have an improper financial relationship with REI, then it would follow that he likely had spoke[n] with them or met with them.  So that is why I asked the question to see whether or not any of these gentlemen had met with or even spoke to a governor." *Id.* at 57.  When he asked the question, Postal Inspector Hartman "was looking at [the plaintiff]" but "Mr. Reedy answered that question

. . . [h]is answer was no, that they had not met with any governor individually." *Id.* Postal

Inspector Hartman made a record of this answer in his notes that: "Reedy never talked to board

members individually." Defs.' Ex. 52 at USA-010-0529 (Hartman handwritten notes on Nov. 20,

1985). After hearing Mr. Reedy's answer, Postal Inspector Hartman "looked in the direction of

the plaintiff . . . [who] nodded affirmation of Mr. Reedy's answer." 7/10/14 PM Tr. at 57; *see*

*also* 7/11/14 PM Tr. at 7 (Hartman testifying: "Reedy answered and Mr. Moore affirmed.

Nodded.").  In a follow-up question, Postal Inspector Hartman asked "when you did meet with

the Board of Governors were all three of you always present[?]"  7/10/14 PM Tr. at 58.  The

plaintiff said "yes, with the exception when one of them stepped in and out of the room for some

reason." *Id.*[32]  The Postal Inspector's notes of this meeting and their testimony reflect that at no

point did the plaintiff and his subordinates indicate that Mr. Reedy had met over dinner with

Vice Chairman Voss in September 1984.

The plaintiff denied any recollection of this question being asked or Mr. Reedy's answer,

and testified that if he had thought that Mr. Reedy had lied to the Postal Inspectors, he "would

have said, Reedy, tell them the truth."  6/24/14 AM Tr. at 122-23 (Plaintiff testimony).

### 3.  *Postal Inspectors Learn of Relationship between REI and GAI*

In December 1985, the Postal Inspectors learned that REI had retained two consultants:

GAI and Hill & Knowlton.  7/10/14 PM Tr. at 62-63 (Hartman testimony).  They also learned

---

[32] The Postal Inspectors summarized the November 20, 1985 interview with the plaintiff and his
subordinates at REI in a memorandum, which reports that the plaintiff indicated attending meetings with USPS
BOG's Technology Committee on three occasions, prior to the November 4, 1985 meeting: in March 1985 at USPS
headquarters; in April 1985 at REI Headquarters; and in May 1985 at REI Headquarters.  Pl.'s Ex. 105 at 3. The
memorandum then reports: "Mr. Moore stated that Bray, Reedy and himself were all present at meetings with USPS
Board of Governors, with the exception when one of them stepped in and out during the course of the meeting.  Mr.
Reedy added that they [REI's Bray, Reedy and Moore] never talked to individual Board members, but rather they
spoke to Technology Committee members as a group [the Technology Committee].  Messrs. Moore and Bray
nodded affirmatively to Mr. Reedy's statement. Mr. Moore related that it was clear to Messrs. Voss and Camp and
Ms. Peters that REI had a working product and that these meetings resulted in REI's May 1985 proposal to the
USPS." *Id.* (emphasis in original).

through a Dun and Bradstreet report that GAI was a three-person firm based in Detroit,

Michigan, with John Gnau as chairman, William Spartin as president, and Michael Marcus as

vice president and treasurer.  *Id.* at 63-64.  Postal Inspector Hartman placed a telephone call to

GAI's office and "the receptionist or the individual answering the phone said 'MSL,'" which the

Postal Inspectors found out was an executive recruitment firm with the same president as GAI:

William Spartin.  *Id.* at 64.  At the time, this fact "did not mean much," but it became significant

later in the investigation.  *Id.* at 64, 69 (Hartman testimony).

### 4.  January 6, 1986 Firing of Postmaster General Carlin

On January 6, 1986, PMG Carlin was fired after just one year of service as PMG, and

replaced by Albert Casey.  7/10/14 PM Tr. at 71-74 (Hartman testimony).   Shortly thereafter, the

Postal inspectors learned of two events that heightened their suspicions about REI's involvement

with possible corruption within USPS.

First, in what can only be called a strange coincidence, a Postal Inspector struck up a

conversation with a female passenger sitting next to him on a train, on December 13, 1985.

When the woman found out that "he worked for the post office," the woman told the inspector

that Paul Carlin's firing was "imminent."  7/10/14 PM Tr. at 73 (Hartman testimony).  This

occurred three weeks before PMG Carlin was actually fired "[a]nd the passenger indicated to the

postal inspector that one of the reasons he was going to be fired was the delay in awarding a

multi-line contract to REI."  *Id.*  The Postal Inspectors later identified the "female passenger" as

Midge Gnau, the daughter of the GAI chairman, John Gnau.  *Id.* [33] Postal Inspector Hartman

---

[33] When Midge Gnau was subsequently interviewed by the Postal Inspectors, she confirmed her
conversation with Postal Inspector David Smith on an AMTRAK train from New York City to Philadelphia and that
she had been told by both William Spartin and her father, John Gnau, prior to December 13, 1985, "that Carlin
would be fired." Defs.' Ex. 73 at 2 (Memorandum of Interview of Midge Gnau, dated May 28, 1986).

testified that when he learned the identity of the female passenger his reaction was "[g]reater suspicion of Gnau & Associates, MSL, and now REI is tied into the firing of Paul Carlin." *Id.*

Second, on February 5, 1986, a Congressional hearing on the topic of the firing of PMG Carlin revealed that USPS had hired MSL, which was headed by William Spartin, to find a replacement for PMG Carlin. *Id.* at 74. Ironically, PMG Carlin had initially hired William Spartin from MSL to do executive searches for USPS "[a]t the strong urging and insistence of Peter Voss," but PMG Carlin was unaware of Mr. Spartin's association with GAI or REI. 7/8/14 AM Tr. at 109-10 (Carlin testimony). Postal Inspector Hartman testified that when he heard this information, "[a] large puzzle piece was now turned over and [the Postal Inspectors] . . . had an idea of what [they] were investigating and what kind of activity [they] should be focusing on" because "[n]ow [they] had confirmation that a consultant to REI that had a relationship with MSL, the head hunter to replace Paul Carlin, had an association with REI." *Id.* at 74.

### 5.   *Postal Inspection Service Request for Initiation of Grand Jury Investigation*

In February, 1986, the Postal Inspectors prepared a written report for the DC USAO charting the information they had gathered so far during the investigation and to request that a grand jury investigation be opened. *See* Defs.' Ex. 55 (Postal Inspectors' Preliminary Report, dated February 1986); *see also* 7/10/14 PM Tr. at 75, 80 (Hartman testimony). The DC USAO opened a grand jury investigation and authorized "the issuance of grand jury subpoenas for telephone toll records, bank account records and credit card records for some of the suspects." 7/10/14 PM Tr. at 87 (Hartman testimony).[34] Postal Inspector Hartman testified that at this stage

---

[34] The first of multiple grand jury subpoenas to REI was issued on April 17, 1986, and requested production of, inter alia, personnel, employment, travel and telephone records for the plaintiff and Messrs, Reedy and Bray, as well as records related to REI's relationship with GAI and GAI's employees, including records and invoices with or regarding USPS management and BOG and U.S. Congressmen. Defs.' Ex. 68 (G.J. Subpoena to REI, dated April 17, 1986).

he would have characterized the investigation as a "joint investigation with the United States Attorney's office and it . . . became a grand jury investigation." *Id.*

From responses to the grand jury subpoenas, the Postal Inspectors learned about check payments from GAI to Vice Chairman Voss' company, as well as telephone calls between Voss and GAI and MSL. *Id.* at 87-88. Moreover, the Postal Inspectors discovered telephone calls, from July through December 1984, between Vice Chairman Voss' office and the REI extension assigned to the plaintiff. *Id.* at 89. This telephone contact with REI stopped in December 1984. *Id.* at 90. This information was "significant" "[b]ecause after December 1984, REI agreed to hire GAI and after REI hired GAI, the telephone contract between Voss and REI appeared to cease." *Id.* at 90. The contact between REI and Vice Chairman Voss between July and December of 1984 was also significant to Postal Inspector Hartman because he believed it "contradicted [the plaintiff's] statement to [him] on November 20, 1985" regarding the fact that REI had not had one-on-one contact with any USPS governor. *Id.* at 89. This information made the plaintiff, Mr. Reedy, and REI's possible involvement in the conspiracy "more suspect than it was before." *Id.* Moreover, the Postal Inspectors reviewed a letter, dated July 2, 1984, from the plaintiff to Vice Chairman Voss on which someone had handwritten the phrase "making point, taking heat, working for you." *Id.* at 92. Postal Inspector Hartman testified that the handwriting was that of Voss' secretary, Sharon Peterson, who was "writing down Peter Voss' comments during Peter Voss' conversation with William Moore." *Id.* Postal Inspector Hartman found "it was suspicious that a Board of Governors member was stating to William Moore that he was working for you." 7/10/2014 PM Tr. at 92 (Hartman testimony).

### 6.  *April 1986 Confession of William Spartin About Illegal Scheme*

In April 1986, William Spartin sought and obtained a non-prosecution agreement with the DC USAO in exchange for his cooperation.[35]  Pl.'s Ex. 269 at 4-5 (Tr. of William Spartin Grand Jury testimony, dated September 1, 1987) ("Tr. Spartin G.J. testimony"); 7/10/2014 PM Tr. at 93 (Hartman testimony).  During this and many subsequent interviews, [36] Mr. Spartin revealed the "large conspiracy, kickback arrangement between John Gnau and Peter Voss.  And he mentioned the relative role of John Gnau and Michael Marcus and the possible participation of Robert Reedy and William Moore in that kickback arrangement."  7/10/14 PM Tr. at 95 (Hartman testimony).  Mr. Spartin described Vice Chairman Voss as the "mastermind of the whole deal," *id*. at 94, including arranging for REI to hire John Gnau, *id*. at 95-96; Defs.' Ex. 56 at 2 (Hartman handwritten notes of April 7, 1986 Interview of William Spartin, stating "Gnau said he got contract with REI through Voss").  The interview with Mr. Spartin provided "further evidence of Voss' individual contact with people at REI and more significantly, that Voss had something to do with REI hiring [GAI]."  7/10/14 PM Tr. at 96.  The Postal Inspectors were suspicious of Vice Chairman Voss' recommendation of GAI because GAI was a small Michigan consulting firm with only three employees and "REI already had a large Washington, D.C. consulting firm, an international firm named Hill and Knowleton[sic]" working for them.  *Id.*

Vice Chairman Voss also arranged, in early December 1985, for Mr. Spartin to be hired by USPS BOG Chairman John McKean to conduct the search for the replacement for PMG

---

[35] The non-prosecution and cooperation agreement contained standard terms that obliged the witness to cooperate with the United States in exchange for immunity from prosecution for his conduct in relation to the illegal conspiracy.  *See* Pl.'s Ex. 269 at 4-5 (Tr. of William Spartin Grand Jury testimony, dated September 1, 1987) ("Tr. Spartin G.J. testimony").

[36] Due to the number of people involved in, and duration of, the conduct under investigation, the Postal Inspectors interviewed some witnesses multiple times to garner, confirm and re-check details.  *See* 7/10/2014 PM Tr. at 113 (Hartman testimony).  Postal Inspector Hartman testified that "it was very typical to interview an individual in a case like this more than once."  *Id.*

Carlin, an opportunity that "excited" "Voss, Gnau and Spartin . . . that they were in a position to

name their candidate as Postmaster General."  Pl.'s Ex. 137 at 18-19 (Interview Summary of

William Spartin presented to the Grand Jury on Sept. 1, 1987) ("Spartin G.J. Interview

Summary").  This information was subsequently confirmed by Vice Chairman Peter Voss. Pl.'s

Ex. 160 at 16-17 (Interview Summary of Peter Voss, dated May 9, 1986 ("Voss Interview on

May 9, 1986"), in which Voss reported that he recommended William Spartin to USPS BOG

Chairman John McKean to conduct the search for a replacement for PMG Carlin); Defs.' Ex. 65

at 14-15 (Voss G.J. Interview Summary, stating "he introduced William Spartin to John

McKean" and "suggested William Spartin" to McKean "to identify a replacement Postmaster

General").  Mr. Spartin describes how he obtained the name of PMG Carlin's replacement as

follows:  while having lunch with Mr. Gnau at the Maison-Blanche Restaurant in Washington,

D.C., Mr. Gnau received a telephone call from Mr. Reedy, who informed him that the plaintiff

had three names to suggest as Postmaster General candidates, and Mr. Gnau told Mr. Spartin to

call REI to obtain the names.  Pl.'s Ex. 226 at 23 (Spartin Polygraph Tr., stating that, during a

lunch, Gnau received a telephone call from someone at REI and Gnau "says talk to Bill Moore,

he's got some suggestions for you. So I said okay."); Pl.'s Ex. 137 at 19 (Spartin G.J. Interview

Summary); Pl.'s Ex. 206 at 17 (John Gnau Interview Summary presented to Grand Jury on

October 16, 1986) ("Gnau G.J. Interview Summary").  Upon his return to the office, Mr. Spartin

called the plaintiff, who "seemed to be expecting his call" and "gave me three names," including

Albert Casey, who "was obviously Moore's first choice."  Pl.'s Ex. 137 at 19 (Spartin G.J.

Interview Summary); Pl.'s Ex. 226 at 23 (Spartin Polygraph Tr.).

    After Albert Casey was successfully installed as the new PMG in early January, 1986,

"Gnau suggested they have a dinner meeting with REI officers to discuss new strategy for

obtaining a sole source contract for REI from the USPS," and this "victory" dinner was arranged for January 9, 1986 at the Madison Hotel.  Pl.'s Ex. 137 at 21 (Spartin G.J. Interview Summary); Pl.'s Ex. 269 at 41-42 (Tr. Spartin G.J. testimony, referring to dinner "as a victory celebration"). Vice Chairman Voss subsequently confirmed information garnered from Messrs. Gnau and Spartin that the plaintiff "recommended Al Casey for the position" to Mr. Spartin and further indicated his "impression from Spartin's comments and actions that the multi-line optical character reader contract would be wired to Recognition Equipment, Incorporated with the appointment of Al Casey as Postmaster General."  Defs.' Ex. 65 at 15 (Voss G.J. Interview Summary); *see also* Pl.'s Ex. 160 at 20 (Voss Interview on May 9, 1988, in which Voss "said there was a definite indication Spartin believed that Casey was acquainted with the MLOCR and would help REI get the contract").

Mr. Spartin eventually testified, under oath, before the grand jury about his own involvement and the role of others in the illegal scheme.  He testified that, in his opinion, the plaintiff and Mr. Reedy knew that Vice Chairman Voss was receiving money from Mr. Gnau relative to the MLOCR procurement.  Pl.'s Ex. 269 at 10 (Tr. Spartin G.J. testimony).  He explained the basis for this opinion as follows:

> with the many conversations between Mr. Reedy and myself and the many conversations between Reedy and Mr. Gnau, and my conversations with Gnau and Voss, that it became – at least in my opinion, I felt that Mr. Reedy knew that we were somehow taking care of Mr. Voss, because I rationalize that why would Mr. Voss be so adamant to help us and all the things he was doing, which we relayed back to Mr. Reedy, just led me to believe that they had to come to the conclusion that somehow we were doing something to take care of Mr. Voss . . . they had to know way down deep if they asked themselves or looked at the issue, that we were – GAI was handling Mr. Voss.

*Id.* at 11.

In particular, Mr. Spartin highlighted Mr. Reedy's inquiries about, "Why don't you get Peter Voss to do this [referring "to order a sole-source contract"]?," indicating that he knew they had some sort of control over Vice Chairman Voss.  *Id.* at 12.  In addition, Mr. Spartin described "the agitation on the part of both Moore and Reedy as to why things weren't progressing faster, and they kept saying, 'Geez, we lose any more time, we're going to lose our competitive position.  We need the contract now.  Why don't you get Voss to do this, or why don't you get Voss to do that.' I mean, they felt all along that we were controlling Voss and they let their wishes known . . . to both John and myself in terms of what they wanted us to do, and they wanted the whole thing expedited, they wanted the competitive tests stopped.  They just felt that we should do that." *Id.* at 12-13.[37]

### 7.   *April 8, 1986 Postal Inspector Interview with Plaintiff's Subordinates*

On April 8, 1986, the Postal Inspectors interviewed Mr. Bray and Mr. Reedy at REI headquarters in Dallas. 7/10/14 PM Tr. at 97-98 (Hartman testimony).  When Mr. Reedy was asked how REI came to hire GAI, he told the Postal Inspectors that he was introduced to GAI from someone at Hill and Knowlton.  *Id.* at 98.[38]  The Postal Inspectors later learned that this response was false and that Vice Chairman Voss had recommended GAI to Mr. Reedy at the dinner meeting in Dallas on September 3, 1984.  *Id.* at 98; Defs.' Ex. 65 at 4-5 (Voss G.J. Interview Summary).

---

[37] The plaintiff corroborates Mr. Spartin's testimony to a certain extent about his conversations with GAI to get things done within high levels of the USPS.  The plaintiff testified that GAI was "always trying to show us that they were wired in, if you will, that they really knew what was going on," but that he "discounted that entirely." 6/25/14 PM Tr. at 161.  The plaintiff's actions, however, belie his testimony that he deemed GAI's promises to be mere puffery.  His actions reflect that he monitored Mr. Reedy's progress in retaining GAI, agreed to retain GAI, increased that retainer to $22,000 per month along with a promise to pay GAI one-percent of any USPS contract awarded to REI – far more than the amounts paid to what the plaintiff himself described as a "prestigious" consulting firm—and that he kept close tabs on GAI's efforts to obtain for REI the award of a USPS sole source contract. The Court finds the plaintiff's testimony about not believing GAI was "wired in" not credible.

[38] Postal Inspector Hartman testified that he was not in attendance during the interview of Mr. Bray and Mr. Reedy on April 8, 1986 but was advised of statements made at the interview.  *Id.* at 97-98.

At this interview, the Postal Inspectors also asked Mr. Bray whether he knew who recommended GAI to REI, and he responded, "no." 6/30/14 PM Tr. at 42 (Bray testimony). Mr. Bray admitted during his trial testimony that this response was a lie. *Id.* The Postal Inspectors also asked Mr. Bray at the April 1986 interview about whether he knew who had recommended Mr. Casey to be Postmaster General and again he responded "no." *Id.* at 43. Mr. Bray admitted during his trial testimony that this response was also a lie. *Id.*

### 8. *May 1986 Guilty Plea and Cooperation by Vice Chairman Voss*

On May 9, 1986, Vice Chairman Voss was interviewed by the Postal Inspectors and "spilled his guts" about the kickback conspiracy. Edwards Dep. at 516-17, dated Feb. 15, 2000. He subsequently entered into a plea and cooperation agreement with the DC USAO. Pl.'s Ex. 165 (Voss Plea Agreement). Over multiple interviews with Vice Chairman Voss, the Postal Inspectors learned significant information about the operations of the illegal scheme, which they summarized into a single statement that was reviewed and adopted as true and correct by Vice Chairman Voss before the grand jury. Pl.'s Ex. 214 at 7 (Tr. Voss G.J. testimony confirming that he "met many, many days and spent many, many hours . . . being debriefed by various members of the Postal Inspection Service since May 30th of 1986"); *id.* at 9 (Voss confirming that summary of interviews presented to grand jury was true and accurate "to the best of my memories"); Defs.' Ex. 65 (Voss G.J. Interview Summary); 7/7/14 AM Tr. at 48 (Hartman testimony); 7/11/14 AM Tr. at 6 (Hartman testimony); Voss Dep. at 42, Jun. 6, 2014.

Vice Chairman Voss confirmed that, in 1984, he and Mr. Gnau entered into "a business arrangement wherein Voss would refer potential clients to John R. Gnau and Gnau's public relations firm, [GAI]. Mr. Voss and Mr. Gnau agreed that [] Voss would receive a commission equal to 30% of the fees generated by Voss' referrals." Defs.' Ex. 65 at 1-2 (Voss G.J. Interview Summary). In August or September, 1984, REI's Vice President of Marketing, Mr. Reedy,

contacted Voss and invited him to dinner "to discuss the REI point of view on the multi-line issue." Pl.'s Ex. 160 at 4 (Voss Interview on May 9, 1986); Pl.'s Ex. 214 at 14 (Tr. Voss G.J. testimony). At the dinner meeting, Vice Chairman Voss told Mr. Reedy that REI "was mistakenly presenting an emotional plea to the [USPS] for the sale of multi-line optical character readers" when "it should be a more businesslike or intelligent presentation." Defs.' Ex. 65 at 4 (Voss G.J. Interview Summary). When Mr. Reedy advised Vice Chairman Voss that REI's public relations were being taken care of by Hill & Knowlton, Vice Chairman Voss recommended that REI retain Detroit-based GAI in the company's dealings with USPS. *Id*. at 4-5. Vice Chairman Voss said that he realized he would receive 30% of all fees that REI paid GAI. *Id*. at 5.

Vice Chairman Voss' purpose in pushing REI to retain GAI was corroborated by his then-administrative assistant, Sharon Peterson, who entered into a non-prosecution agreement with the government and testified before the grand jury within a few weeks of Vice Chairman Voss. Vice Chairman Voss and Ms. Peterson told the Postal Inspectors that, after the dinner meeting with Mr. Reedy, they alerted Messrs. Marcus and Gnau about USPS MLOCR and automation issues, arranged for them to meet with PMG Carlin in January, 1985, and urged REI to consummate the hiring of GAI. Pl.'s 535 at 5-6 (Peterson G.J. Interview Summary, noting her belief that arranging meeting between PMG Carlin and GAI "aided GAI's efforts to finally obtain a contract with REI"); Defs.' Ex. 65 at 5 (Voss G.J. Interview Summary).

When REI later hired GAI, Vice Chairman Voss "stated that on several occasions during 1985, he discussed with Michael Marcus, John Gnau and William Spartin, both individually and collectively, the fact that they would all share equally in the proceeds of the 1% commission in the event Recognition Equipment, Inc. was awarded a contract by U.S. Postal Service." *Id.* at 6.

Vice Chairman Voss opposed the USPS plan to retrofit with multi-line read capability the

SLOCR machines purchased in Phase I and II of the automation program from REI's competitor

since this would delay by several years a contract to REI for MLOCRs equipment.  *Id.* at 7-8.

He admitted that his interest in the kickback he would receive from GAI if REI obtained the

MLOCR contract influenced "his decision to press for an order to Deputy Postmaster General

Jackie Strange to freeze the retrofit program."  *Id.* at 8.  Indeed, "his potential receipt of one

quarter of the 1% REI contingency fee were motives for his continued actions to cause an

immediate contract award to Recognition Equipment, Inc."  *Id.* at 10.

Both Vice Chairman Voss and Ms. Peterson told the grand jury that as part of the effort

to obtain a USPS procurement contract for REI, Mr. Marcus prepared position papers,

memoranda, and letters expressing the views of REI and that were signed by BOG Governor

Ruth Peters, who mistakenly believed they were written by Vice Chairman Voss.  *Id.* at 8; Pl.'s

Ex. 535 at 7 (Peterson G.J. Interview Summary, stating that "Michael Marcus prepared position

papers, letters and memorandums on behalf of the Technology and Development Committee of

the Board of Governors," which documents were furnished "to Ruth Peters as the independent

and objective work product of Mr. Voss and Mrs. Peterson.").  This information was

corroborated by Mr. Marcus, who admitted to Postal Inspectors that he "routinely and actively

authored Technology and Development Committee letters and memoranda which were furnished

USPS management . . . as the independent and objective work product of either Peter Voss or the

Technology and Development Committee."  Pl.'s Ex. 196 at 14 (Memorandum of Interview of

Michael Marcus on August 5 and 6, 1986).

Vice Chairman Voss also gave GAI "internal [USPS] briefing documents" to assist GAI

and REI in refuting the USPS OCR technology plans.  Defs.' Ex. 65 at 8 (Voss G.J. Interview

Summary).  Mr. Marcus confirmed that "during the course of the REI/GAI relationship, []

Peterson and [] Voss routinely furnished [him] with the content of USPS policy deliberations,

internal memorandums related to the single-line/multi-line controversy and proposals furnished

the USPS by ElectroCom Automation (ECA), REI's competitor."  Pl.'s Ex. 196 at 13

(Memorandum of Interview of Michael Marcus on August 5 and 6, 1986); *see also* Pl.'s Ex. 535

at 7 (Peterson G.J. Interview Summary, stating that she furnished to "GAI, and Mr. Marcus in

particular, copies of internal [USPS] documents concerning the automation issue . . . so he could

rebut [USPS] policy.").

The assistance to REI went even deeper than preparation of position papers, which

appeared to be authored by the key BOG Technology Committee when they were actually

written by REI's consultants.  Vice Chairman Voss confirmed the involvement of the co-

conspirators, Messrs. Gnau and Spartin, in the removal of PMG Carlin, whom they believed

"was the stumbling block to [REI's] receipt of a [USPS] production award."  Defs.' Ex. 65 at 13

(Voss G.J. Interview Summary).  Ms. Peterson stated that the three GAI employees, Messrs.

Gnau, Marcu and Spartin "recommended to Voss that Carlin be fired due to his nonsupport of

REI and failure to follow Voss' instructions to make a sole source award to REI" and that "Peter

Voss actively pursued the removal of Paul Carlin as [PMG] because Carlin was generally

unresponsive to Peter Voss' desires."  Pl.'s Ex. 535 at 9 (Peterson G.J. Interview Summary).

After new PMG Albert Casey was in place, BOG Chairman John McKean discovered

that William Spartin had been retained to find the new PMG while also serving as the president

of REI's consulting company.  Vice Chairman Voss contacted Mr. Spartin "and advised him of

McKean's knowledge of the Gnau/Spartin relationship."  *Id.* at 16.  Mr. Spartin responded that

he would contact the plaintiff and discuss the circumstances surrounding the Casey

recommendation, and later informed Vice Chairman Voss that, having discussed the matter with the plaintiff, Mr. Spartin was going to state that Carla Hills, not the plaintiff, recommended Albert Casey to be the next PMG.  *Id.*

Vice Chairman Voss told the Postal Inspectors that "he did not know if REI knew that he [Voss] was getting money from John Gnau."  Pl.'s Ex. 160 at 12 (Voss Interview Memorandum, dated May 9, 1986); *see also* 7/15/14 PM Tr. 118-20 (Edwards testimony); Voss Dep. at 41, 52, Jun. 12, 2014.  Consequently, his testimony before the grand jury made no reference to his personal knowledge or opinion about whether the plaintiff or other REI employees were aware that REI's payments to GAI were paid, in part, to Voss in an illegal bribery and kickback scheme.  *See generally* Defs.' Ex. 65 (Voss G.J. Interview Summary); Pl.'s Ex. 214 (Tr. Voss G.J. testimony).  Vice Chairman Voss testified that "I think if – if implicating [the plaintiff] would have helped me and it had been true, I would have done it.  I told the truth."  Voss Dep. at 52.

Shortly after Vice Chairman Voss pleaded guilty, on May 30, 1986, to accepting a gratuity and embezzlement and misappropriation of government property, Pl.'s Ex. 538 at ¶ 20 (Stipulated Facts),  AUSA Joseph Valder was newly assigned to the case.  *Id.* at 101.  AUSA Valder remained the prosecutor on the case for the rest of the investigation and the Postal Inspectors communicated with him regularly about the progress of the investigation.  *Id.*  Shortly after this guilty plea, the USPS suspended the competitive testing underway for the next phase of the automation program, 7/16/ 14 AM Tr. at 37-38 (McIntosh testimony), "pending the outcome of the investigation relative to Voss' corrupt influence on the automation program," Pl.'s Ex. 291 at 108 (Details of Offense); Pl.'s Ex. 229 at 71, 77 (ZIP+4 Report) (noting that both ECA and REI were selected as vendors to participate in the Phase IIA competitive test, which began in late

May 1986, "to design a conversion kit to retrofit the Electrocom Automation Phase II machines to multi-line" but the test was suspended on about June 6, 1986).[39]

### 9. July 25–26, 1986 Follow-up Interviews of Plaintiff and Subordinates and Review of Plaintiff's Notebooks

With the revelations of Messrs. Spartin and Voss, the Postal Inspectors arranged another meeting with REI officials for July 25-26, 1986. 7/11/14 AM Tr. at 106-08. This turned out to be the last interview with the plaintiff prior to his indictment. 7/14/14 PM Tr. at 82 (Hartman testifying: "we were not able to interview Mr. Moore after July of 1986"). Postal Inspector Hartman testified that the most significant take away from the July 1986 interview with the plaintiff and Mr. Reedy was that "there was a general minimization of Spartin's role as a GAI consultant" for REI. *Id.* at 107. Indeed, the plaintiff and Mr. Reedy both indicated that they did not take Mr. Spartin "seriously," but rather "ignored him." *Id.*

Prior to the interview, the plaintiff had produced, in response to an April 17, 1986 grand jury subpoena, a photocopy of a single notebook maintained by the plaintiff that was labeled "Postal." 7/11/14 AM Tr. 93 (Hartman testimony). The original notebook contained "eighty-sheets" according to the cover. *Id.* The photocopied notebook provided to the Postal Inspectors, however, contained only fifty-four sheets. *Id.* at 94. At the time of the July 1986 interview, the Postal Inspectors were not aware that thirty-six pages were missing from the plaintiff's "Postal" notebook because "[i]n the photocopy page you could not read how many sheets were supposed to be in the journal." *Id.* at 93-95. The Postal Inspectors only obtained the original notebook in response to a grand jury subpoena sometime after the interview. *Id.* at 95; *see* Pl.'s Ex. 183

---

[39] When the automation program was re-started, the cost required to retrofit the SLOCR machines had increased from $46,500,000 to $150,000,000, resulting in an increased cost of about $100,000,000 to the government attributable in large part to the illegal conspiracy. Pl.'s Ex. 291 at 108 (Details of Offense).

(Grand Jury subpoena issued Feb. 9, 1987, requesting production, inter alia, of "[a]ny and all original notebooks, diaries, notes . . . prepared by or for REI officers and directors relative to . . . services performed by [GAI] . . ..").

The plaintiff's "Postal" notebook contained entries for September 1985 through January 6, 1986, the date on which PMG Carlin was fired as postmaster general, but no dated entries for February through May 1986, with the last entry in the notebook dated June 24, 1986. 7/11/14 AM Tr. at 94-96 (Hartman testimony). The Postal Inspectors found suspicious that this notebook contained an entry labeled "Closed Session," which appeared to reflect information relayed in a closed BOG session that occurred on December 2, 1985. 7/11/14 AM Tr. at 99 (Hartman testimony). More troubling to the Postal Inspectors, however, was the fact that this Postal notebook was missing more pages than any other of the plaintiff's eleven notebooks over the same general time period. 6/25/14 AM Tr. at 50 (Plaintiff testimony). The Postal Inspectors' suspicion only increased when the Postal Inspectors learned from co-conspirators about discussions among the co-conspirators and the plaintiff to purge their files. Pl.'s Ex. 196 at 22 (Interview Summary of Michael Marcus presented to grand jury on Oct. 23, 1986) ("Marcus G.J. Interview Summary"), indicating "Mr. Marcus stated that Spartin reported that Reedy, Moore, Gnau and Voss have already met and developed a story to cover up their involvement. Spartin added that they had purged their files and he urged Marcus to meet with Gnau to develop their story."); 7/11/14 AM Tr. at 37-38 (Hartman testimony); 7/14/14 PM Tr. at 69 (Kormann testimony that "And during the courses of our interviews certainly Mr. Spartin and Mr. Gnau, there was, they referred to conversations they had with Mr. Moore about getting their stories straight, purging their files, et cetera").

Other notebooks maintained by the plaintiff also contained entries that the Postal Inspectors found suspicious. For example, the plaintiff's September 1984 notebook contained an entry, dated December 18, 1984, with notes from a telephone conversation with Vice Chairman Voss, noting "Get John Knau [sic] involved. Have broad scale association with John. Get together. Call Peter Voss" and "the business to be had here is substantial." Defs.' Ex. 180 at 308171 (September 1984 Plaintiff Journal Entries); 7/14/14 PM Tr. at 79 (Kormann testimony). The Postal Inspectors were also concerned by an April 1985 journal entry where the plaintiff had written the following: "USPS," "ZIP+4 not going well," "Consultant," "Consultant-wired Peter Voss," "Inside vs. Outside control" and "Just Jellison." Pl.'s Ex. 183 at 625 (April 1985 Plaintiff Journal Entries); 6/25/14 AM Tr. at 138-39 (Plaintiff testimony). The Postal Inspectors understood the reference to "consultants" to mean GAI, 7/11/ 14 AM Tr. at 84 (Hartman testimony), and that this entry indicated the plaintiff's recognition that these consultants had a "wired" connection in some way to Vice Chairman Voss. *Id*. at 89 (Hartman testimony).

### 10. Subsequent Interviews of Co-Conspirators

Through the latter part of 1986 and early 1987, the DC USAO was continuing, with the assistance of the Postal Inspectors, to review documentation produced in response to grand jury subpoenas, present testimony to the grand jury, and investigate other co-conspirators. These efforts were largely successful and resulted in the guilty pleas of (1) John Gnau, GAI's Chairman, to one count of conspiracy to defraud the Government and one count of the payment of illegal gratuities, on October 17, 1986, and (2) Michael Marcus, GAI's vice president and treasurer, to two counts of aiding and abetting paying illegal gratuities to Vice Chairman Voss, on January 20, 1987. Pl.'s Ex. 538 ¶¶ 23, 26 (Stipulated Facts); 7/10/14 PM Tr. at 102 (Hartman testimony). Both Messrs. Gnau and Marcus testified before the grand jury on October 16 and 23, 1986, respectively. Pl.'s Ex. 538 ¶¶ 22, 24 (Stipulated Facts).

For both of these witnesses, the Postal Inspectors and AUSA Valder prepared summaries of the information garnered over multiple interviews, and those summaries, after review and editing by the witnesses, were presented to the grand jury as the significant part of their testimony.  7/10/14 PM Tr. at 113-14 (Hartman testimony); Pl.'s Ex. 206 at 1 (Gnau G.J. Interview Summary) (noting that contents recount "a summary of statements made to Postal Inspectors by John R. Gnau, Jr. on September 23 and 30 and October 1 and 9, 1986"); Pl.'s Ex. 210 at 8-9 (Tr. of John Gnau Grand Jury testimony, dated October 16, 1986) ("Tr. Gnau G.J. testimony"), confirming that the interview summary is "true and accurate to the best of [his] knowledge and belief"); Pl.'s Ex. 196 at SMFC4 10997  (Memorandum of Interview of Michael B. Marcus, bearing handwritten notation from witness that, "the Memorandum, as corrected is true to the best of my knowledge").

Mr. Gnau stated that he first heard about REI in late summer 1984 from Vice Chairman Voss, with whom he already had in place an agreement to pay 30% of any fees paid to GAI from contacts provided by Voss.  Pl.'s Ex. 206 at 6, 8 (Gnau G.J. Interview Summary).  "Voss told Gnau there was an opportunity to make a lot of money with REI because they (REI) could use help in obtaining Postal Service contracts."  *Id*. at 8.  When Mr. Gnau met Mr. Reedy for the first time in October 1984, at the Dallas-Fort Worth Airport, "Reedy stated, Voss said you can do great things."  Mr. Reedy said that "Peter [Voss] and Bill [Moore] have a friendship and we need help in getting a Postal Service contract."  *Id.* at 8; Pl.'s Ex. 210 at 9 (Tr. Gnau G.J. testimony). Mr. Gnau "suggested" to Mr. Reedy "that [he] not mention Peter Voss' name but simply refer to him as 'our friend,'" to which Mr. Reedy responded, "'I understand.'" Pl.'s Ex. 206 at 8-9 (Gnau G.J. Interview Summary).  The Postal Inspectors found this interchange suspicious because of the acknowledgment to keep "the relationship between REI, GAI, and Voss a secret."  7/10/14

PM Tr. at 118 (Hartman testimony).  Moreover, at this first meeting, Mr. Gnau reported that he did not have "to sell GAI's capabilities to Reedy" and "[i]t was obvious [] that the REI/GAI contract was a 'done deal.'"  Pl.'s Ex. 206 at 9 (Gnau G.J. Interview Summary).  Nevertheless, when he heard nothing to consummate the contract, he complained to Vice Chairman Voss, who told him to call the plaintiff.  *Id*.  Mr. Reedy assured Mr. Gnau that the "contract will happen." *Id*.; *see also* Pl.'s Ex. 535 at 5 (Peterson G.J. Interview Summary, stating that when REI failed to return Gnau's telephone calls and failed to enter an agreement with GAI prior to December 1984, "she contacted REI at Peter Voss' instruction and asked that they contact John R. Gnau.").

At Mr. Gnau's first meeting with the plaintiff at REI's headquarters in Dallas, on January 3, 1985, Mr. Gnau promised "that he could obtain a sole source contract for REI, multi-line character readers" in 120 days.  7/10/14 PM Tr. at 116-17 (Hartman testimony); Pl.'s Ex. 206 at 10 (Gnau G.J. Interview Summary).  According to Mr. Gnau, the plaintiff responded "that scares me."  7/10/14 PM Tr. at 117 (Hartman testimony); Pl.'s Ex. 206 at 10 (Gnau G.J. Interview Summary).  Michael Marcus accompanied Mr. Gnau on this trip and confirms the substance of this conversation, stating that "Gnau told REI that he could deliver a production award in 90 to 120 days" and that REI "was curious as to how GAI could deliver in 3-4 months what William Moore could not deliver in three years."  Pl.'s Ex. 196 at 10 (Interview Summary of Michael Marcus presented to Grand Jury on Oct. 23, 1986 ("Marcus G.J. Interview Summary")).  In response to this query, "Gnau told REI that GAI would build REI support at the Board of Governors level through the Technology and Development Committee.  Gnau stated that Voss would help influence [this] Committee" and "the implication was that Voss was Gnau's man." *Id.*

The general substance of this conversation is also confirmed by the plaintiff's handwritten notes in one of his notebooks, which were produced to the government "in the latter part of 1986." 7/14/14 PM Tr. at 84 (Hartman testimony). The plaintiff's notes indicate a meeting on "1-3-85" with "Mike," referring to Michael Marcus, and Mr. Gnau, noting "timeframe (3-4 months)." Defs.' Ex. 181 at 307351 (Plaintiff's January 1985 Notebook). The Postal Inspectors found this information suspicious in terms of reflecting the plaintiff's awareness of the criminal conspiracy "[b]ecause [the plaintiff] was unable to get a contract for the prior two plus years" and "[n]ow a consultant walks into his office and said I can get one in 120 days." 7/14/14 PM Tr. at 83-84 (Hartman testimony).

In the Spring of 1985, Mr. Gnau reported that he spoke privately with Mr. Reedy, who asked "what's your arrangement with Peter Voss? John Gnau said, it's better you not know." 7/15/14 AM Tr. at 36 (Hartman testimony, reading from Defs.' Ex. 210 (Hartman Notes of Oct. 1, 1986 Interview of John Gnau)). The Postal Inspectors found this interchange to be indicative of REI's acknowledgment of the suspicious circumstances surrounding the GAI and Peter Voss relationship. *Id.* at 72 (Hartman testimony).

Subsequently, on August 29, 1985, Messrs. Spartin, Gnau, and Marcus met with Mr. Reedy in Dallas and negotiated an increase in their contract payments from REI to $22,000 per month to GAI going forward. Pl.'s Ex. 206 at 14 (Gnau G.J. Interview Summary); 7/10/14 PM Tr. at 119-20 (Hartman testimony). Mr. Reedy commented to Mr. Gnau: "I know you have people to take care of." *Id.* Mr. Marcus confirms hearing this statement from Mr. Reedy and stated "his belief that Reedy was aware that Voss' cooperation did not result from the persuasiveness of REI's arguments, but resulted from the fact that Voss and possibly others, were taken care of." Pl.'s Ex. 196 at 18 (Marcus G.J. Interview Summary). The Postal

Inspectors found this interchange suspicious and further acknowledgement of the illegal arrangement between GAI and Peter Voss.  7/10/14 PM Tr. at 121-22.  A portion of the $22,000 was considered "a draw against the one percent contingency fee that REI agreed to pay GAI in the event that they were successful in getting a post office contract for REI," and the remaining $6,000 was purportedly for GAI to perform public relations.  7/10/14 PM Tr. at 120; Pl.'s Ex. 262 at 66- 69 (Tr. Bray G.J. testimony); Pl.'s Ex. 137 at 13 (Spartin G.J. Interview Summary). Yet, GAI did not assume or perform any new, additional public relations work for REI.  Pl.'s Ex. 262 at 66-69 (Tr. Bray G.J. testimony, stating that he could not say what GAI did to earn the money paid under the $6,000 contract); Pl.'s Ex. 137 at 13 (Spartin G.J. Interview Summary, stating that "Spartin said that Reedy, Moore or REI never called upon him (Spartin) to perform any of the public relations functions called for in the agreement, but continued to pay GAI $6,000 per month").

Finally, Mr. Gnau corroborated Mr. Spartin's information about the plaintiff's role in recommending the replacement for PMG Carlin, a role that the plaintiff admits.  Specifically, he told the Postal Inspectors that the plaintiff had recommended three names to William Spartin, including that of Albert Casey, who ultimately replaced PMG Carlin. Pl.'s Ex. 206 at 17 (Gnau G.J. Interview Summary"); *see also* 6/24/14 AM Tr. at 162-64 (Plaintiff testifying that in response to Mr. Spartin's request for recommendations for the new PMG, he recommended three people, including Albert Casey).  He also reported that the plaintiff attended the "victory celebration" on January 9, 1986 for getting "our man in."  Pl.'s Ex. 206 at 18 (Gnau G.J. Interview Summary).  The plaintiff confirms that he was at this dinner where Mr. Spartin "was going to brag about the great job he had done of putting a new Postmaster General in place" and "destroy[ing]" former PMG Carlin.  6/24/14 AM Tr. at 165-66 (Plaintiff confirming that "Yes,

[Spartin] must have said something like that [referring to question.]" "Didn't Spartin tell you that Carlin had been destroyed?"]).

According to the plaintiff, he discounted GAI's information when he was told, as early as November 1985, that PMG Carlin was going to be fired because "why would the postal service put a new Postmaster General in who I thought was doing a good job and fire them a year later? That was beyond my comprehension."  6/24/14 AM Tr. at 160-61 (Plaintiff testimony).  This purportedly positive view of PMG Carlin cannot be reconciled with the plaintiff's complaints that PMG Carlin "didn't want to see me.  He didn't want me to come in and talk to him.  I wanted to talk to him just like I talked to Bolger, and he wasn't interested in doing it," 6/24/14 AM Tr. at 152, and Frank Bray's view, as REI's manager in charge of the USPS business, that PMG Carlin was stymieing REI's efforts for a USPS contract, *see* Pl.'s Ex. 262 at 55-56 (Tr. Bray G.J. testimony, in which Bray testifies that, at June 5, 1985 meeting among plaintiff, Gnau, Marcus and others at REI, they discussed that PMG Carlin and James Jellison were "both opposed to REI getting a sole-source procurement"); *id.* at 83-84 (Bray testifying that "every time it appeared that there was a recommendation from the Technology Committee or the Board to proceed with sole-source procurements either to REI or splitting with REI and ECA, that management, Carlin, blocked it . . . where Carlin repeatedly tried to stop in moving ahead with any contract award to REI"); *id.* at 86 (Bray testifying that Mr. Reedy was pleased about Al Casey becoming PMG "because he (Reedy) believed that REI would then have an opportunity to talk to Postal management"); Pl.'s Ex. 137 at 12 (Spartin G.J. Interview Summary, stating that "during summer of 1985," at meeting at "REI headquarters, REI and GAI agreed that Paul Carlin, Postmaster General and James Jellison, Senior Assistant Postmaster General were obstacles to REI receipt of a sole source contract . . . GAI and REI recognized that the

replacement of Carlin was an essential step to obtain a sole source contract"). The plaintiff further acknowledges that he considers Albert Casey "a friend" and "godfather," with whom he socializes, 6/24/14 AM Tr. at 153, and that he made efforts to educate Mr. Casey about REI's interests in USPS business, *id.* at 165. The plaintiff's criticism of PMG Carlin combined with his friendly relationship with Albert Casey, raises some doubt about the veracity of the plaintiff's testimony that, in his view, PMG Carlin was doing a good job and his disinterest in having PMG Carlin replaced with a friend.

After the public revelation of Mr. Spartin's significant connections to GAI and REI, Mr. Gnau told the Postal Inspectors that he had two conversations with the plaintiff about Mr. Spartin's effort to "cover-up" these connections. Mr. Gnau reported that, in the first conversation, "Reedy and Moore advised Gnau, 'Our attorneys are nervous about this meeting, but we aren't trying to do anything wrong.' Moore told Gnau he was nervous about Spartin's attempted cover-up." Pl.'s Ex. 206 at 21 (Gnau G.J. Interview Summary). In the second conversation with the plaintiff in late May, 1986, at a political fund raising event in Washington, D.C., "Moore said he was uncomfortable with the cover-up that he and Spartin had agreed upon. Gnau stated it was apparent that Spartin had agreed to protect Moore and credit someone other than Moore with recommending Albert Casey's name." *Id.*[40] The Postal Inspectors found this

---

[40] Messrs. Voss, Spartin and Gnau tell variations of this story about the plaintiff's role in Mr. Spartin's efforts to cover-up his conflict of interest in working for GAI, a consultant to REI, at the same time he was hired by USPS to search for and recruit a new PMG. After Mr. Spartin's conflict of interest in the recruitment of Albert Casey became a subject of investigation, Mr. Spartin tried to distance himself from GAI and REI by back-dating a letter of resignation as well as lying to Postal Inspectors that his own independent research led to Casey's name. Pl.'s Ex. 137 at 27 (Spartin G.J. Interview Summary); *United States v. Recognition Equipment Inc. et al.*, Criminal Action No. 88-0385 ("Crim. Trial Tr.") at 2620 (Spartin testimony, dated October 23-25, 1989). Mr. Spartin stated that he reached out to Mr. Reedy "to discuss who it is who referred who to Casey" and "Reedy said well you, you talked to Bill Moore, ..it's on the record." Pl.'s Ex. 226 at 29 (Spartin Polygraph Tr.). Then Mr. Spartin spoke to the plaintiff, who said "look, … I gave you Casey's name. He said ah, I got the call from John [Gnau], and you called me and I gave you three names and one of them was Casey, and I said that's fine, we'll let the record stand right there. And that's the only conversation I had with REI. Nothing else." *Id.* Mr. Spartin's testimony before the grand jury and at the criminal trial differed and indicated that the plaintiff had agreed to cover-up GAI's connection to the

information suspicious because the "significance of a cover up is people have cover ups because they have something to hide." 7/10/14 PM Tr. at 122 (Hartman testimony).

Messrs. Gnau, Spartin, Voss and Marcus and Ms. Peterson offered no testimony that any one of them ever directly told the plaintiff or any other REI employee that GAI was paying off Vice Chairman Voss. *See, e.g.*, 7/7/14 AM Tr. at 49-50 (Hartman testimony); Pl.'s Ex. 206 at 21 (Gnau G.J. Interview Summary, stating:  "Moore and Reedy wanted to know about the involvement of Voss and Gnau in any illegal activity that they should know about. Gnau told them, "It's better that you don't know."); Pl.'s Ex. 160 at SMFC4 09901 (Voss Interview on May 9, 1986, reporting that "he did not know if REI knew that he [Voss] was getting money from John Gnau"); Voss Dep. at 52, Jun. 12, 2014 (Voss stating that he did not have direct knowledge as to whether the plaintiff knew of the conspiracy); *see generally* Pl.'s Ex. 214 (Tr. Voss G.J. testimony); Pl.'s Ex. 211 (Tr. of Michael Marcus Grand Jury testimony, dated October 23, 1986 ("Tr. Marcus G.J. testimony")); Pl.'s Ex. 204 (Tr. Peterson G.J. testimony).  All of the co-conspirators, however, told the Postal Inspectors that the plaintiff must have known about the

---

recruitment of Albert Casey. Pl.'s Ex. 137 at 27 (Spartin G.J. Interview Summary, stating "Spartin telephoned and talked with Moore and Moore indicated he would say what Spartin wanted him to say," which was "that he (Moore) called Spartin on his own initiative and volunteered some names").  Vice Chairman Voss gives another version of this "cover-up," stating that, in March 1986, after John McKean learned of Mr. Spartin's "apparent conflict of interest" as President of GAI, which represented REI, Vice Chairman Voss contacted Mr. Spartin, "who told him that he would contact [REI] President William Moore to discuss the circumstances surrounding the Casey recommendation. Mr. Voss stated that Mr. Spartin told him that the Casey matter was discussed and handled with William Moore, and indicated that he (Spartin) was going to state that Carla Hills was the individual who recommended Al Casey as the next Postmaster General." Defs.' Ex. 65 at 16 (Voss G. J. Interview Summary).  Although confirming that Mr. Spartin called him "and asked [him] to change the facts about how he got Casey's name," the plaintiff denies that he agreed to do that.  6/25/14 AM Tr. at 166-67 (Plaintiff testimony); 6/25/14 PM Tr. at 4 (Plaintiff testifies "I think he was suggesting to protect himself against something").  Mr. Gnau's interview summary relays two conversations with the plaintiff, who reportedly "told Gnau he was nervous about Spartin's attempted cover-up" and "he was uncomfortable with the cover-up that he and Spartin had agreed upon." Pl.'s Ex. 206 at 21 (Gnau G.J. Interview Summary). Given the variations in Mr. Spartin's story and the lack of clarity in the details about what his cover-up story was, Mr. Gnau's reported conversations with the plaintiff are too thin a basis to conclude that the plaintiff was part of any cover-up of REI and GAI's participation, through Mr. Spartin, in the selection of the new PMG.

conspiracy.  7/15/14 AM Tr. at 104-105 (Kormann testimony).  Mr. Spartin expressed his

opinion to the grand jury that the plaintiff and Mr. Reedy knew that Vice Chairman Voss was

receiving money from Mr. Gnau with respect to the MLOCR procurement.  Pl.'s Ex. 269 at 10

(Tr. Spartin G.J. testimony, stating, in response to question, "Do you recall that you told [the

Postal Inspectors in August 1987] that in your judgment Moore and Reedy did know that Voss

was receiving money from Gnau relative to the MLOCR procurement?," that "A: That is my

opinion, yes, sir.").[41]

Another witness, Frank Bray, REI's manager of postal programs, presented generally

exculpatory testimony to the grand jury, testifying about the occasions when the plaintiff and Mr.

Reedy had queried John Gnau about the source of GAI's influence over Vice Chairman Voss.

He testified that: "Robert Reedy asked John Gnau 'point blank' whether or not he paid anyone to

obtain a MLOCR contract on behalf of REI. Mr. Gnau replied that he did not, but Gnau told

Reedy and Bray that he had loaned Peter Voss money due to Voss' financial problems resulting

from divorce proceedings . . . [F]ollowing Peter Voss' guilty plea, Reedy and/or Moore again

spoke to John Gnau and Gnau again denied paying Peter Voss monies relating to the MLOCR

contracts." Pl.'s Ex. 262 at 94 (Tr. Bray G.J. testimony).[42]  Rather than these queries suggesting

---

[41] This opinion expressed by Mr. Spartin is targeted for special attention by the plaintiff, who claims the opinion was predicated on improper use grand jury material.  Specifically, AUSA Valder allowed Mr. Spartin and his counsel to review four interview summaries of other witnesses to refresh Mr. Spartin's recollection of events. The propriety of this use of the four interview summaries is discussed in detail, *infra*, in Part IV A.

[42] The plaintiff has repeatedly claimed during this prolonged litigation that government agents manipulated the grand jury process by not allowing Mr. Bray to provide certain exculpatory testimony in the grand jury.  *See, e.g.*, *Moore I*, 65 F.3d at 192 (plaintiff claiming "misconduct [by] concealing and distorting exculpatory evidence to create misleading or incomplete witness accounts of what Moore knew about the alleged fraud"); *Moore IV*, 571 F.3d at 65 (same); *2010 Decision*, 730 F. Supp. 2d at 179 (citing plaintiff's evidence that "the prosecutor made statements to grand jury witnesses to 'not reveal' certain portions of their testimony to the grand jury").  As support, the plaintiff cites the events surrounding the preparation of Mr. Bray's interview summary for presentation to the grand jury.  Specifically, Mr. Bray has testified that "there were things that my counsel and I wanted to put in; and they said, no, you cannot put that in."  6/30/14 PM Tr. at 24.  In particular, Mr. Bray wanted his interview summary to contain a three-line paragraph stating: "[1] Mr. Bray stated he was shocked by and Moore and Reedy expressed surprise at Voss' plea. [2] Following Voss' plea, Moore, Reedy and himself, outside the presence of counsel, have

any suspicion on the part of REI about possible corruption, Mr. Bray testified before the grand

jury that the attention given to REI from the BOG was due to their "good product."  Specifically,

in response to a question about whether he came "to suspect that your good fortune might have

been due to corrupt events or corrupt influence outside of your knowledge," Mr. Bray testified

that, "I felt like we had a good product. We had a product the Postal Service needed . . .. We

finally got a chance to talk to the [BOG] about this.  The [BOG] listened . . . we got their

---

discussed the events and transactions among REI, GAI and the USPS. [3] Mr. Reedy never advised Bray whether or not he told Postal Inspectors that Gnau was referred to him (REI) by someone other than Peter Voss." Pl.'s Ex. 263 at 22 (Draft of Interview summary for Frank Bray).  Part of this proposed paragraph was covered with handwriting by AUSA Valder noting some names, including "Hill & Knowlton," and the cryptic two-words "don't reveal." AUSA Valder could not recall what those cryptic two-words referred to. Valder Dep. at 491-92, Mar. 1, 2000.  This complaint about not including information for presentation to the grand jury is belied by review of the grand jury transcript. Specifically, the topic in each of the three sentences was "reveal[ed]" to the grand jury through questions posed to Mr. Bray by AUSA Valder. Pl.'s Ex. 262 at 100-01 (regarding [1]), 101 (regarding [2]), 102 (regarding [3]) (Tr. Bray G.J.  testimony).

Mr. Bray and his counsel also requested that AUSA Valder elicit testimony before the grand jury that Mr. Bray did not believe that the plaintiff or Mr. Reedy knew about the kickback scheme, but this was not done.  7/7/14 AM Tr. at 90 (Hartman testimony).  AUSA Valder recalls that he did not believe it to be appropriate for the witness to offer an opinion about what others thought.  7/16/14 PM Tr. at 80 ("There was opinion in here, there were competency problems in here.  And I did not, I agree with the inspectors that it was improper").  In any event, examination of Mr. Bray's testimony before the grand jury reveals that he made efforts to exculpate himself, REI, the plaintiff and Mr. Reedy. He certainly did not admit, as he did during the instant trial, that he had lied to the Postal Inspectors during interviews with the Postal Inspectors in November 1985.  In addition to the exculpatory statement noted in the text, Bray provided further exculpatory testimony, including that: (1) "[he] did not know of any contact from Mr. Voss to anyone at REI" regarding finalizing a consulting contract with GAI, Pl.'s Ex. 262 at 13; (2) Mr. Bray was involved in the preparation of the original and subsequent consulting contracts with GAI, *id.* at 37, 67, and "felt like [Marcus] was good and that Gnau & Associates from that standpoint were earning their money," *id.* at 91; (3) REI did not put any controls on GAI's communications with USPS because "we felt like that certainly Mike Marcus understood the issues, understood REI's . . . strategy, REI's position, REI's product, and knew how to present it . . . he grasped the issues very quickly," *id.* at 52-53; (4) the plaintiff "offered to work together with AEG on a conversion kit contract," but Mr. Bray "could not recall Mr. Moore stating that he would attempt to kill the retrofit phase of the multi-line procurement" or mentioning his political influence with Vice President Bush and congressmen, *id.* at 72; (5) he denied seeing any competitors' presentations to BOG that were obtained by Mr. Marcus or other REI employees, *id.* at 77, or other internal USPS or BOG documents, *id.* at 110, and even if ECA's proposal to BOG had been disclosed to REI, "I don't know if there would've been anything in that proposal that was beneficial to REI or not," *id.* at 81; (6) GAI was not telling REI officials everything that was going on, *id.* at 78; (7) Bray says he was "shocked" and both the plaintiff and Mr. Reedy "were very surprised at the Voss plea," *id.* at 100; and (8) Mr. Bray had "no knowledge" or "reason to believe . . . that Gnau was paying Voss any money," *id.* at 110.

attention, and that's why we felt like that maybe finally someone can listen and appreciate and understand what our product can do for the Postal Service." *Id*. at 103-04.

In addition to the exculpatory testimony provided by Mr. Bray, AUSA Valder testified that the grand jury was advised on multiple occasions that the case against the plaintiff and his co-defendants was circumstantial, stating:

> I must have told that grand jury 10 times if not 20 times that there was no evidence anywhere that anyone had told Mr. Moore or Mr. Reedy directly that Gnau was paying Voss off, that it was a circumstantial case. I said that dozens of times. If you look at the day I last discussed the case with the grand jury, I said it right there again. And if you look at the various things I said to the grand jury, I told them repeatedly, you now, again out of fairness to Mr. Moore, Mr. Reedy, REI, just like with Mr. Spartin, it was a very difficult question.  It was a circumstantial question. One you had to draw an inference from which I and my entire supervisory cadre including Mr. Leeper as far as the conspiracy count, agreed with.

7/16/14 PM Tr. at 85-86.

## C.  Consideration of Indictment by D.C. U.S. Attorney's Office

The DC USAO spent many months engaged in a thorough review of the evidence and proposed charges in the indictment against the plaintiff and his co-defendants.  As the then-Chief of the Criminal Division, H. Marshal Jarrett, testified "the U.S. Attorney directed that we have a high level of review, and that's what we did."  7/10/14 AM Tr. at 41-42 (Jarrett describing the level of review of the plaintiff's case as "decidedly at the thorough end of the spectrum"); 7/17/14 AM Tr. at 27-28 (Valder testimony); *id*. at 127 (Knight testimony).  To execute this "high-level" review, a committee consisting of no fewer than six AUSAs, including H. Marshall Jarrett, then-Chief of Special Prosecutions Paul Knight, then-Deputy Chief of Special Prosecution Charles Leeper, and other AUSAs William Birney, William Block and Rhonda Fields, and the then-U.S. Attorney Jay Stephens, were involved in reviewing the evidence and

the proposed indictment.  7/2/14 AM Tr. at 103-07 (Leeper testimony); *see also* 7/17/14 AM Tr.

at 125-26 (Knight testimony).

 Members of the review committee met on at least seventeen separate occasions to discuss

and evaluate the proposed indictment. *See* 7/16/14 PM Tr. at 100 (Valder testimony).  AUSA

Valder testified that by "the end [he] believe[d] there were 15 to 17 prosecutors, supervisors, and

department attorneys who had reviewed [the proposed indictment] . . .[a]nd [he] just can't think

of certainly any other case that ever received a review such as that." *Id.*; *see also* Defs.' Ex. 10

(Memorandum to Jay Stephens from Paul Knight and Charles Leeper, dated June 1, 1988 ("June

1988 DC USAO Mem."), noting that "[o]ver the past two months, Bill Block, Charlie Leeper,

Rhonda Fields, and [Paul Knight] have been meeting with Joe Valder and the two main

investigators in the case (Postal Inspectors Frank Korman[n] and Mike Hartman) to carefully

review the proposed REI indictment").

 As part of the review procedure, the prosecutors considered investigative materials

provided by the Postal Inspectors that were compiled into a 150-page document entitled the

"Details of Offense," which was intended "to provide a background and chronological detail of

the evidence in the case" garnered during the investigation.  7/15/14 AM Tr. at 75 (Kormann

testifying that the "Details of Offense" "present[ed] a complete summary of the evidence . . . that

[the Postal Inspectors] had gathered in a form that the U.S. [A]ttorney could readily review");

7/10/14 PM Tr. at 109 (Hartman testimony); Pl.'s Ex. 291 (Details of Offense).  The evidence

described in the "Details of Offense" was gathered "[t]hrough interviews and grand jury

subpoenas of documents," 7/10/14 PM Tr. at 108 (Hartman testimony), as well as "phone

records, Mr. Moore's notebooks, REI phone logs, et cetera," 7/15/14 AM Tr. at 76 (Kormann

testimony).  This was a "working document" that grew in length as new evidence was discovered

and presented to the U.S. Attorney's office on a "very regular basis."  7/10/14 PM Tr. at 108

(Hartman testimony); *see also* 7/15/14 AM Tr. at 75 (Kormann testimony); 7/16/14 PM Tr. at 87

(Valder testimony).  In addition, the DC USAO considered a 300-page joint submission from

REI, the plaintiff, and Mr. Reedy presenting their perspective on the evidence as showing a lack

of sufficient knowledge and/or involvement in the kickback and bribery conspiracy to support an

indictment.  *See* Defs.' Ex. 8 (February 5, 1988, REI Joint Submission to DC USAO).

Confronted with these two perspectives on the events at issue, the prosecutors conducting

the review within the DC USAO engaged in considerable debate and discussion about whether

and what charges should be brought against REI and any of its employees.  Supervising AUSAs

Paul Knight and Charles Leeper authored two memoranda about the issues at stake, offering

differing views on whether an indictment should be brought.  *See* Defs.' Ex. 10 (June 1988 DC

USAO Mem.); Pl.'s Ex. 313 (Supplement to June 1, 1988 Memorandum ("Supp. DC USAO

Mem."), noting that "[s]ince our last memorandum, [they had] conducted a further review of the

evidence and, along with Bill Block, formulated recommendations" with respect to each

proposed count).  The reviewing AUSAs recognized that "one of [their] most difficult tasks has

been to ascertain whether REI was guilty of criminal acts or just engaged in very aggressive, and

even 'sharp' business practices" because "[t]here [was] no question that they played 'hardball'

with the Postal Service and their competitors; it is not as clear that their actions were criminal."

Defs.' Ex. 10 at 1 (June 1988 DC USAO Mem.).  "Rather than try to summarize all of the

evidence," they recommended that the U.S. Attorney himself "review the attached 'Details of the

Offense' which provid[ed] an excellent summary and index of the key events in the case."  *Id.* at

12.  They further noted that "[t]he facts underlying th[e] indictment are complicated and the

evidence [was] entirely circumstantial," *id.* at 1, which was a consideration stressed in the joint

submission by the prospective defendants, *id.* at 2.  Consequently, the DC USAO was well aware that the co-conspirators said they never told the plaintiff or his co-defendants about the illegal kickback and bribery scheme, 7/11/14 AM Tr. at 40-41 (Hartman testimony), and that the evidence against the plaintiff was circumstantial, 7/10/14 AM Tr. at 40 (Jarrett testimony); 7/17/14 AM Tr. at 132, 136 (Knight testimony).

In addition to permitting a substantial defense submission, the DC USAO also provided defense counsel an opportunity to make an oral presentation in an effort to dissuade the prosecutors from pursuing an indictment against the plaintiff and his co-defendants.  On September 22, 1988, defense counsel met with then- U.S. Attorney Jay B. Stephens and other AUSAs, including Bill Birney, Bill Martin, Marshall Jarrett, Paul Knight, Charles Leeper, and Joseph Valder. 7/15/14 AM Tr. at 119-20 (Kormann testimony); *see also* Defs.' Ex. 81 at 1 (Handwritten Notes of September 22, 1988 USAO Meeting).

In the end, only one of the reviewing prosecutors, Charles Leeper, recommended that no indictment be brought but even he testified that "reasonable minds [could] disagree" about the issue.  7/2/14 AM Tr. at 116 (Leeper testimony).  By contrast, more senior prosecutors, including his direct superior, then-Chief of Special Prosecutions Paul Knight, and then-Criminal Chief Marshall Jarrett, disagreed with this recommendation believing that charges should be brought against the plaintiff and his co-defendants.  7/10/14 AM Tr. at 43, 64-65, 68 (Jarrett testimony); *see* Defs.' Ex. 10 at 1 *(*June 1988 D.C. USAO Mem.); Pl.'s Ex. 313 at 1 (Supp. D.C. USAO Mem.).  Ultimately, then-U.S. Attorney Jay Stephens, made the decision to approve the indictment of the plaintiff and co-defendants.  7/2/14 AM Tr. at 45, 66 (Leeper Testimony).[43]

---

[43] Notwithstanding the undisputed evidence that the then-U.S. Attorney made the final decision to indict, the plaintiff persists in arguing that the Postal Inspectors procured the plaintiff's indictment by "aggressively lobb[ying]" the U.S. Attorney's Office to "approve the prosecution" of the plaintiff, Reedy, and REI.  Pl.'s COL at

The grand jury returned an indictment against the plaintiff on October 7, 1988.  *See* Pl.'s Ex. 326

(Indictment against Plaintiff, Mr. Reedy and REI). [44]

Following the plaintiff's acquittal, defense counsel filed a complaint with the Department

of Justice's Office of Professional Responsibility ("OPR") requesting a determination: "whether

the reviewing authorities were fully aware of the exculpatory evidence which was available to

the prosecutor and the Postal Inspectors . . ." Pl.'s Ex. 385 at 2 (Letter, dated November 10,

1989, from Defense Counsel to Counsel for OPR).[45]

A year and a half later, OPR responded to defense counsel's complaints, concluding with

respect to the review process that:

> The supervisory process that resulted in [the decision to indict the plaintiff, Mr. Reedy,
> and REI] was exhaustive.  There were numerous meetings at which the merits of the case
> were debated and analyzed.  Memoranda which scrutinized each count of the proposed
> indictment were prepared and circulated.  In the course of that procedure, the indictment
> was modified and revised several times before final approval.  As a result, the problem
> areas of the case, including the state of knowledge of the defendants, were identified and
> fully considered.  In addition, extensive presentations on behalf of the defendants were
> made to both the U.S. Attorney and the Department prior to the approval of the
> indictment, and those presentations produced even more supervisor review, further
> analysis of the case, and additional fine-tuning of the indictment.  In the light of the

---

29 n. 8).  In particular, the plaintiff cites two letters that CPI Clauson sent to then-U.S. Attorney Stevens "urg[ing] a
timely decision relative to the prosecution of Recognition Equipment, Inc., William G. Moore and Robert Reedy."
Pl.'s Ex. 309 at 1 (Letter, dated May 13, 1988, from Clauson to Stevens); *id.* at 2 (Letter, dated July 27, 1988, from
Clauson to Stevens) (same).  These letters avoid discussion of the proposed defendants "guilt or innocence, but
rather [] discuss the effect of delaying the decision on the Inspection Service's ability to effectively protect Postal
Service assets and to maintain the integrity of various postal systems."  Pl.'s Ex. 309 at 1 (Letter from Clauson to
Stevens, dated May 13, 1988).  Specifically, as a result of the investigation, the Postal Service had suspended its
procurement process for approximately six months, which cost the Postal Service "valuable time and countless
millions of dollars in lost savings.  *Id.*  CPI Clauson confirmed in his testimony at trial that USPS sought a decision
on the indictment essentially so that the USPS could move on.  *See* 7/10/14 AM Tr. at 126-27 (Clauson testifying
that: "[T]his case went on for a long time once the initial defendants were disposed of.  During that time the postal
service would not proceed with the procurement action and . . . the time that passed became . . . a very expensive
burden for the postal service.  So there came a time that we pressured for a decision on this case with increasing
intensity.").

[44] The indictment charged the plaintiff with seven counts, including conspiracy, theft of property used by
the postal service, mail fraud, wire fraud, and receipt of stolen property.  Pl.'s Ex. 326 (Indictment).

[45] Defense counsel also complained to OPR about "whether the reviewing authorities were aware of the fact
that Spartin was allowed to review the Grand Jury statements of four other coconspirators."  Pl.'s Ex. 385 at 2.  OPR
rejected this complaint stating that "we will advise the Executive Office of our decision that AUSA Valder was not
deficient in his compliance with the court's discovery order."  Defs.' Ex. 88 at 2 (Letter, dated August 1, 1991, from
OPR to U.S. Attorney Jay B. Stephens).

> extensive and extraordinary review afforded this matter, we cannot conclude that the
> review process for this indictment was deficient.

Defs.' Ex. 87 at 2 (Letter, dated May 30, 1991, from OPR to Defense Counsel). While "[i]t

would be easy, given the benefit of hindsight, to conclude that in light of the judgment of

acquittal the decision to indict was clearly incorrect," OPR further determined that examination

of the record reveals "a rational basis for the U.S. Attorney's decision" as well as "sufficient

evidence support[ing] the government's theory of the case." *Id.* As support for this

determination, OPR cited "<u>e.g.</u>, the apparently missing pages from Mr. Moore's spiral notebooks

and Mr. Reedy's apparently false statements to the Postal Inspectors, as well as his seemingly

conscious disregard for the signals – 'it's better that you don't know about the relationship

between Gnau and Voss' – he was receiving." *Id.* at 2.

  In sum, review of the evidence in this case and proposed indictment were given a high

level of attention and consideration within the DC USAO and, despite the presentations by

defense counsel, all of the prosecutors, but one, believed that the evidence was sufficient to

prove, beyond a reasonable doubt, that the plaintiff and his co-defendants were guilty of the

charges in the indictment. *See* 7/2//14 AM Tr. at 110; 103-07 (Leeper testimony); *see also*

7/17/14 AM Tr. at 125-26 (Knight testimony).

### D.  Plaintiff's Alleged Damages

  The plaintiff demanded a total of $235,191,398.90 in lost compensation, emotional and

reputational damages from the defendants, as well as punitive damages. 6/27/14 AM Tr. at 39-40

(Dr. Fanara Testimony).[46] Despite devising the litigation strategy that culminated in this

damages claim, even plaintiff's counsel described the amount as "astronomical" when

---

[46] As support for his claim of emotional damages, the plaintiff presented testimony that he went to the
emergency room for an acute stress reaction on account of experiences emanating from the investigation and
indictment. 6/24/14 PM Tr. at 61, 64, 66-67 (Plaintiff testimony); 7/2/14 PM Tr. at 9-13 (Patrick Moore testimony).

questioning the plaintiff's damages experts.  6/27/14 AM Tr. at 40.  The plaintiff proffered three experts on damages: (1) Dan Cruse, a former executive recruiter at an executive search firm, testified as an expert on executive placement and opined about what he believed the plaintiff's career path would have been but for the indictment, 6/26/14 AM Tr. at 25-26; (2) Dr. Charles Betsey, an economics professor at Howard University, testified as to the plaintiff's lost compensation resulting from the indictment, based upon the predictions made by the plaintiff and Mr. Cruse, *id.* at 73; and (3) Dr. Philip Fanara, a finance professor at Howard University, testified as to the lost stock options that the plaintiff could have made "but for" the indictment, also based entirely upon the predictions made by the plaintiff and Mr. Cruse, 6/27/14 AM Tr. at 9-10.

Mr. Cruse confirmed the plaintiff's view that his future professional career, but for the indictment, would have produced the following successes: (1) the plaintiff would have remained CEO of REI for at least another three years, when REI would have reached $750 million in annual revenues, *see* 6/24/14 PM Tr. at 97 (Plaintiff testimony); (2) the plaintiff would have left REI in 1994 to become a CEO of a larger company, which would have provided compensation packages comprised of base salary, performance-related bonuses, and stock options, 6/24/14 PM Tr. at 97-98 (Plaintiff testimony); (3) the plaintiff would have retired as a CEO of a larger, publicly traded company than REI at the age of sixty-five, 6/24/14 PM Tr. at 90 (Plaintiff testimony); and (4) the plaintiff would have continued working on boards until the age of seventy-two, 6/24/14 PM Tr. at 98-100 (Plaintiff testimony). 6/26/14 PM Tr. at 15-16 (Cruse testimony).  Due to the perpetual taint or stigma of being indicted, Mr. Cruse stated that, as an executive search recruiter, he would not have recruited the plaintiff for a position as CEO or Director.  *Id.* at 9-10.  In addition, Mr. Cruse testified that he was not aware of any instance

where someone has been indicted and acquitted, and still became the CEO or Director of a major, publicly traded company. *Id.* at 10-11.

Predicated on the testimony of the plaintiff and Mr. Cruse about the plaintiff's intended and anticipated career path, Dr. Betsy testified that the plaintiff's total lost cash compensation from 1989 through 2011 would be $13,324,477. 6/26/14 PM Tr. at 94.[47] He based this on the average cash compensation packages and board fees at the representative companies chosen by Mr. Cruse, 6/26/2014 PM Tr. at 82-90 (Dr. Betsey testimony). Dr. Betsey added these two estimates from lost compensation garnered as a CEO and lost compensation garnered as a Director and deducted from this total estimate the actual income the plaintiff earned as a consultant at the Grayson Group for the period that he would have been the CEO of another publicly-traded company. *Id.* at 91.

Finally, Dr. Fanara testified as to the plaintiff's losses from lost stock option opportunities, predicated upon the plaintiff's testimony about his intended career path, Mr. Cruse's opinion about the plaintiff's career prospects (if not for the indictment), and Dr. Betsey's estimated lost compensation. Dr. Fanara estimated the value of the plaintiff's lost stock options to be $187,000,000. 6/27/2014 AM Tr. at 73-74. He calculated this estimate by averaging the value of the options actually received by the CEOs at the representative companies chosen by Mr. Cruse, and applying a rate of return of 8.8 percent.[48] 6/27/2014 AM Tr. at 32-35. Applying

---

[47] This estimate was based, in part, on the plaintiff's testimony that during the approximately six years that the plaintiff served as REI's CEO, his salary rose from $204,211 to $2,301,018, including both his annual salary and bonus, and he anticipated further salary increases and career advances. 6/24/2014 PM Tr. at 30-31, 98 (Plaintiff testimony); *see* Pl.'s Ex. 430A at WM 076609, 075615 (tax returns). According to the plaintiff, but for the indictment, he would not have been terminated as CEO and REI would not have been acquired by another company. 6/25/2014 PM Tr. at 24.

[48] Dr. Fanara used the Black-Scholes Model, which is a generally accepted formula for calculating the value of a stock option. *In re Fed. Nat'l Mortgage Ass'n Sec., Derivative, & ERISA Litig.*, 87 Fed. R. Serv. 3d 196 (D.D.C. 2013) *appeal dismissed*, 14-7007, 2014 WL 1378762 (D.C. Cir. Apr. 3, 2014) (approving a class action settlement that relied on "the commonly-used Black–Scholes methodology for valuing options" and upholding the use of implied volatility rather than historical volatility as an input for one of the formula's six variables).

the same rate of return to the plaintiff's total lost cash compensation, assuming it were invested

in a conservative, balanced portfolio, Dr. Fanara estimated the plaintiff's loss would be

$48,012,793.76. 6/26/2014 PM Tr. at 95-97; 6/27/14 AM Tr. at 35 (Fanara testimony).  By

adding up the lost stock options and other stock compensation with the lost cash compensation,

Dr. Fanara testified to a total damages loss of $235,191,398.90.  6/27/2014 AM Tr. at 40-41.

The defendants countered the plaintiff's "astronomical" damages claim with the

testimony of Dr. Jerald Udinsky, a financial and rehabilitation economist,[49] who opined that,

based upon the plaintiff's work history, education, and performance at REI, his income as the

owner of the Grayson Group is representative of his age-earnings profile and that, consequently,

the plaintiff did not suffer economic damages from the indictment.  7/16/14 PM Tr. at 173-74.[50]

As support for this opinion, Dr. Udinsky cited several circumstances.  First, following his

acquittal, the plaintiff served as the CEO of two other companies but was not successful. 7/16/14

PM Tr. at 169.  Second, REI's revenue growth during the plaintiff's tenure as CEO was not

sustainable since the growth was due to a one-time sale of REI real estate and severe cutbacks in

labor and expenses that contributed to quick, short term profitability. *Id.* at 160; 6/24/14 PM Tr.

at 103.

Finally, and more significantly, Dr. Udinsky opined that as CEO of REI, the plaintiff had

hired GAI, which was the consultant facilitating kickbacks to a member of the USPS's BOG to

obtain a contract for REI.  7/16/2014 PM Tr. at 153-56.  This association between REI and both

the corrupt consultants and the corrupt public official negatively impacted REI's stock price,

---

[49] Dr. Udinsky explained that this area of expertise involves analysis of "how a person moves between jobs. If you lose your job for some reason, I have developed an expertise in how you locate additional employment, the types of earnings you could anticipate, how long it takes you to become reemployed, and any economic loss that you may experience while you are finding new employment." 7/16/14 AM Tr. at 99.

[50] Dr. Udinsky determined that, if the plaintiff did suffer economic damages as a result of the indictment, those damages would cease to accrue after a two-year job search, or when he obtained comparable employment, and would amount to only $377, 644.  7/16/14 AM Tr. 127-32.

which declined in 1987, prior to the indictment and happened "in conjunction with the stock market decline that happened at that time . . . [and] the investigation of REI [which] began in that period of October 1987. *Id.* at 154. Dr. Udinksy explained that prior to the considerable October 1987 drop in REI's stock price, REI had already received bad press, stating "this terrible problem of Mr. Voss being found to have taken illegal payments, the guilty plea. Then after Voss, six months later, a lot of articles having to do with Gnau and Marcus pleading guilty, so –and every time there was an article, the end of the article tends to be: And, by the way, they were associated with - - they were the representatives of REI, the marketing representatives of REI in Washington. And many of [the articles] would actually mention Mr. Moore as the CEO." 7/16/14 AM Tr. at 154-55. Thus, by the time of the indictment, in October 1988, "[t]he financial and business community had already taken consideration of these problems, and that [the plaintiff] and REI were already associated with these criminal activities. Whether they liked it or not, they were just associated with it." *Id.* at 156.

Moreover, Dr. Udinsky opined that even if the indictment had not occurred, REI's growth would not have continued because REI's technology was not superior to that of its competitors. 7/16/14 AM Tr. at 163-64. After a test between REI's MLOCRs and those of a competitor, the USPS determined that the competitor offered superior equipment and awarded its contract to the competitor. *Id.* at 162-63. Following a lawsuit, a Federal District Court in Delaware, upon review of "all the evidence extensively . . . wrote a fairly long opinion, and in that opinion determined that, in fact, the REI machine had significant problems" and the USPS was justified in awarding the contract to the competitor. *Id.* at 163 (referring to Mem. Op., *Unisys Corporation vs. United States Postal Service*, No. 89-331 (LON) (D. Del. Aug. 14, 1989)).

# IV.        CONCLUSIONS OF LAW ON PLAINTIFF'S FTCA CLAIM

The only count of the plaintiff's original FTCA complaint against the government that remains for disposition alleges that the actions of the Postal Inspectors, "acting within the scope of their employment as employees of defendant United States of America, constituted malicious prosecution in violation of the laws." FTCA Compl. ¶ 36. The parties' lengthy submissions of proposed Findings of Fact and Conclusions of Law have been considered, along with the testimony and exhibits admitted at trial, to reach the conclusions of law set out below.

To establish the tort of malicious prosecution, under local District of Columbia law, the plaintiff must prove the following four elements: "(1) the defendant's initiation or procurement of a criminal proceeding against the plaintiff; (2) absence of probable cause for the proceeding; (3) malicious intent on the part of the defendant; and (4) termination of the proceeding in favor of the plaintiff." *Moore II*, 213 F.3d at 710 (citation omitted); *see also Rogala v. District of Columbia*, 161 F.3d 44, 57 (D.C. Cir. 1998) ("An action for malicious criminal prosecution requires proof of the institution of a criminal action, with malice and without probable cause, that ultimately terminates in the plaintiffs' favor."); *Pitt v. District of Columbia*, 491 F.3d 494, 501 (D.C. Cir. 2007) (citation omitted); *DeWitt v. District of Columbia*, 43 A.3d 291, 295-297 (D.C. 2012).[51] As an initial matter, the parties agree and the Court finds that the fourth element is satisfied by the dismissal of all criminal charges against the plaintiff. *See Recognition Equip. Inc.*, 725 F. Supp. at 588 (ordering that "[the plaintiff's] motion for judgment of acquittal pursuant to Fed. R. Crim. P. 29 is granted"); Pl.'s COLs at 3. Hence, no further discussion of the last element is necessary.

---

[51] The parties do not dispute that these are the requisite elements of a malicious prosecution claim under local law. *See* Pl.'s COLs at 2; Defs.' COLs at 2-3. The defendants concede that no "special injury" need be proven. *See* Defs.' COLs at 3 n.2.

The plaintiff must prove each of the remaining three elements, however, to succeed on his FTCA malicious prosecution claim. Indeed, failure to prevail on any of these elements requires judgment in favor of the defendant. The plaintiff has failed to prove all three remaining elements, each of which is addressed *seriatum* below.

### A. Postal Inspectors Did Not Procure Indictment Against Plaintiff

To prove a malicious prosecution claim the plaintiff must show that the defendants initiated or procured the criminal proceeding against him. *See Moore II*, 213 F.3d at 710. The Circuit has already found that, while only prosecutors initiate criminal proceedings, a "person who 'procures' a criminal proceeding may be liable for malicious prosecution." *Id.* (citing RESTATEMENT (SECOND) OF TORTS § 653). "In fact, those who procure malicious prosecutions are usually the only potential defendants because, as here, prosecutors enjoy absolute immunity." *Id.* "In order to find that a defendant procured a prosecution, the plaintiff must establish a chain of causation linking the defendant's actions with the initiation of criminal proceedings." *Id.* (internal quotations and citation omitted). This causal link between the defendant's actions and the initiation of criminal proceedings must be established without taking into account those actions protected by the discretionary function exception. *See* 28 U.S.C. § 2680(a) (FTCA does not extend to claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused"); *Moore I*, 65 F.3d at 196-97 (finding that § 2680(a) applies to the plaintiff's FTCA claim for malicious prosecution); Pl.'s COLs at 29 (conceding that he "must prove that his indictment was procured through conduct unprotected by this discretionary-function exception").

The plaintiff posits the following theory of procurement: "the Postal Inspectors'releasing of grand jury testimony to Spartin . . . caused Spartin to incriminate him . . . [and] led to

[Moore's] indictment and then his prosecution." *Moore II*, 213 F.3d at 710 (citing FTCA

Compl. ¶ 26); *see also* Pl.'s COLs at 32.  The D.C. Circuit has already concluded that this

allegation, if true, would fall outside the discretionary function exception and support liability

under the FTCA for malicious prosecution.  *Moore I*, 65 F.3d at 196-97.  The *Moore I* Court

explained that  "[d]isclosing grand jury testimony to unauthorized third parties . . . is *not* a

discretionary activity nor is it inextricably tied to matters requiring the exercise of discretion.

Rather, it is a discrete activity, sufficiently separable from protected discretionary decisions to

make the discretionary function exception inapplicable to this allegation." *Id.* at 197.

        To satisfy the first element of his FTCA malicious prosecution claim and support his

theory that the defendant Postal Inspectors' unauthorized disclosure of grand jury testimony to

Mr. Spartin procured the indictment against the plaintiff, the plaintiff must prove both that (1)

the Postal Inspectors "disclosed grand jury material" to Mr. Spartin, in violation of Federal Rule

of Criminal Procedure 6(e), *Moore II*, 213 F.3d at 710 n.4; and (2) such disclosure "caused

Spartin to incriminate [the plaintiff], which led to [the plaintiff's] indictment," *Id.* at 710.  The

evidence presented at trial falls short of proving either point by a preponderance of the

evidence.[52]

---

[52] Earlier in this litigation, the plaintiff also alleged that the Postal Inspectors violated grand jury secrecy by disclosing to former PMG Carlin a copy of the draft indictment before final consideration by the grand jury. *See, e.g., Moore II*, 213 F. 3d at 707, 712-713 (summarizing plaintiff's allegation that "weeks before an indictment was returned against Moore, the inspectors passed along a draft indictment to Carlin. Carlin later filed a civil RICO claim against Moore, alleging that Moore conspired to have the Board dismiss him" and finding that disclosure of the draft indictment, "[i]f the complaint is true," "violated the secrecy of the grand jury). The evidence at trial put this allegation to rest. Specifically, Paul Carlin testified at trial that two Postal Inspectors visited him at his house on September 20, 1988, but that they did not discuss nor show him a draft indictment.  7/8/14 AM Tr. at 103-105. Indeed, PMG Carlin testified that he did not review the indictment before the suit was filed. *Id.* at 107 ("The Court: … Did you review the indictment before you filed your lawsuit?  The Witness: No."); *see also* 7/15/14 AM Tr. at 111-15 (Kormann testifying that he reviewed accuracy of factual information contained in draft indictment with Carlin but did not show him the draft nor advise him of the purpose of the meeting);  7/14/14 AM Tr. at 88-91 (Hartman testimony)(same).

### 1.   *Postal Inspectors Did Not Violate Rule 6(e)*

Federal Rule of Criminal Procedure 6(e)(2), titled "Secrecy," provides, in pertinent part, that "[u]nless these rules provide otherwise, the following persons must not disclose a matter occurring before the grand jury . . . (vii) a person to whom disclosure is made under Rule 6(e)(3)(A)," which paragraph, in turn, describes "any government personnel…that an attorney for the government considers necessary to assist in performing that attorney's duty to enforce federal criminal law." FED. R. CRIM. P. 6 (e)(2) and (3)(A).  Safeguarding grand jury secrecy serves multiple interests, including (1) encouraging prospective witnesses to come forward voluntarily and to testify fully and frankly, which would be less likely "if preindictment proceedings were made public" and witnesses were subjected "to retribution as well as to inducements;" (2) decreasing the risk that "those about to be indicted would flee, or would try to influence individual grand jurors to vote against indictment;" and (3) "assur[ing] that persons who are accused but exonerated by the grand jury will not be held up to public ridicule." *Butterworth v. Smith*, 494 U.S. 624, 630 (1990) (internal quotation marks and citations omitted); *see also Rehberg v. Paulk*, 132 S. Ct. 1497, 1509 (2012) (describing same reasons for grand jury's secrecy); *Douglas Oil Co. v. Petrol Stops Nw.*, 441 U.S. 211, 219 n.10 (1979) (summarizing same "distinct interests served by safeguarding the confidentiality of grand jury proceedings" ); *In re Grand Jury Subpoena (Miller)*, 438 F.3d 1141, 1150-51 (D.C. Cir. 2005) (citing same "catalog[]" of "multiple reasons for preserving the ancient secrecy of the grand jury"); *SEC v. Dresser Indus., Inc.*, 628 F.2d 1368, 1382 n.36 (D.C. Cir. 1980) (describing "rationale for grand jury secrecy" as "well established").

To effectuate the purposes of protecting the secrecy of grand jury proceedings, Rule 6(e) extends secrecy beyond the transcribed proceedings actually occurring before the grand jury to cover "any hearing," FED. R. CRIM. P. 6(e)(5), and "[r]ecords, orders and subpoenas relating to

grand jury proceedings… to the extent and as long as necessary to prevent the unauthorized

disclosure of a matter occurring before a grand jury," FED. R. CRIM. P. 6(e)(6).  As the D.C.

Circuit has observed, "the scope of the secrecy is necessarily broad . . . encompass[ing] not only

the direct revelation of grand jury transcripts but also the disclosure of information which would

reveal 'the identities of witnesses or jurors, the substance of testimony, the strategy or direction

of the investigation, the deliberations or questions of the jurors, and the like.'"  *Fund for*

*Constitutional Gov't v. Nat'l Archives & Records Serv.*, 656 F.2d 856, 869 (D.C. Cir. 1981)

(quoting *Dresser Industries, Inc.*, 628 F.2d at 1382).

At the same time, "a veil of secrecy" is not "drawn over all matters occurring in the world

that happen to be investigated by a grand jury." *Dresser Indus., Inc.*, 628 F.2d at 1382.

Consequently, despite the relatively short text of its operative words — "a matter occurring

before the grand jury"— determining the precise reach of the "veil of secrecy" afforded by Rule

6(e) is a complex task that rests on a fact-specific inquiry into the nature and context of the

matter disclosed.  *See In re Grand Jury Impanelled Oct. 2, 1978 (79-2)*, 510 F. Supp. 112, 114

(D.D.C. 1981) (lamenting that "Rule 6(e)'s prohibition against disclosing matters occurring

before the grand jury is deceptive in its simplicity") (internal quotation marks and brackets

omitted).

In evaluating whether a violation of grand jury secrecy occurred in this case, the Court

first summarizes the pertinent facts before discussing the legal factors relevant to resolving this

critical dispute, on which the plaintiff must prevail in order to sustain his FTCA claim.

### a.  The Pertinent Facts

Briefly, the plaintiff asserts that the disclosure by government agents to William Spartin

of four interview summaries, which were prepared for the purpose of presentation to the grand

jury and adopted as the bulk of the testimony of four witnesses before the grand jury, constitutes

an unauthorized disclosure of grand jury material and a violation of Rule 6(e). The government vehemently disputes that the interview summaries constitute grand jury material subject to Rule 6(e), notwithstanding that the same interview summaries disclosed, in full or redacted form, to Mr. Spartin had been previously presented as witness testimony to the grand jury. The key facts underlying this dispute are generally undisputed, as described below.

### i.    Disclosure of Interview Summaries to William Spartin

On April 8, 1986, Mr. Spartin, the president of GAI, entered into a non-prosecution agreement requiring him to cooperate and provide truthful information to avoid prosecution for any crimes he may have committed. Pl.'s Ex. 269 at 4-5 (Tr. Spartin G.J. testimony). In the sixteen months between the time he agreed to cooperate and the time he testified before the grand jury on September 1, 1987, Mr. Spartin met with the Postal Inspectors on over 20 occasions, *id*. at 5, and provided them with information related to his two GAI colleagues, who pleaded guilty to paying illegal monies to Vice Chairman Voss, and his interactions with the plaintiff and others at REI. The information relayed by Mr. Spartin in these interviews was ultimately compiled into a 28-page interview summary presented to the grand jury. *Id*. at 9.

Approximately six months after his cooperation began, AUSA Valder invited Mr. Spartin and his counsel to a meeting at the DC USAO on October 24, 1986. *See* Valder Dep. at 341, Mar. 1, 2000. The meeting was prompted by the concern that Mr. Spartin was not "telling the truth," *id.* at 340, and "was lying," *id.* at 342. In consultations with his supervisors, "about how to handle Mr. Spartin, there was a consensus we had to do something very significant . . . we had to wake him up . . . [a]nd, with my supervisors' concurrence," AUSA Valder planned to "tear up a copy of the plea agreement, and tell him [Spartin] that because he clearly wasn't telling the truth, he was in danger of losing the benefit of his plea agreement. Or of his nonpros agreement.

And that was approved by my supervisors." *Id.* at 333-44; *id.* at 353 ("my supervisors approved it"); *id.* at 354 .

As planned, at this meeting, AUSA Valder confronted Mr. Spartin and explained that the government was skeptical that Mr. Spartin was providing complete and truthful testimony regarding his involvement in the conspiracy.  *Id.* at 382 ("it was our view Spartin wasn't telling the truth… and we were considering revoking his plea agreement"); 7/16/14 PM Tr. at 49 (Valder testimony).  AUSA Valder demonstrated the depth of concern over Mr. Spartin's level of cooperation by dramatically tearing up a copy of Mr. Spartin's non-prosecution agreement. Valder Dep. at 305, 382, Mar. 1, 2000.  Mr. Spartin was permitted time to consult privately with his counsel, after which his counsel spoke to AUSA Valder and advised that Mr. Spartin truly had difficulty recalling events.  7/16/14 PM Tr. at 64 (Valder testimony).[53]

In order to facilitate Mr. Spartin's recollection of events, AUSA Valder consulted with his supervisors about whether he could share with Mr. Spartin summaries of interview of other witnesses.  Valder Dep. at 383-84, Mar. 1, 2000 (noting "consultation with my supervisors . . . that we didn't want to be showing Spartin anything that he had not already been involved in and should have had awareness of"); 7/16/14 PM Tr. at 67 (Valder testimony).  With the approval of his supervisors, AUSA Valder then directed the Postal Inspectors to gather certain interview summaries for his review and, in accordance with these instructions, Postal Inspectors Hartman and Kormann brought to AUSA Valder the interview summaries of four grand jury witnesses,

---

[53] Due to their skepticism about whether Mr. Spartin's lack of recollection was truthful, the investigating agents tested his veracity by arranging for Mr. Spartin to be polygraphed by Postal Inspector Norman Robbins on December 5, 1986.  Pl.'s Ex. 226 (Spartin's Polygraph Tr.); Valder Dep. at 397, Mar. 1, 2000.  This polygraph examination showed no deception. Robbins Dep. at 71, April 25, 2000 (Q: As a result of the examination that you did for Mr. Spartin, you in fact determined that the information he was conveying was truthful; correct? A: Yes. The information that--my opinion was that the questions that I asked him, the relevant questions, he was truthful on those questions.).

Messrs. Gnau, Marcus and Voss, and Ms. Peterson, as well as a document transcribing a conversation with another individual.[54]  Valder Dep. at 376-77, Mar. 1, 2000; 7/14/14 PM Tr. at 116-17 (Hartman testimony).

AUSA Valder testified that he reviewed the four interview summaries with "the scissors in my hand" and he cut out those sections that did not reflect Mr. Spartin's "contact with this topic or this event."  During this review and redaction process, AUSA Valder, consulted with Postal Inspectors Hartman and Kormann but he made the final decision about any redactions to the interview summaries, stating "I'm sure that the Inspectors and I read it and discussed this paragraph should be out, and that paragraph should be out, or this sentence should be out, and that it was a combination of the Inspectors and I making the redacted versions, and then the final approving person was me.  That in my judgment, the parts to be displayed to him would only be those things that he had already been involved in."  Valder Dep. at 384, Mar. 1, 2000; *see* 7/16/14 PM Tr. 67 (Valder testimony).

After this review and redaction process, the interview summaries were provided to Mr. Spartin and his counsel to review at the USAO "for four or five hours" in early November, 1986, in order to refresh Mr. Spartin's recollection.  Valder Dep. at 306, Mar. 1, 2000 ("There was one day when for four or five hours I allowed him to read segments of other people's summaries for the purpose of refreshing his recollection, because he was badly unable to recall historical events"); *id.* at 383 ("my diaries will show you the dates . . . before November 13, . . . that Mr. Gettings and Mr. Spartin came to my office and that they were – I remember they were left alone with these material and I gave them these statements"); *id.* at 384 ("We were trying to refresh his

---

[54] The fifth document is an undated, untitled, four-page partial transcription of a conversation with a person, identified by AUSA Valder as Tom Minor, "pertaining to an event that Spartin had previously been involved in."  Valder Dep. at 377, Mar. 1, 2000.  The plaintiff raises no issue about this document, which bears no markings indicating that it presented to the grand jury.

recollection as to what the truth was, which as I said before is permissible."); *id.* at 387, 516 (purpose of showing interview summaries to Mr. Spartin was to refresh his recollection); *see also United States v. Recognition Equipment Inc. et al.*, Criminal Action No. 88-0385 ("Crim. Trial Tr.") at 2610 (Spartin testimony, dated October 23-25, 1989)(Spartin testifying: ("Q: You read these documents for about four hours, you say?  A: Yes, sir.").

At the time these four interview summaries were disclosed to Mr. Spartin and his counsel, they had been presented, in full, to the grand jury. *See* Pl.'s Ex. 538 ¶¶ 21-22, 24 (Stipulated Facts); *see also* Valder Dep. at 378, Mar. 1, 2000 ("I believe that all four of them had already been adopted by their respective witnesses before the grand jury . . . I'm not exactly positive that Marcus and Gnau had already been before the grand jury").  AUSA Valder is clear that he, not the Postal Inspectors made the decision to disclose the four interview summaries to Mr. Spartin.  Valder Dep. at 381, Mar. 1, 2000 ("The Inspectors didn't show it to him. I showed it to him."); *id.* at 430 ("I told you that I showed Mr. Spartin whatever it was that comprises Government Exhibit 707").[55]  At no time, however, did the Postal Inspectors or AUSA Valder inform Mr. Spartin or his counsel that the interview summaries had been presented to the grand jury. Indeed, Mr. Spartin testified under oath at the plaintiff's criminal trial that he did not know the summaries he reviewed had served as grand jury testimony. *See* Crim. Trial Tr. at 2610 (Spartin testimony, dated October 23-25, 1989) ("Q. Now, you knew, did you not, sir, that the documents that you had received from the Government contained Grand Jury material; didn't you know that?" Spartin "A. No, sir, I didn't."); *id.* at 2612 (Spartin "A. Sir, I did not know they represented Grand Jury testimony. I am not an attorney and I wasn't sure what I was looking at. I

---

[55] The five documents, including the four interview summaries at issue, disclosed to Mr. Spartin were introduced at the plaintiff's criminal trial as Government Exhibit 707.

made some assumptions. I made them entirely on my own. As far as I knew, these were

statements…I did not know they were Grand Jury material.").[56]

### ii.   Purpose, Preparation and Presentation of Interview Summaries to Grand Jury

Having established that Mr. Spartin did not know the four interview summaries for

Messrs. Gnau, Marcus and Voss, and Ms. Peterson, had been presented to the grand jury, the

Court pauses here to consider other factors that may have a bearing on the critical question

whether these summaries constitute grand jury material. Specifically, the circumstances under

which these summaries were prepared, their purpose and their use before the grand jury are

described more fully below.

The four interview summaries at issue were originally drafted by the Postal Inspectors at

the direction of AUSA Valder to compile in a single document the information provided by the

witnesses over multiple interviews.  AUSA Valder testified at his deposition that he proposed

this method for presentation of testimony to the grand jury in order "to make an efficient

presentation to the grand jury of complicated facts that I probably could not nearly as quickly,

and as easily, and efficiently elicit from witnesses in the same degree of complexity, and you

---

[56] Despite these clear statements from Mr. Spartin, under oath, that no one told him, and he did not otherwise know, about the four interview summaries being presented to grand jury, the plaintiff seizes on references made by Mr. Spartin during his polygraph interview to "testimony" and "transcripts" from other witnesses, Pl.'s Ex. 226 at 236, 238, 240 (Spartin Polygraph Tr.), as evidence that Mr. Spartin knew that the interview summaries he was permitted to review were presented to the grand jury. Pl.'s COL at 36. That inference is belied by Mr. Spartin's testimony under oath at the criminal trial, which is cited in the text. See Crim Tr. at 2610, 2012; *see also* Valder Dep. at 381, Mar. 1, 2000 ("Mr. Spartin testified to Judge Revercomb under oath that when he as given those respective items that, he may have used the word testimony, but that he did not understand at the time that those items had been before the grand jury. And I think you will find that Spartin said that clearly.").  Significantly, a witness's speculation or assumption about what another person might --or even likely--have said to a grand jury is simply not sufficient to amount to an *actual* disclosure of grand jury material.

know, truthful information."  Valder Dep. at 320-21, Mar. 1, 2000.  Generally, before each of

these witnesses testified before the grand jury, he or she had the opportunity to review the

interview summary with counsel and make edits to the document.  *Id.* at 321.  AUSA Valder

described the process as follows: "the practice was for the Inspectors and the witness, to insure

an accurate statement of what did happen, not what didn't happen . . . the witness summaries

were very carefully and responsibly done to set forth the truth of what did happen.  Every event,

every fact that happened that was relevant and material to the grand jury's consideration was set

forth."  *Id.* at 311-312.[57]

Each of the four witnesses whose interview summaries are at issue testified before the

grand jury pursuant to his or her cooperation agreement with the government and not pursuant to

grand jury subpoena.  *Id.* at 369.  The interview summary, as edited by the witness, was marked

as a grand jury exhibit and read by AUSA Valder to the grand jury with the witness present.  *Id.*

at 356.  The interview summary read by AUSA Valder was recorded but not transcribed by the

grand jury court reporter.  *Id.* at 357, 360.  When he had finished reading the summary, AUSA

Valder then asked the witness whether he or she adopted the summary as his or her testimony

before the grand jury.  *Id.* at 308, 330-31, 361.  AUSA Valder also asked the witness whether the

---

[57] The plaintiff has posited that presentation of grand jury testimony through use of interview summaries is unusual and even unethical.  6/24/14 AM Tr. 41-42 (Pl.'s Opening Statement); 7/17/14 AM Tr. at 72-73 (plaintiff's counsel questioning of Valder).  AUSA Valder disputed this position and noted that this was a practice sanctioned by his supervisors and used with some regularity at the DC USAO, since the practice had a number of benefits, including ensuring efficient, thorough and accurate presentation of testimony to the grand jury and allowing defense counsel, who are not permitted in the grand jury room during the presentation of evidence, to be able to review their clients' written testimony.  7/16/14 PM Tr. at 73 (Valder testimony). AUSA Valder's testimony was corroborated, as well as disputed, by other witnesses from the DC USAO.  7/17/14 AM Tr. at 148-149 (Knight testimony, stating that use of summary statements was a "common tactic"); 7/2/14 AM Tr. 25-27 (Leeper testimony, stating that he was not familiar with the procedure of presenting summary statements to a grand jury).  This dispute over what the practice was in the DC USAO and whether interview summaries may properly be used as grand jury testimony is immaterial to resolution of the issue of whether Rule 6(e) material was improperly disclosed to William Spartin and requires no further comment from the Court.

summary had been read correctly and whether the information was true and accurate to the best of the witness' recollection. *Id.* at 308-09.[58]

Comparison of the interview summaries presented to the grand jury and the summaries disclosed to Mr. Spartin and his counsel, which comprise Pl.'s Exhibit 535, reveals the following:

1.   The 24-page interview summary for Michael Marcus compiles information from several interviews he had with Postal Inspectors, and reflects roughly ten handwritten edits he initialed on September 5, 1986, before he testified before the grand jury on October 23, 1986. Pl.'s Ex. 196 (Marcus G.J. Interview Summary); Pl.'s Ex. 211 (Tr. Marcus G.J. testimony).  The version of this summary disclosed to Mr. Spartin contains redacted paragraphs on three pages.

2.   The 19-page interview summary for Peter Voss compiles information from his interviews with the Postal Inspectors "following May 30, 1986," and has the notation "GJX#4" handwritten on the top of the front page of the document. Defs.' Ex. 65 (Voss G.J. Interview Summary).  Mr. Voss testified before the grand jury on August 28, 1986.  Pl.'s Ex. 214 (Tr. Voss G.J. testimony); Voss Dep. 91-92, Jun. 12, 2014. The version of this summary disclosed to Mr. Spartin does not appear to have any redactions.

---

[58] REI's employee, Frank Bray, testified before the grand jury on July 16, 1987, pursuant to a grand jury subpoena.  Valder Dep. at 369, Mar. 1, 2000.  The presentation of his interview summary did not follow the same procedure used for Messrs. Gnau, Marcus and Voss, and Ms. Peterson.  Instead, AUSA Valder specifically requested that the court reporter transcribe the summary as it was read and, while it was being read, AUSA Valder stopped at various points to ask Mr. Bray questions.  *Id.* at 359. The interview summary of Mr. Bray was not among the four summaries disclosed to Mr. Spartin and, therefore, the plaintiff has not put that summary at issue as part of the alleged violation of Rule 6(e).

3. The 22-page interview summary for John Gnau compiles information from four
   interviews he had with Postal Inspectors, and reflects roughly ten handwritten edits he
   initialed.  Pl.'s Ex. 206 (Gnau G.J. Interview Summary).  This interview summary
   was finalized on October 9, 1986, a week before he testified before the grand jury on
   October 16, 1986.  Pl.'s Ex. 210 (Tr. Gnau G.J. testimony). The version of this
   summary disclosed to Mr. Spartin contained 18 pages, with four pages removed
   entirely, as well as paragraphs redacted on three pages.

4. The 12-page interview summary for Sharon Peterson, who served as Mr. Voss'
   administrative assistant, compiles information from three interviews she had with the
   Postal Inspectors, and reflects roughly 27 handwritten edits she initialed on
   September 19, 1986, the same date that she testified before the grand jury.  Pl.'s Ex.
   535 (Peterson G.J. Interview Summary); Pl.'s Ex. 204 (Tr. Peterson G.J. testimony).
   The version of this summary disclosed to Mr. Spartin does not appear to have any
   redactions.

In sum, the interview summaries of Ms. Peterson and Mr. Voss that were disclosed to Mr.
Spartin were the same summaries presented to the grand jury, while the disclosed interview
summaries of Messrs. Gnau and Marcus were redacted versions of the summaries presented to
the grand jury.  As discussed *infra*, in Part III. A.1(b), the fact that two of the interview
summaries shown to Mr. Spartin were redacted and the others not, is immaterial.

### b.   Interview Summaries Are Not Protected By Rule 6(e)

The question raised by these facts is whether the grand jury secrecy rule is violated by
disclosing to a witness summaries of interviews conducted by the Postal Inspectors of other
people, when, unbeknownst to the witness to whom disclosure is made, those summaries had

been presented to the grand jury?[59]   The answer to this question is no.[60]   The interview

summaries were derived from investigatory interviews conducted independently of the grand

jury and no disclosure was made of the critical information that the interview summaries were

presented to or used in the grand jury.   Consequently, whatever their level of involvement in the

disclosure of the interview summaries to Mr. Spartin, the Postal Inspectors did not violate Rule

6(e).

In reaching this conclusion the Court is guided by the key test or "touchstone" articulated

by the D.C. Circuit that Rule 6(e) prohibits the disclosure of documents that "would 'tend to

reveal some secret aspect of the grand jury's investigation.'"   *Senate of the Com. of Puerto Rico*

*ex rel of Judiciary Comm. v. U.S. Dep't of Justice (SoCPR)*, 823 F.2d 574, 582 (D.C. Cir. 1987)

(Ginsburg, R.B., J.).   Under this test, merely because a document or information has been

presented to the grand jury, even as a grand jury exhibit, does not automatically cloak that either

the document or the information with grand jury secrecy protection.   *See Citizens for*

*Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*, 746 F.3d 1082, 1100 (D.C. Cir. 2014)

(*CREW*) ("'[T]here is no per se rule against disclosure of any and all information which has

---

[59] The government argues that even if disclosure of the interview summaries to Mr. Spartin constituted a violation of Rule 6(e), this conduct was conceived, directed and executed by AUSA Valder and should not be imputed to the Postal Inspector defendants.   *See* Def.'s COLs at 5 ("regardless of whether any of the materials shown to Spartin were covered by Rule 6(e) . . . Moore failed to prove that it was the *postal inspectors* who provided any of the disputed materials to Spartin").   Whether the Postal Inspectors were sufficiently involved in the review, redaction and subsequent disclosure of the interview summaries to Mr. Spartin to support legal liability for a Rule 6(e) violation need not be resolved since, as discussed in Part III.A.1.(b), the interview summaries are not protected by grand jury secrecy.

[60] In the *2010 Decision*, the court denied the defendants' renewed motion for summary judgment, quoting the D.C. Circuit summary "of the evidence proffered by the plaintiff" that "the postal inspectors improperly showed GAI Officer Spartin other witnesses' grand jury statements. " *2010 Decision*, 730 F. Supp. 2d at 179 (quoting *Moore IV*, 571 F.3d. at 65).   This evidentiary proffer was obviously evaluated under the applicable summary judgment standard requiring the court to draw all justifiable inferences in the plaintiff's favor and accept as true the plaintiff's evidence.   *Id.* at 177-78.   The evidence no longer needs to be viewed through a prism favoring the plaintiff's perspective, however, but may be evaluated on the merits.   Thus, prior judicial summaries of the plaintiff's evidence are not binding on this Court.

reached the grand jury chambers,' let alone any and all information which 'could' reach the grand jury" (quoting *Lopez v. Dep't of Justice*, 393 F.3d 1345, 1349 (D.C. Cir. 2005) (citations omitted)).

Rather, the test for application of Rule 6(e) is met only when the documents themselves or the context in which they are described, relayed or communicated indicates that they were a focus of grand jury attention and, thereby, "reveal some secret aspect of the grand jury's investigation." *Lopez*, 393 F.3d at 1349.  As the D.C. Circuit explained, "[t]he disclosure of information 'coincidently before the grand jury [which can] be revealed in such a manner that its revelation would not elucidate the innner workings of the grand jury' is not prohibited." *SoCPR*, 823 F.2d at 582 (quoting *Fund for Constitutional Gov't*, 656 F.2d at 870).  Thus, for example, a grand jury transcript or a grand jury subpoena would fall squarely within the protection of Rule 6(e), since such records demonstrably reveal the internal workings of the grand jury.  Disclosure of such materials would compromise the "purpose of Rule 6(e) [] to 'protect from disclosure only the essence of what takes place in the grand jury room, in order or preserve the freedom and integrity of the deliberative process.'" *Fleet Nat'l. Bank v. Exp.-Imp. Bank of the U.S.*, 612 F. Supp. 859, 868 (D.D.C. 1985) (quoting *In re Grand Jury Investigation (N.J. State Comm'n of Investigation),* 630 F.2d 996, 1000 (3d Cir. 1980)).

In evaluating whether disclosure of a particular document reveals the inner workings of the grand jury, at least in the context of a party seeking disclosure under the Freedom of Information Act ("FOIA"), the D.C. Circuit has instructed that the government "bears the burden of demonstrating some nexus between disclosure and revelation of a protected aspect of the grand jury's investigation." *CREW*, 746 F.3d at 1100 (internal quotations and citations omitted); *see also Lopez*, 393 F.3d at 1351 (noting key finding that "there is a nexus between disclosure of

the information and revelation of the grand jury's strategy or direction in the past").  Conversely,

when a party, such as the plaintiff here, contends that documents are covered by grand jury

secrecy, the plaintiff bears the burden of showing the same nexus to revelation of the grand

jury's internal proceedings.  A myriad of factors may be probative in this analysis, including

markings linking the document to grand jury proceedings and the circumstances under which the

document was created, used, or requested.  Even if the purpose for the creation of the document

was for presentation to a grand jury, however, the document may nonetheless fall outside the

protection of Rule 6(e), if that purpose is not discernible from the document itself or other

contextual information.  In short, there must be "a nexus between disclosure of the information

and revelation of the grand jury's strategy or direction in the past."  *Lopez*, 393 F.3d at 1351.

Then-Judge Ginsburg's decision in *SoCPR* is illustrative of this point. In that case, the

Senate of Puerto Rico made a "FOIA request to DOJ seeking information relating to" "possible

official complicity in a 1978 politically-inspired homicide," 823 F.2d at 577, including a request

for "evidence submitted for the consideration of any Grand Jury or magistrate," *id*. at 582.  The

D.C. Circuit rejected the Department of Justice's blanket refusal to disclose documents as

protected by Rule 6(e) since "there is nothing in this record to suggest that the Senate, or any

third party, would have been able to determine *which* documents had been submitted to the grand

jury." *Id.* at 583.  The mere fact that certain documents may have been presented to the grand

jury or even prepared for the grand jury was not enough to garner Rule 6(e) protection.  Instead,

the D.C. Circuit found that "[a]bsent that identifying information, it is difficult to see how

disclosure would reveal anything concerning the inner workings of the grand jury." *Id.*

Likewise, in *Lopez*, the Court noted the distinct roles of prosecutors, who may interview

witnesses "either as part of a 'screening' process in advance of actual grand jury testimony, or as

part of the prosecution's own investigation." 393 F.3d at 1350. As a result, the "dates on which prosecutors interviewed prospective grand jury witnesses do not inherently reveal secret matters occurring before a grand jury," *id.* at 1347, and, therefore, are not protected from disclosure under Rule 6(e), while "post-testimony debriefing of a witness inherently indicates that the witness *did*, in fact, *testify* before the grand jury" and, therefore, is protected, *id.* at 1351.

The evidence at trial in this case shows that each of the four interview summaries shown to Mr. Spartin were — as each appeared to be — a compilation of information relayed by the witness over the course of two or more interviews conducted by the Postal Inspectors. Such interviews are a quintessential investigatory activity that "does not on its face convey any information about 'some secret aspect of the grand jury's investigation.'" *Lopez*, 393 F.3d at 1350; *see also Wash. Post Co. v. U.S. Dep't of Justice*, 863 F.2d 96, 100 (D.C. Cir. 1988) (Rule 6(e) did not cover report used to question witnesses before grand jury because the report "had a purpose wholly separate from the grand jury deliberations" and did not "reveal[] anything whatsoever about the grand jury's deliberations[.]"). The factors urged by the plaintiff as evidence that these summaries constitute Rule 6(e) material, such as the purpose of their creation, the timing of their creation and editing close in time to the witness' grand jury testimony, and their use as witness testimony before the grand jury, Pl.'s COL at 32, 34, are simply not dispositive.[61] Instead, the plaintiff ignores the most significant probative factors

---

[61] The plaintiff relies on two cases from other circuits as support for his position that witness summaries prepared for the purpose of presentation to the grand jury are subject to Rule 6(e), but these cases are easily distinguishable. First, the Third Circuit in *In re Grand Jury Matter*, 697 F.2d 511, 512–13 (3d Cir. 1982), denied a request from a State agency for "all of the grand jury materials pertinent to its [Federal] investigation," concluding that such a request would divulge matters before the grand jury, including witness interviews "conducted outside the grand jury's presence but presented to it." Given the nature of the request at issue, production of the witness interviews would have been clearly linked to the work of the grand jury. Similarly, *In re Special February, 1975 Grand Jury*, 662 F.2d 1232, 1233-38 (7th Cir. 1981), *aff'd sub nom. United States v. Baggot*, 463 U.S. 476 (1983), the Seventh Circuit addressed a request by the Internal Revenue Service for "certain evidence generated by the grand jury investigation to assist its determination of Baggot's civil tax liability," including a statement "prepared by

required in evaluating whether the four interview summaries disclosed to Mr. Spartin and his counsel revealed the inner workings of the grand jury, namely, that, in context, the summaries reflected only the normal work of the Postal Inspectors, without any link to the workings of the grand jury and, indeed, Mr. Spartin testified that he was unaware of any such link.[62]  *See* Crim. Trial Tr. at 2610-13, 2615, 2737 (Spartin testimony, dated October 23-25, 1989).

Accordingly, the Court finds that disclosure of the interview summaries to Mr. Spartin and his counsel did not violate Rule 6(e).

### 2. *Mr. Spartin's Testimony Did Not Cause Indictment of Plaintiff*

Even if the four interview summaries constituted grand jury material and, further, even if the Postal Inspectors limited involvement in helping AUSA Valder review and prepare those summaries were sufficient to establish liability for violating Rule 6(e), the plaintiff would still have to show that, but for Mr. Spartin's grand jury testimony, the plaintiff would not have been indicted and prosecuted.  *See Moore II*, 213 F.3d at 712 ("if [the plaintiff] would have been indicted and prosecuted anyway, even without the postal inspectors' alleged misconduct and Spartin's testimony, then the United States cannot be held liable").  The plaintiff cannot meet this

---

the government as part of a plea agreement for the purpose of having it constitute the bulk of Baggot's testimony when read by him to the grand jury."  The court found the requested material was subject to Rule 6(e) since, given the nature of the request, the statement "is too grand jury related to be artificially distinguished from the transcript of its reading to the grand jury."  *Id.* at 1237-38.  By contrast to these two cases, the interview summaries at issue in this case were not clearly linked to the grand jury.

[62] The plaintiff argues that "a reasonable observer would have understood that the documents reflected the witnesses' testimony before the grand jury" and Mr. Spartin "clearly understood as much," Pl.'s COLs at 35.  In other words, the plaintiff asks the Court to find that Mr. Spartin must have known of the government's use of the interview summaries before the grand jury, even though he simultaneously contends that such use of the interview summaries as grand jury testimony was both unusual and unethical.  *Id.*  He cannot have this both ways. If using interview summaries as grand jury testimony was so unusual, he does not explain why Mr. Spartin and his counsel should have been aware that the government used the summaries in this manner.  In any event, the evidence at this trial, carrying forward from the plaintiff's own criminal trial, indicated that, contrary to the suggestion the plaintiff has asserted the past 24 years in this litigation, Mr. Spartin did not know that the interview summaries had been presented to the grand jury, even though the first page of the interview summary of Mr. Voss provided to Mr. Spartin was marked with AUSA Valder's handwritten notation "GJX#4."  Mr. Spartin testified at the criminal trial that he did not notice the mark nor was he was unaware that the statements provided to him had been presented to the grand jury.  *See* Crim. Trial Tr. at 2610-13, 2737-38, 2754.

burden because (1) the four interview summaries did not cause Mr. Spartin to provide testimony inculpating the plaintiff; and (2) even without Mr. Spartin's testimony, the plaintiff would have been indicted.

### 3. *Interview Summaries Did Not Cause Mr. Spartin to Implicate Plaintiff*

At the outset, as even the plaintiff must concede, the four interview summaries were not the only source of Mr. Spartin's knowledge about the conduct of the plaintiff and his co-defendants that contributed to the illegal scheme.  Mr. Spartin was not only deeply involved in the conspiracy, but he was also the co-conspirator credited with having the most regular personal contact with the plaintiff.  *See* Pl.'s Ex. 269 at 29 (Tr. Spartin G.J. testimony, indicating that Spartin had a better rapport with the plaintiff than Mr. Gnau, who told Spartin, "I want you to talk to Moore and you take that relationship").  In addition, prior to testifying before the grand jury, Mr. Spartin reviewed other documentation to refresh his recollection, including his own appointment books, travel vouchers, papers, and files.  FOF ¶ 829 ("not disputed"); Def.'s COLs at 11; Crim. Trial Tr. at 2548 (Spartin testimony, dated October 23-25, 1989).  Nevertheless, the plaintiff contends that the single most damaging statement given by Mr. Spartin before the grand jury was a product of the four interview summaries, namely, "his newly spawned 'opinion' that Moore was aware of the payment scheme," even though previously he "had *repeatedly* conveyed to the Inspectors [exculpatory information] concerning Moore's lack of knowledge of the conspiracy."  Pl.'s COL at 39 (emphasis in original).  Specifically, in the grand jury, Mr. Spartin responded to the question, "Do you recall that you told [the Postal Inspectors in August 1987] that in your judgment Moore and Reedy did know that Voss was receiving money from Gnau relative to the MLOCR procurement?," stating: "A: That is my opinion, yes, sir."  Pl.'s Ex. 269 at 10 (Tr. Spartin G.J. testimony).

As support for his argument that the four interview summaries caused Mr. Spartin to impute knowledge of the conspiracy to the plaintiff, the plaintiff explains "the details that Spartin provided to the grand jury as support for his opinion concerning Moore's knowledge are the same facts—about events at which Spartin was *not* present—that were outlined in the grand jury statements previously shown to him." Pl.'s COLs at 41. Mr. Spartin's grand jury testimony makes abundantly clear, however, that this assertion is not correct. On the contrary, Mr. Spartin stated that his opinion was based on events where he, too, was present, including his direct and multiple conversations over time with both Mr. Reedy and the plaintiff, both of whom made explicit requests for certain USPS procurement steps and on an expedited basis. Pl.'s Ex. 269 at 11-12 (Tr. Spartin G.J. testimony).

For example, in setting forth the basis for his opinion, Mr. Spartin noted, first, that Vice Chairman Voss was pushing REI's interests, stating that "during the course of the GAI/REI relationship Moore and Reedy were aware that Voss was helping on the inside to obtain a sole source contract award for REI." Pl.'s Ex. 137 at 14 (Spartin G.J. Interview Summary). Based upon his "many conversations between Mr. Reedy and myself and the many conversations between Reedy and Mr. Gnau, and my conversations with Gnau and Voss," he "felt that Mr. Reedy knew that we were somehow taking care of Mr. Voss, because I rationalize that why would Mr. Voss be so adamant to help us and all the things he was doing, which we relayed back to Mr. Reedy, just led me to believe that they had to come to the conclusion that somehow we were doing something to take care of Mr. Voss." Pl.'s Ex. 269 at 11 (Tr. Spartin G.J. testimony).

Second, Mr. Spartin described occasions when Mr. Reedy and the plaintiff would make requests to GAI for Vice Chairman Voss to take certain actions, implicitly acknowledging the ongoing communications channel between GAI and Vice Chairman Voss, and demand status

reports on timing.  Mr. Spartin explained that Mr. Reedy would say "Why don't you get Peter Voss to do this, or why don't you get Peter Voss to do that" and Mr. Reedy and the plaintiff "felt all along that we were controlling Voss and they let their wishes . . . be known to both John and myself in terms of what they wanted us to do, and they wanted the whole thing expedited, they wanted the competitive tests stopped.  They just felt that we should do that."  *Id.* at 12-13.  Similarly, at a meeting "to review their progress," on February 26, 1986, the plaintiff "asked Spartin where do we go from here and remarked that nothing is getting done," Pl.'s Ex. 137 at 25 (Spartin G.J. Interview Summary).  The attitude expressed at that meeting continued in subsequent months, when in conversations with Mr. Spartin, "Reedy asked how Peter Voss was doing" and "said he saw no progress on stopping the competitive procurement and told Spartin he was concerned Electrocom would soon have the technology and win the competition," *id.*

Third, Mr. Spartin also testified about the plaintiff's specific queries about GAI's connections to Vice Chairman Voss, including questions from the plaintiff to Mr. Spartin about "how well he (Spartin) and Gnau knew Voss," to which Mr. Spartin responded by "reassure[ing] Moore that he and Gnau were well connected with Peter Voss."  Pl.'s Ex. 137 at 9 (Spartin G.J. Interview Summary).  In fact, Mr. Spartin told both the plaintiff and Mr. Reedy "several times about his ability to influence Peter Voss and Voss's subsequent actions on behalf of REI."  *Id.* at 24-25 (Spartin G.J. Interview Summary).

These interactions with the plaintiff and his co-defendants were experienced first-hand by William Spartin and served as the basis for his opinion expressed to the grand jury.  The four witness summaries certainly provided Mr. Spartin with a broader view of the interactions of the plaintiff and the plaintiff's co-defendants with Mr. Spartin's co-conspirators, but that fact does not diminish Mr. Spartin's own dealings with the plaintiff that led him "to the conclusion that, in

my opinion, that they had to know way down deep if they asked themselves or looked at the issue, that we were—GAI was handling Mr. Voss."  Pl.'s Ex. 269 at 11 (Tr. Spartin G.J. testimony).

That being said, the conclusion that disclosure of the four interview summaries, in whole or redacted form, to William Spartin did not violate Federal Rule of Evidence 6(e) and did not cause him to have or express his "opinion" regarding the plaintiff's knowledge of the conspiracy should not be misconstrued as this Court sanctioning this method of refreshing the recollection of a grand jury witness.  Such wholesale disclosure to a witness of the testimony of co-conspirators involved in the criminal activity that is the subject of the grand jury investigation presents a grave risk of coloring, influencing and molding the witness' testimony to conform to that of the other witnesses, just as the plaintiff contends.  Pl.'s COLs at 38 (arguing that the interview summary statements "had the intended effect of tainting and shaping Spartin's view of the facts").  Such concern, combined with Mr. Spartin's comment during his polygraph examination that "[w]hat colors a lot of this is that I read the testimony of those guys and I was appalled when I read it, because it bothers me now," Pl.'s Ex. 226 at 14 (Spartin Polygraph Tr.), is troubling, even if not sufficient to supplant the personal observations and experiences cited by Spartin as the foundation for this expressed opinion.

In any event, even if the four interview summaries colored Mr. Spartin's view, it does not necessarily follow that it *caused* Mr. Spartin to have the opinion he expressed given the strong foundation of his own personal experiences on which he based that view.

### 4.  Mr. Spartin's Opinion Did Not Procure Indictment

Assuming, *arguendo*, that providing Mr. Spartin with four co-conspirators' interview summaries caused him to form and express the opinion that the plaintiff must have had

knowledge of the illegal payoffs to Vice Chairman Voss, the plaintiff's theory that this opinion caused the grand jury to return the indictment against the plaintiff is a stretch too far.  Even the plaintiff does not argue that the indictment was predicated solely on Mr. Spartin's expressed opinion about the plaintiff's knowledge of the alleged scheme but only that the indictment "substantial[ly]" relied on Mr. Spartin's testimony.  FOF ¶ 596 (proffering plaintiff's view that "[i]n substantial reliance on Spartin's testimony, the grand jury indicted Moore, Reedy and REI").  According to the plaintiff, only a "substantial" showing would be sufficient because, under local law, "[a]ny conduct . . . that was a substantial contributing factor in causing the [harm] is a legal cause of that [harm]."  Pl.'s COLs at 36 (quoting *Pazimino v. Wash. Metro. Area Transit Auth.*, 638 A.2d 677, 679 (D.C. 1994)).

Since Mr. Spartin presented evidence to the grand jury, his testimony may very well have contributed to the finding of probable cause for the return of the indictment. Yet, mere contribution is not the standard.  The D.C. Circuit's instruction that "if Moore would have been indicted and prosecuted anyway, even without the postal inspectors' alleged misconduct and Spartin's testimony, then the United States cannot be held liable."  *Moore II*, 213 F.3d at 712.  The evidence presented to the grand jury, consisting of documentation returned from "in excess of 200 subpoenas" and "in the order of 30" witnesses, 7/16/14 PM Tr. at 33-34 (Valder testimony), meets this standard, even if Mr. Spartin's testimony were put aside.[63]

Mr. Spartin's opinion was obviously offered as just that: his opinion.  He never testified that he told anyone at REI about the payoffs made to Vice Chairman Voss, that he actually paid any of REI's money to Vice Chairman Voss, or that the specific topic of such payoffs ever came

---

[63] Even Mr. Spartin concluded, based on his review of the four interview summaries, that "I'm not a lawyer but Jesus, there's enough there to seem to me to hang REI from the yardarm."  Pl.'s Ex. 226 at 28 (Spartin Polygraph Tr.).

up with anyone at REI.  Thus, his testimony was, similarly to the other co-conspirators, circumstantial regarding the extent of the knowledge that the plaintiff and his co-defendants had -- or should have had -- regarding the illegal payoff scheme.  In this respect, Mr. Spartin's testimony was corroborative and cumulative of that of the other co-conspirators rather than the linchpin on which the indictment rested.

The plaintiff's argument that Mr. Spartin's opinion that the plaintiff must have known of the illegal bribery and kickback scheme was the *raison d'etre* for the grand jury to return the indictment, dovetails with his argument that probable cause for the indictment was lacking.  As discussed next, he is wrong on that score as well.

### B.  Plaintiff Failed to Prove Absence of Probable Cause

In a malicious prosecution case, "[l]ack of probable cause is an essential element . . . and a showing of probable cause is thus a valid defense which warrants a directed verdict for the defendants."  *Ammerman v. Newman*, 384 A.2d 637, 639 (D.C. 1978) (citing *Smith v. Tucker*, 304 A.2d 303 (D.C. App. 1973) and *Prieto v. May Dep't Stores, Co.*, 216 A.2d 577 (D.C. App. 1966)); *see Amobi v. D.C. Dep't of Corr.*, 755 F.3d 980, 992 (D.C. Cir. 2014) ("To support a malicious prosecution claim, '[t]here must be . . . absence of probable cause for the proceeding,'" quoting *DeWitt v. District of Columbia*, 43 A.3d 291, 296 (D.C. 2012)).  "The issue in a malicious prosecution case is not whether there was probable cause for the initial arrest, but whether there was probable cause for the underlying suit."  *Amobi v. D.C. Dep't of Corr.*, 755 F.3d 980, 992 (D.C. Cir. 2014) (quoting *Pitt v. District of Columbia*, 491 F.3d 494, 502 (D.C. Cir. 2007) and *Dellums v. Powell (Dellums II)*, 566 F.2d 216, 220 (D.C. Cir. 1977)).[64]

---

[64] Lack of probable cause is an element of the both the plaintiff's *Bivens* claim for retaliatory inducement to prosecution and FTCA claim for malicious prosecution.  *See Hartman v. Moore*, 547 U.S. 250, 261 (2006) (holding that plaintiff was required to plead and prove the absence of probable cause to support his *Bivens* claim); *Moore II*

"In a civil action for malicious prosecution, probable cause is defined as the existence of 'facts and circumstances as will warrant a cautious man in the belief that his action and the means taken in prosecuting it are legally just and proper.'" *Pitt*, 491 F.3d at 501-02 (quoting *Ammerman*, 384 A.3d at 639-40)).   Whether there is probable cause to institute a suit "'depends not on the actual state of the case in point of fact, but upon the honest belief of the person instituting it and may flow from a belief that turns out to be unfounded as long as it is not unreasonable.'" *Lyles v. Micenko*, 404 F. Supp. 2d 182, 189 (D.D.C. 2005) (quoting *Ammerman*, 384 A.2d at 640).

In evaluating the presence or lack of probable cause, the court may consider a grand jury indictment as *prima facie* evidence of probable cause.  *Moore IV*, 571 F.3d at 63, 67, 69; *see also Russo v. New York*, 672 F.2d 1014, 1018 (2d Cir. 1982) ("under New York law, where a warrant has been issued following an indictment by a grand jury, a presumption arises that the defendant acted with probable cause"); *Rothstein v. Carriere*, 373 F.3d 275, 282 (2d Cir. 2004) ("a grand jury's indictment creates a presumption that the criminal proceeding was supported by probable cause").  "The imposition of a *prima facie* standard creates a rebuttable presumption that will stand until the appellant introduces sufficient evidence to negate it."  *Moore IV*, 571 F.3d at 69. The D.C. Circuit has instructed that the plaintiff may rebut the presumption in this case by showing "that the indictment was produced by fraud, corruption, perjury, fabricated evidence, or other wrongful conduct undertaken in bad faith."  *Id*.; *see also Amobi*, 755 F.3d at 992 (reiterating quoting *Moore IV*, 571 F.3d at 67).

---

213 F.3d at 709-10 (listing as an element of an FTCA claim the "absence of probable cause for the proceeding"); *Moore IV*, 571 F.3d at 65 (noting that one of the elements for a retaliatory prosecution claim is that "the government lacked probable cause to bring the criminal prosecution against the appellant" (citing *Hartman*, 547 U.S. at 265-66)).

As discussed below, the plaintiff has failed to rebut the presumption of probable cause presented by the indictment and, in any event, the investigating federal law enforcement agents and the federal prosecutors had ample evidence supporting probable cause to believe that the plaintiff had committed the crimes for which he was indicted. Consequently, the plaintiff has failed to meet the no-probable cause requirement for his malicious prosecution FTCA claim against the government.

### 1.  *Plaintiff Has Not Rebutted Indictment's Presumption of Probable Cause*

The plaintiff had four weeks to present all of the evidence gathered over the last two decades to make his case that the presumption created by the indictment should yield to condemning evidence that the Postal Inspectors engaged in "fraud, corruption, perjury, fabricated evidence, or other wrongful conduct undertaken in bad faith," *Moore IV*, 571 F.3d at 67, and that this wrongful conduct, rather than valid evidence, persuaded the grand jury to return an indictment. Not even the plaintiff, however, contends that the Postal Inspectors engaged in "fraud," "corruption" or "perjury" before the grand jury. Notably, as long ago as the *1993 Decision*, another Judge on this Court made clear that the plaintiff's shrill allegation of "falsified" evidence did not amount to the actual fabrication of evidence but instead referred only to the plaintiff's concern that the government did include in witnesses' statements presented to the grand jury the exculpatory information that the witnesses did not directly inform the plaintiff about the illegal bribery and kickback scheme. *See 1993 Decision*, 1993 WL 405785, at *8 n.4. Thus, to rebut the presumption of probable cause, the plaintiff is left to show that the indictment was obtained through "other wrongful conduct undertaken in bad faith."

The plaintiff maintains that, to bolster their weak case against the plaintiff, the Postal Inspectors resorted to "prohibited, improper, or inappropriate" tactics to "procure an indictment

where one was not warranted."  Pl.'s COL at 14.  The litany of such tactics cited by the plaintiff

include: (1) "repeatedly interviewing the witnesses on matters already covered," *id*. at 11; (2)

"shading the evidence presented to the grand jury," *id*. at 11, first, by withholding "exculpatory

information from the grand jury," *id*. at 12,  about "the key fact that each co-conspirator had

denied telling Moore about the existence of the conspiracy," *id*. at 13, and, second, "improperly

shar[ing] with Spartin his co-conspirators' scripted witness statements, in order to elicit"

Spartin's "'opinion'… that Moore knew that Voss was receiving money from Gnau," *id*. at 13;

and (3) "bullying and intimidating" various witnesses, by "yell[ing] at Frank Bray and William

Spartin, whose plea agreement was also torn up by AUSA Valder "for the shock effect," *id*. at

11.

Despite the plaintiff's criticisms of the investigative "tactics" employed during the course

of the investigation by either or both the Postal Inspectors and AUSA Valder, none of these

actions, considered individually or in combination, are so egregious as to undermine the validity

of the indictment due to the grand jury's reliance on tainted, unreliable or incorrect evidence. For

example, the first "tactic" criticized by the plaintiff of re-interviewing witnesses multiple times,

is frequently necessary when investigating a complex conspiracy, particularly of lengthy duration

among multiple individuals, each of whom may have varying roles and levels of knowledge

about different events. Rather than being somehow coercive, as the plaintiff implies, diligent re-

interviewing of witnesses as additional factual information comes to light is a diligent

investigative practice to test the memories and veracity of the witnesses.

The plaintiff's next criticism—that the Postal Inspectors withheld information from the

witnesses' statements, and thereby from the grand jury, about the co-conspirators admitting they

did not directly communicate to the plaintiff that REI's fees paid to GAI were used to make

payoffs to Vice Chairman Voss—has been a continuous chorus throughout this litigation, but repetition does not make it any more persuasive for at least three reasons. First, this criticism falls short of claiming that incorrect or perjured testimony was elicited and presented to the grand jury. On the contrary, each of the co-conspirators testified under oath that his or her interview summary was true and correct. *See e.g.*, Pl.'s Ex. 210 at 8-9 (Tr. Gnau G.J. testimony); Pl.'s Ex. 211 at 9 (Tr. Marcus G.J. testimony); Pl.'s Ex. 214 at 9 (Voss Grand Jury testimony); Pl.'s Ex. 269 at 10 (Tr. Spartin G.J. testimony); Pl.'s Ex. 204 at 10 (Peterson Grand Jury testimony). Had any of the co-conspirators testified falsely that he or she had told the plaintiff about the illegal payoff scheme, the plaintiff would be rightly outraged, but that is not what occurred before the grand jury.

Second, no legal requirement obliges prosecutors to include exculpatory information in presentations to the grand jury. *United States v. Williams*, 504 U.S. 36, 54-55 (1992) (holding that courts have no authority to require the government to disclose exculpatory evidence to the grand jury because it would "alter the grand jury's historical role"); *United States v. Borda*, 905 F. Supp. 2d 201, 204 (D.D.C. 2012) ("dismissal of an otherwise valid indictment is inappropriate even where the government failed to disclose substantial exculpatory evidence it possessed at the time of the grand jury"); *In re Special Proceedings*, 842 F. Supp. 2d 232, 252 (D.D.C. 2012) ("[t]he grand jury is not required to hear or consider evidence which would exonerate a target of an investigation, and the fairness of its methods is unreviewable" (internal quotations and citations omitted)); *accord United States v. Slough*, 679 F. Supp. 2d 55, 62 (D.D.C. 2010)(noting that government's failure to present the grand jury with exculpatory evidence in violation of internal policies "does not, standing alone, constitute an independent grounds for dismissal of the indictment"). This is because a grand jury sits not to determine guilt or innocence but rather to

assess whether there is adequate basis for bringing a criminal charge, "and to make the assessment it has always been thought sufficient to hear only the prosecutor's side." *Williams*, 504 U.S. at 51.

Finally, the fact that none of the co-conspirators testified about not making a direct disclosure to the plaintiff about the illegal arrangement with Vice Chairman Voss was not hidden by the government but was obvious from the interview summaries and grand jury testimony of those witnesses. Moreover, AUSA Valder testified that the grand jury was advised multiple times that the case against the plaintiff and his co-defendants was circumstantial. 7/16/14 PM Tr. at 85-86 (Valder testimony). In the plaintiff's view, however, AUSA Valder and the Postal Inspectors had to do more to highlight the circumstantial nature of the case by including in the interview summaries more specific information that no direct communication of the payoff scheme was made to the plaintiff. This assertion is predicated on the faulty premise that "the only way Moore could have obtained actual knowledge of the conspiracy—a prerequisite to agreeing to participate in the conspiracy—would be if he learned of the scheme from someone with knowledge of the kickback payments from GAI to Voss and the reasons for those payments." Pl.'s COL at 7; *id.* (stressing that there is no explanation "for how Moore could have learned of the secret payoffs other than from the conspirators themselves"). The plaintiff ignores the uncomfortable fact for him that another way in which the plaintiff could have gained knowledge of the illegal scheme, even without a direct communication, was by recognizing red flags of "suspicious circumstances." Vice Chairman Voss was certainly conducting himself in such a blatantly unethical manner favorable to REI that observers within the USPS were made highly suspicious about his personal motivations, but the plaintiff contends that he missed all of these queues. As the Supreme Court has said, "direct evidence of a fact is not required.

Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330 (1960).

Multiple red flags were obviously waving in this case, starting with the plaintiff agreeing to hire GAI on the promise that a USPS contract would be forthcoming in only a short 120 days, and then agreeing to pay this small, Detroit-based firm, $22,000 per month for consulting and public relations services, which were neither clearly defined nor used, due largely to GAI's close connection to Vice Chairman Voss, the same BOG member engaging in vigorous efforts to steer a sole-source contract worth hundreds of millions of dollars to REI. The plaintiff plainly or deliberately ignored these red flags. *See Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2070-2071 (2011) ("a willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts"); *Cooper v. NTSB*, 660 F.3d 476, 483-484 (D.C. Cir. 2011) (noting that under willful blindness standard, "the finder of fact may infer that a defendant acted knowingly if he deliberately closed his eyes to what otherwise would have been obvious to him and did not act through ignorance, mistake, or accident" (citing *United States v. Alston-Graves*, 435 F.3d 331, 337-40 (D.C. Cir. 2006)).

The issue of the plaintiff's willful blindness and concomitant criminal culpability is not before this Court, but is relevant in reviewing the merits of the plaintiff's position that he has rebutted the presumption of probable cause by showing the indictment was essentially invalid due to lack of evidence of a direct communication to the plaintiff about the illegal scheme. The Court rejects the plaintiff's position and credits the grand jury with the common sense to notice both (1) the obvious lack of such testimony from any grand jury witness, and (2) the red flags apparently ignored by the plaintiff, to base its return of the indictment on circumstantial

evidence. For the same reason, no matter how legitimate the plaintiff's concerns are about the manner in which "co-conspirators' scripted witness statements" were used to refresh the recollection of William Spartin, the opinion expressed by Mr. Spartin before the grand jury was clearly described as his opinion, and merely helped to summarize some of the same red flags already before the grand jury and available for them to evaluate in making their probable cause determination.

The plaintiff's third complaint is that the Postal Inspectors used intimidating techniques, such as yelling and threats in their treatment of the Frank Bray, William Spartin and Peter Voss. The Postal Inspectors credibly denied this accusation about their own treatment of these witnesses. 7/11/14 AM Tr. at 6, 51 (Hartman testimony); 7/15/14 AM Tr. at 60 (Kormann testimony). Furthermore, whatever intimidation was used, for example, on Frank Bray, did not stop him from lying to the Postal Inspectors or presenting generally exculpatory testimony to the Grand Jury. None of these witnesses testified before the grand jury that the plaintiff or his co-defendants were told directly about the illegal scheme, thus making clear that any intimidation by government agents did not result in eliciting such testimony.

In sum, the plaintiff's myriad criticisms of the investigative techniques used to present testimonial evidence before the grand jury fall far short of undermining the validity of the indictment and rebutting the presumption of probable cause presented by the indictment. The indictment may, therefore, be considered not just as *prima facie* evidence of probable cause but as dispositive on this point.

### 2.   Indictment Against Plaintiff Was Supported by Probable Cause

The analysis of the plaintiff's FTCA claim could stop with the finding that the indictment reflects a valid finding of probable cause by the grand jury since that finding alone warrants entry of judgment in the government's favor. Even if the plaintiff were able to rebut the

presumption of probable cause created by the indictment, however, the evidence presented at trial demonstrated ample probable cause for the grand jury's action in returning the indictment.

At the outset, the plaintiff proffers that "[t]he most powerful evidence showing an absence of probable cause is the plethora of direct evidence from the actual conspirators that [the plaintiff] had no actual knowledge and did not participate in the Voss-Gnau scheme."  Pl.'s COLs at 7.[65]  This proffer suffers from two significant flaws: first, direct evidence is not necessary to show probable cause since "[t]he law makes no distinction between the weight or value to be given to either direct or circumstantial evidence."  *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003).  Second, while the co-conspirators testified that they personally did not tell the plaintiff directly the details of the kickback and bribery scheme, they nonetheless maintained that the plaintiff had to have known about the conspiracy due to the red flags associated with the dealings among REI, GAI and Vice Chairman Voss.  7/15/14 AM Tr. at 104-05 (Kormann testimony); Pl.'s Ex. 269 at 10 (Tr. Spartin G.J. testimony).

Furthermore, brief examination of certain key evidence gathered during the investigation makes abundantly clear that the indictment of the plaintiff was fully supported by probable cause. As an initial matter, the investigation began in the summer of 1985 because of Vice Chairman Voss' unusual involvement in applying pressure to USPS management to award a sole source contract to REI.  This conduct sparked suspicion about REI's participation in the illegal scheme that was compounded and corroborated by: (1) REI's retention of GAI, at the

---

[65] In support of this assertion, the plaintiff points to co-conspirator testimony from Messrs. Voss, Spartin, Gnau, and Marcus and Ms. Peterson, and also testimony from Mr. Bray.  *See* Voss Dep. at 40-41, 52, Jun. 12, 2014 (indicating that Voss did not tell the plaintiff about the conspiracy); Pl.'s Ex. 226 at Bates 00244  (Spartin Polygraph Tr., Spartin stating " I don't give a hoot and hell about Bill Moore" and "I wish I could give them REI," but that "I'm not gonna lie."); 7/7/14 AM Tr. at 49 (Hartman testimony) (indicating that Gnau told Postal Inspectors that he did not tell the plaintiff about the scheme); Kormann Dep. at 134, 2/17/2000, ECF 489 (stating that Marcus never told the Postal Inspectors that he or anyone else told REI about the illegal payments); *id.* at 136 (Kormann stating that Peterson never told Postal Inspectors that she told the plaintiff of the conspiracy); 6/30/14 PM Tr. at 26-27, 32-33 (Bray testifying that prior to Voss' guilty plea, neither he nor the plaintiff had any knowledge of the conspiracy).

recommendation and urging of Vice Chairman Voss, *see supra* Part III B.7.; (2) the payment to GAI of a monthly retainer that was over four times the amount paid to REI's other, better established, Washington D.C.-based consulting firm, which was already purportedly performing the same services, *see supra* Part III B.10.; (3) the lies told to the Postal Inspectors, on November 20, 1985, by the plaintiff and his subordinates about not meeting one-on-one with BOG members, even though, with the plaintiff's knowledge, Mr. Reedy had met privately for dinner with Vice Chairman Voss on September 3, 1984, and telephone records showed contacts between the plaintiff and Vice Chairman Voss beginning in July, 1984 and the ensuing months, *see supra* Part III B.2., which lies were perceived to be an apparent effort to cover-up REI's relationship with Vice Chairman Voss; (4) the lie told to the Postal Inspectors by Mr. Reedy, on April 8, 1986, that he met John Gnau through a contact at Hill & Knowlton rather than through Vice Chairman Voss, *see supra* Part III B.6.; (5) the plaintiff and Mr. Reedy's responses to Postal Inspectors' questions, on July 25, 1986, which responses the inspectors found suspicious because the plaintiff "could not explain or recall the significance of Moore's notes relative to Voss' actions . . . and the appointment of Casey," Pl.'s Ex. 291 at 10 ("Details of Offense"), and they "consciously downplayed Spartin's role as a consultant to REI and his participation in their MLOCR sales efforts," *id.*, *see supra*, Part III B.9.; (6) co-conspirators' testimony that the plaintiff and his subordinate, Mr. Reedy, made various statements, requests and inquiries implicitly acknowledging GAI's influence over Vice Chairman Voss, including (a) Mr. Reedy agreeing to refer to this BOG member as "our friend," asking about GAI's arrangement with Vice Chairman Voss and stating, when GAI's retainer was increased to $22,000 per month, that "I know you have people to take care of," *id.*, (b) the plaintiff asking GAI's John Gnau and William Spartin about getting Peter Voss to order a sole source contract for REI, *id.*; and (c) both

the plaintiff and Mr. Reedy complaining to Mr. Spartin about the lack of progress in obtaining a prompt award of a USPS sole source contract, *id.*; (7) among the journals maintained by the plaintiff was a dedicated notebook labeled "Postal," which was missing thirty-six out of eighty sheets when produced in response to a grand jury subpoena, raising significant suspicion since co-conspirators had informed the Postal Inspectors about an agreement to purge evidence of the conspiracy from their files, *see supra* Part III B.9. & C.

The totality of this evidence supported probable cause to indict the plaintiff.[66] Therefore, the plaintiff has failed to establish an absence of probable cause for his indictment and his inability to do so is fatal to his FTCA claim.

### C.  Postal Inspectors Did Not Act With Malice

Finally, to prevail on his FTCA claim for malicious prosecution, the plaintiff must also show that the Postal Inspectors pursued the criminal investigation and secured an indictment against him out of malice rather than because they believed the plaintiff engaged in a criminal conspiracy to defraud the United States.  In this context, "malice" means "'a primary purpose . . . other than that of bringing an offender to justice.'" *Amobi v. D.C. Dep't of Corr*, 755 F.3d 980, 992 (D.C. Cir. 2014) (quoting *DeWitt,* 43 A.3d at 296 (quoting *Jarett v. Walker*, 201 A.2d 523, 526 (D.C. 1964))).  Proof of the requisite malice may be established from "the existence of a willful, wanton, reckless or oppressive disregard for the rights of the plaintiff."  *Tyler v. Cent. Charge Serv., Inc.*, 444 A.2d 965, 969 (D.C. 1982).

---

[66] Based upon a summary of a portion of this evidence, supervisory AUSAs within the DC USAO commented that "none of the evidence shows direct knowledge by Moore of the payments to Voss through GAI," but that "in light of Moore's close association with Reedy – from which one can infer that Moore knew of at least some of Reedy's conversations with Gnau—it proves no more than that Moore <u>probably</u> knew of the payments to Voss." Pl.'s Ex. 10 at 6 (Mem., dated June 1, 1988, to DC USA Jay B. Stephens from Paul K. Knight and Charles S. Leeper) (emphasis in original).  While the focus of this memorandum was on the likelihood of success under the standard of proof required at trial, notably, the assessment of what the evidence "probably" showed is closer to the standard applied by the grand jury.

The plaintiff posits that "evidence of malice abounds," Pl.'s COLs at 21, and the energy and resources he has committed to this litigation over the past twenty-five years is testament to the tenacity of this position.  Yet, the totality of the evidence gathered over the three-year, evolving investigation into the illegal bribery and kickback scheme—which led to criminal convictions of Vice Chairman Voss, John Gnau and Michael Marcus as well as non-prosecution/cooperation agreements with others and, ultimately, to the indictment of the plaintiff and his co-defendants indictment—considered as a whole, simply does not support the plaintiff's allegation that he was maliciously targeted for criminal prosecution by the Postal Inspection Service because of his outspoken criticism of USPS.

As support for his position "that the Postal Inspectors acted with malice," the plaintiff relies on the purported absence of probable cause, which he contends "gives rise to an inference of malice."  Pl.'s COLs at 22-23.  This reliance is misplaced.  While "malice may be presumed from the lack of probable cause if not inconsistent with other facts in the case, *Chapman v. Anderson*, 3 F.2d 336, 339 (D.C. Cir. 1925); *Kalantar v. Lufthansa German Airlines*, 402 F. Supp. 2d 130, 150 (D.D.C. 2005) ("malice may be, and generally is, inferred from want of probable cause") (internal citation omitted), this is not the situation here.  As discussed, *supra*, in Part IV. B., probable cause existed to indict the plaintiff on criminal charges.  Hence, no inference of malice is warranted on this basis.

Moreover, even if the plaintiff were able to establish the lack of probable cause, a finding of malice would be "inconsistent with other facts in the case."  *See Chapman*, 3 F. 2d at 339. The plaintiff rang the death knell on his own assertion that the Postal Inspectors maliciously induced the prosecution against him during his testimony on the second day of trial. Specifically, the plaintiff admitted on cross-examination not only that he was angry about the

Postal Inspectors belief in his guilt at the time of his indictment, but also that "they still think that [he is] guilty today" of the crimes for which he was investigated, indicted, and acquitted. 6/25/14 AM Tr. at 29 ("Q. You're also angry that the postal inspectors believed you were guilty, right? A. Yes.; Q: In fact, you believe that they still think that you're guilty today? A. I think they do, yes."); *see also* Defs.' COLs at 18 ("If the plaintiff himself does not believe that the inspectors' alleged unconstitutional animus drove their investigation and the ultimate prosecution, the Court certainly will not make such a finding.").

Indeed, the two Postal Inspectors most involved in working with the DC USAO on the indictment of the plaintiff and his co-defendants, made clear their belief in the plaintiff's guilt. Postal Inspector Hartman testified credibly that when he "recommended that [the plaintiff, REI and Mr. Reedy] be charged, that [he] believed they were guilty and should be charged for what they did." 7/7/14 AM Tr. at 103.  Likewise, Postal Inspector Kormann testified credibly about his belief that the plaintiff was guilty based upon the evidence uncovered during the investigation.  7/1/14 AM Tr. at 33. Postal Inspector Kormann stated:

> The issue came to be not what his position was but what actions did he take to ensure that his goal would, in fact, be achieved; namely, a sole source award to his company. And our investigation disclosed that he took several steps that led me to believe, and led the investigation to believe, that he did join the conspiracy that was formed by Gnau and Voss and Marcus and Spartin, and that, as our investigation proceeded and the conspiracy began to unravel, he took steps to minimize the knowledge that we believed he had and that the investigation showed that he had.

*Id*.[67]  The Postal Inspectors' belief in the plaintiff's guilt, a belief that persists to this day and that the plaintiff himself recognizes, goes a long way to defeat the plaintiff's long-standing

---

[67] Postal Inspector McIntosh also testified about his view of the plaintiff's role in the charged conspiracy, stating, in response to the question of "why was Mr. Moore investigated?" that "I think the short answer is that it was his consultants that had gone to jail, and it was --- it seemed to be apparent that but for the money that REI had been paying their consultants, that there would have been no conspiracy."  7/16/2014 AM Tr. at 43.

accusation in this lawsuit that these government agents pursued criminal charges against the plaintiff due instead to some malicious or improper motive.

Nevertheless, the plaintiff cobbles together a slew of disparate incidents in an effort to show a malicious purpose "to punish Moore for his constitutionally protected conduct," Pl.'s COL at 28, despite his own testimony attributing a *proper* motive to the Postal Inspectors.  The plaintiff's over-arching theory is that the Postal Inspectors "viewed Moore's constitutionally protected efforts to use political pressure to win a contract and (allegedly) effect personnel change within the Postal Service to be a basis for the criminal charges against him." *Id*. at 23.[68] As principle support for this theory, the plaintiff cites: (1) "animosity" or "hard feelings" from USPS management based upon brief comments to the plaintiff scattered over several years from PMG William Bolger and his successor, PMG Paul Carlin, William Chapp, Assistant PMG for Engineering, and James Jellison, Senior Assistant PMG for Operation; (2) the launching of the criminal investigation into REI and the plaintiff before uncovering the illegal payoff scheme; and (3) certain memoranda prepared by the Postal Inspectors over the three-year course of the investigation.[69] *Id.* at 23-24.  Despite the vehemence with which the plaintiff argues in favor of a

---

[68] In the plaintiff's view, he presented at trial "ample direct evidence corroborating the conclusion that the Postal Inspectors acted with malice," Pl.'s COL at 23, based on: (1) "the strength of the direct evidence of Moore's innocence," *id.* at 22; (2) the extent to which the Postal Inspectors relied "on slanted and unreasonable views of the circumstantial evidence to make a case against Moore," *id.* at 23; and (3) "the extent to which the inspectors engaged in improper investigative actions," *id.*  All three of these bases for proving malice also serve as the underpinnings of the plaintiff's argument that probable cause for his indictment was lacking and, as such, are discussed – and rejected –, *supra*, in Part IV. B.  For the same reasons that the plaintiff's interpretation of the evidence is insufficient to show no probable cause, his view of the evidence is insufficient to support an inference of malice.

[69] The plaintiff also cites Postal Inspector McIntosh's communications and delivery of five documents to former PMG Carlin as "clear and dramatic evidence that these agents were acting with malice and were willing to break the rules to help Carlin go after REI and Moore." Pl.'s COL at 27. This factual allegation has been expressly repeated by the D.C. Circuit, *see Moore II*, 213 F.3d at 707, but, as demonstrated at trial, is utterly divorced from critical context. The evidence at trial revealed that, on June 9, 1986, former PMG Carlin called Postal Inspector McIntosh "out of the blue," since this inspector had no personal relationship with PMG Carlin and only knew him as among the most senior managers at USPS. 7/16/14 AM Tr. at 27-29 (McIntosh Testimony); 7/8/14 AM Tr. at 84-85 (Carlin Testimony). Indeed, at the time, Paul Carlin remained a senior USPS employee serving as a special assistant

finding of malice, the evidence at trial, including the deposition and live testimony of the

defendant Postal Inspectors and their supervisors within the USPS, as well as of AUSA Valder

and his supervisors within the DC USAO, demonstrates that the plaintiff is just plain wrong.

### 1.   Alleged USPS Animosity Towards REI and Plaintiff

First, no matter how stung the plaintiff may have been by comments made to him by

various USPS senior managers, this does not translate into a scheme – so broad-based that it

reached from two successive Postmasters General down through the ranks to line-Postal

Inspectors – to activate a three-year criminal investigation culminating in the plaintiff's

indictment.   As summarized by the plaintiff, these comments consisted of various USPS officials

telling him to "'back off' from his congressional lobbying efforts and media campaign" and to

"get media and congressmen off [their] backs," and James Jellison "rebuff[ing] Moore's

overtures to discuss REI's multi-line machine."  Pl.'s COLs at 23.[70]  The plaintiff attributes the

---

to the BOG and, consequently, remained a part of USPS' senior management. *Id.* at 29 (McIntosh testifying: "he was still—I mean, even though he had been displaced as postmaster general, he was still the very top echelon of postal management by title, at least . . .[s]o I had no reason—no reason to doubt the validity of his request."). Former PMG Carlin requested "copies by number of about five documents that postal service managers had created during the period of January to June of 1985." *Id.*  Postal Inspector McIntosh testified that none of the documents requested were investigative materials but rather were materials gathered "primarily for the purpose of producing the report that Congressman Ford had asked for, for a complete history of a multi-line optical character reading program." *Id.*  Subsequently, on December 9, 1986, former PMG Carlin requested "a particular document that Jackie Strange, the deputy postmaster general, had written back in March of 1985," namely, "the Phase II freeze order ... [in which] Strange. . . directed the postal service to freeze the retrofit activities regarding this Phase II optical character readers."  *Id. at 30.*   This document related to a "completely separate" investigation "from any grand jury investigation." *Id.*  The plaintiff's characterization of the contact between Postal Inspector McIntosh and former PMG Carlin, at best, ignores significant context that obviates any finding of "rule" breaking or malice.  No evidence was presented that Postal Inspector McIntosh had any knowledge or understanding about how former PMG Carlin intended to use the requested documents or information, let alone that any Postal Inspector encouraged former PMG Carlin to initiate lawsuits against the USPS and REI and the plaintiff. 7/16/14 AM Tr. at 85-86 (Carlin testimony). This is a far cry from the malicious scheming about which the plaintiff has speculated before the Courts of this Circuit for years, *see, e.g., Moore II*, 213 F.3d at 707, 712 (noting plaintiff's allegation that "Postal Inspectors also provided witness interview statements and lab results to Paul Carlin" after his dismissal as PMG and did so "for the apparent purpose of assisting Carlin, a private plaintiff, to pursue civil litigation in connection with his dismissal from the Postal Service"), and merits no further discussion.

[70] The plaintiff was also "somewhat offended" when he was told by PMG Bolger that Mr. Jellison referred to REI as a "pip-squeak company."  6/24/2014 AM Tr. at 120-21.  Mr. Jellison denied making this or any other derogatory comment about REI or saying that REI would never obtain a USPS contract. 7/1/2014 PM Tr. at 19 (Jellison Dep. testimony) ("I would never say that to anybody. No, I don't recall that.").  The plaintiff has tried to

"animosity" he believed was expressed in these sporadic comments to the defendant Postal Inspectors due to the inspectors' "unwavering allegiance to USPS management." *Id*. at 27.

As already pointed out, *supra* Part III. A.4., one flaw in the plaintiff's theory that he was indicted out of malice for his outspoken criticism of USPS' automation program decisions was that friction between USPS and REI pre-dated the plaintiff's First Amendment protected activities as REI's CEO.  At the same time, another obvious flaw is that attributing malice to USPS management (which animosity the plaintiff theorizes spilled over to the Postal Inspectors), is difficult, if not impossible, to reconcile with USPS' actual conduct towards REI and its representatives.  The USPS invested substantial R&D funds, amounting to over $60,000,000, in REI's MLOCR technology. 6/24/2014 AM Tr. at 104 (Plaintiff testimony); 7/8/14 AM Tr. at 39 (Carlin testifying that "REI had been paid something between $40 and $60 million to develop some machines and the result of that were the five prototypes that had been sent out to, one to each of the five regions"); 7/1/14 PM Trial Tr. at 3 (Jellison Dep. testimony).  Moreover, USPS management remained interested in REI's progress with this technology and visited REI's headquarters to discuss the company's products.  7/1/14 PM Trial Tr. at 60 (Jellison Dep. testimony: "In fact, we spent a considerable amount of money in Dallas trying to develop a database in Dallas for the REI machines.  If they had had a national database, that would have

---

paint Mr. Jellison as "a staunch ZIP+4 single-line advocate," who was against REI and MLOCR technology but the picture presented at trial was far different. To the contrary, Mr. Jellison expressed support for an eventual transition to MLOCR technology generally but, in the early through mid-1980's, did not believe that this technology could be effectively used, as it required a national directory that did not exist.  7/1/14 PM Tr. at 86 ("So as long as there was a database restriction, we did not want to go to the multi-line read.  The multi-line read became available to us when you could get that national directory up."); *id. at* 64-65 ("From the start, we felt like if we could ever get a national database, multi-line was the way we wanted to go . . . I will say this again: I have never been opposed to a company or a concept.  I was opposed to purchasing a copy of the five machines that REI was developing").  Moreover, USPS spent a considerable amount of money trying to develop a database for REI's machines, which strongly cuts against the allegations made by the plaintiff.  *Id.* at 60 ("In fact, we spent a considerable amount of money in Dallas trying to develop a database in Dallas for the REI machines.  If they had had a national database, that would have been a perfect time to tell us about it, and they didn't tell us about it.").

been a perfect time to tell us about it, and they didn't tell us about it."); *see id.* at 67-68 (Jelllison

Dep. testimony: "I don't remember the management prior to Bill Moore very well, but we dealt

with REI, E-Systems and those people all the time . . . And, of course, we did plant visits at all

the different contractors' plants."); *id.* at 71 (recalling visit of BOG at "both REI and ECA"). The

USPS also deployed five of REI's MLOCR machines in USPS offices around the country as a

pilot project to test their performance. Indeed, after he had been on the job only a few months,

PMG Carlin visited one of the sites to inspect REI's MLOCR equipment, at Vice Chairman

Voss' recommendation and insistence. 7/8/14 AM Trial Tr. at 44 (Carlin testimony). The

plaintiff concedes that PMG Bolger made time to meet with him and even recommended to him

a consultant to improve the presentations that REI was making to the USPS. PMG Carlin also

made time to meet with REI's representatives, John Gnau and Michael Marcus, who had been

hired as REI's consultants. Finally, REI was, along with AEG, one of the two companies

participating in the next phases of the USPS automation program to retrofit existing SLOCR

machines. *See supra* Part III.A.2. and B.1. This actual investment of millions of dollars of

funding, actual meetings, actual site visits by USPS officials to monitor the progress of REI's

development of MLOCR equipment and selection to participate in phases of the automation

program appear to reflect genuine interest, rather than such deep-seated malice as to trigger a

criminal investigation and indictment, as the plaintiff has argued.

The plaintiff discounts these actual efforts by USPS to support REI's development of

MLOCR technology because he was ultimately unsuccessful in obtaining a large contract from

USPS to purchase the MLOCR equipment. While the plaintiff touts the congressional lobbying

and media efforts he took to compel USPS to buy REI's MLOCR equipment, he does not explain

what, if anything, he did to address the concerns of USPS over the perceived performance

shortfalls of the REI equipment.  Set against these perceived operational issues with REI's equipment, the fact that BOG's Vice Chairman Voss "was in effect acting as if he was a surrogate for a single vendor and doing unusual things" for REI not only created suspicion but also "general animosity" towards REI.[71]  7/8/14 AM Tr. at 120, 126 (Carlin testimony); 7/1/14 PM Tr. at 12 (Jellison Dep. testimony that he viewed "[the plaintiff's] persistence in buying REI's machine that [USPS] didn't want" as a "problem.").  These acknowledgements by former USPS managers of annoyance at the plaintiff's "political" approach to obtaining a government contract, rather than doing the hard work of fixing his product, are a slender reed on which to hang his case, in light of the actual conduct of USPS management in supporting REI's opportunities to develop its MLOCR business.  While the plaintiff was on a mission to improve REI's revenue from sales to USPS, the senior managers at USPS were trying to make technology choices that would move mail reliably and efficiently and avoid wasting taxpayer money.  7/1/14 PM Tr. at 62 (Jellison Dep. testimony).  USPS' time-table to sort through the significant technology choices the agency confronted differed from plaintiff's desire to obtain additional USPS business promptly, but that does not mean the leadership of USPS set out to put REI out of business and to punish the plaintiff through an indictment of the plaintiff and his co-defendants – which is the perspective urged by the plaintiff.  In fact, given the actual conduct of USPS in its support of REI, through substantial funding, high-ranking meetings, advice, pilot project purchases and even selection to participate in the competitive testing after the mid-course correction in Phase IIA of the automation program that perspective borders on nonsense.

---

[71] Multiple senior managers within USPS recognized the unusual and suspicious nature of Vice Chairman Voss' actions on behalf of REI, as did the investigators within the U.S. Postal Inspection Service.  Yet, the plaintiff, if he is believed to be completely innocent of participation in this illegal conspiracy, did not notice anything unusual about the second highest ranking member of USPS BOG aggressively pushing a sole source contract for up to $400,000,000 to purchase equipment that technology experts within USPS believed had operational issues.

In any event, any views about the shortcomings of REI's equipment or feelings of animosity among senior USPS officials are only relevant to the plaintiff's case if he is able to show that these views or feelings were shared by the defendant Postal Inspectors and spurred them to initiate and pursue their investigation of, and recommendation to indict, the plaintiff. The plaintiff acknowledges that the defendant Postal Inspectors flatly deny that any animosity by USPS senior management had any influence on their motivations to investigate and recommend indicting the plaintiff (and his co-defendants).  Pl.'s COL at 23.[72]  The plaintiff contends, however, that the defendant Postal Inspectors dissembled on the witness stand and cites three evidentiary bases as support for his view that the inspectors were, in fact, motivated by malice: first, he points to the timing of the initiation of the investigation of REI; second, he holds up two subpoenas issued to REI that seek production of documents related to First Amendment protected activities; and, third, he cherry picks statements contained in documents prepared during the course of the investigation.  Although the inferences the plaintiff has drawn from this evidence has held the plaintiff's case afloat for over twenty years of litigation, examination of the trial evidence demonstrates that the plaintiff's theory simply holds no water.

### 2.  *Initiation of Investigation of REI and Plaintiff Was Warranted*

The plaintiff argues that "[l]ong before they had any evidence of the Voss-Gnau payoff scheme, the Postal Inspectors wanted to put Moore, REI, and their congressional supporters under an investigatory microscope, looking for anything to charge them with, from campaign contributions to frivolous antitrust allegations."  Pl.'s COLs at 24.  The plaintiff has repeated this argument throughout this litigation.  *See, e.g.*, *Hartman*, 547 U.S. at 254 (noting that "[i]n the

---

[72] Although the plaintiff describes these denials as given "glibly," Pl.'s COL at 23, the Court finds that the defendant Postal Inspectors testified in a highly credible manner about their motivations, as did their superiors.  *See* 7/10/14 AM Tr. at 126-29, 172 (Clauson testimony); 7/8/14 AM Tr. at 112 (Carlin testimony).

course of these proceedings Moore has argued, among other things, that the postal inspectors

launched a criminal investigation against him well before they had any inkling of either of the

two schemes mentioned" namely "the payment of kickbacks by GAI to Governor Voss" and

"REI's possibly improper role in the search for a new Postmaster General," *id*. at 253).  The

prism through which the plaintiff is viewing the initiation of the criminal investigation is

distorted since it appears to be predicated on two alternative faulty, or naïve, premises: namely,

that either the Postal Inspection Service needed actual evidence of "the Voss-Gnau payoff

scheme" to launch an investigation into REI or the Postal Inspection Service had not begun

investigating Vice Chairman Voss' activities at the time they consulted with DOJ about

plaintiff's alleged threat to AEG.  As to the first predicate, unimpeachable, clear evidence of

criminal wrongdoing is typically not how investigations of sophisticated public corruption

schemes to cheat taxpayers are uncovered.  Instead, such investigations may be triggered by

reasonable suspicion based on anomalous and ethically questionable behavior by a public official

– and that is exactly how this investigation began.

Indeed, as to the second predicate, suspicions about Vice Chairman Voss and other BOG

members' activities in pushing a sole source MLOCR procurement contract to REI had been

building for some months, resulting in PMG Carlin and CPI Clauson committing a Postal

Inspector to monitor the procurement process, and CPI Clauson opening a formal investigation

of Vice Chairman Voss and other BOG members in the summer of 1985, several months before

the Postal Inspectors met with AEG officials and DOJ attorneys concerning REI.  Contrary to the

plaintiff's argument, the initial investigation focused not on REI or the plaintiff (let alone his

First Amendment-protected activities) but on Vice Chairman Voss, whose blatant efforts to push

REI's interests and pressure BOG members to award REI a sole source USPS contract,

heightened suspicions about corrupt dealings.  *See supra* Part III A.3, B.1.

Within a few months of beginning the investigation of Vice Chairman Voss, the Postal

Inspectors also received a report in early November, 1985 that, instead of the competition

envisioned by the ongoing phases of the procurement process, REI had boldly threatened AEG,

REI's competitor, that he would "kill" the OCR procurement competitive process if AEG did not

agree to split two competitive USPS OCR procurement contracts with REI.  7/10/14 AM Tr. at

118 (Clauson testimony); Pl.'s Ex. 107 at SMFCA 00210 ("Investigative Strategies" Mem.,

dated December 1985); 7/7/14 AM Tr. at 28 (Hartman testimony); 7/14/14 Tr. at 23-24

(Kormann Testimony).  The Postal Inspectors followed up on this report with a meeting with

AEG officials, who confirmed that, at a meeting on October 17, 1985, requested by REI under

the pretense of seeking technical information, the plaintiff had told AEG officials that he had

"political clout" and "could kill the Phase IIA project" unless AEG agreed to a "deal

(compromise) wherein ECA/AEG would get the Phase IIA conversion contract and REI the

Phase III MLOCR."  Pl.'s Ex. 107 at SMFCA 400210 ("Investigative Strategies" Mem., dated

December 1985).

The plaintiff characterizes the Postal Inspectors' concern about the plaintiff's proposed

"deal" to thwart the competitive process and to split the contract as amounting to "frivolous

antitrust allegations."  Pl.'s COL at 24.  Evaluating whether the plaintiff's proposal was

"frivolous" under antitrust law, was one of the reasons for the Postal Inspectors' meeting with

two supervising DOJ attorneys.  *See* 7/7/14 AM Tr. at 19-20, 67-68 (Hartman testimony).  As

reflected in the memorandum, dated November 8, 1985, from Postal Inspectors Edwards and

Hartman to their supervisor, CPI Clauson, summarizing the DOJ meeting, the DOJ attorneys

"advised us to continue our inquiry."  Pl.'s Ex. 101 (Nov. 8, 1985 Memo.); *see also* 7/10/14 AM

Tr. at 43-45 (Jarrett Testimony).  The DOJ attorneys recommended, *inter alia*, that the inspectors

"investigat[e] vendor's (REI) intention and capability of actually competing on Phase II

conversion" and "review and analyze documents, meetings, testimony, transcripts, etc. to detect

and establish a pattern of irregular, possibly unethical behavior and possible perjury regarding

Executive Order 11222."  Pl.'s Ex. 101 at 1.[73]  In accordance with these recommendations from

two supervisory level DOJ attorneys, the Postal Inspectors outlined for their supervisors their

next investigatory steps, including "create a complete subject file, i.e., Congressional testimony,

REI correspondence, etc."  Pl.'s Ex. 101 at 2.  Far from targeting REI due to the plaintiff's First

Amendment protected activities, "Congressional testimony" by REI representatives could inform

the investigators about REI's intentions and capabilities, per the DOJ attorneys'

recommendations on avenues for further investigation into whether criminal wrongdoing was

occurring.

### 3. *Subpoenas Issued to REI*

The plaintiff cites as evidence of malice that two of the multiple grand jury subpoenas

issued to REI, in July 1986 and February 1987, respectively, demanded certain records "with no

apparent regard for the First Amendment protection."  Pl.'s COL at 24.  The plaintiff

successfully made this argument several times before the D.C. Circuit, which described these

subpoenas as "targeting expressive activity" and noted their significance as "evidence of

retaliatory motive" that "comes close to the proverbial smoking gun."  *Moore V*, 644 F.3d at 420

n. 4 (D.C. Cir. 2011) (quoting *Moore III*, 388 F.3d at 884)), *cert. granted*, *judgment vacated*, 132

S. Ct. 2740 (2012), *opinion reinstated*, *Moore VI*, 704 F.3d 1003, *cert. denied*, 134 S. Ct. 295.

---

[73] The referenced Executive Order 11222 was originally issued in 1965 and prescribes "standards of ethical conduct for Government officers and employees."  30 Fed. Reg. 6469.

Within the context of the evidence presented over the four week trial, however, the issuance of these subpoenas had a legitimate investigatory purpose other than targeting First Amendment protected activity.

The July 24, 1986 subpoena specifically requested records relating to REI's use of PAC funds, including as the plaintiff decries, records relating to "'[a] summary of all contributions to candidates and or holders of public office,' 'authorization for individual PAC disbursements,' and 'disbursement of PAC funds to include the contributors' and payees' name.'"  Pl.'s COL at 24; Pl.'s Ex. 183 at SMFC3 09159 (G.J. Subpoena, dated July 24, 1986).  The topics reflected in the July 1986 subpoena were intended by the Postal Inspectors to identify whether and to whom REI may have made corrupt payments in order to obtain USPS business, including to legislators. 7/11/14 AM Tr. at 66 (Hartman testifying that July 1986 Subpoena issued as "[w]e were trying to gather as much information as possible to determine which way this investigation should run").  Postal Inspector Kormann further explained in more detail that:

> [W]e asked for copies of correspondence and the nature of contact between Mr. Moore and Congress. And we had a very valid specific reason for doing that. And that's because of the Buy American or Buy REI Amendment that looked out of place. Once we looked at the timeframe, why would there be a mid course correction that affirmed Mr. Moore's position in July of '85, but the Buy American or Buy REI Amendment comes up three weeks later and requires a sole source award to REI. It does didn't look completely coincidental. So we needed to find out what is the connection here. What is going on between these people . . .  we needed to understand the nature of the interaction. We could not leave any stone, any obvious stone unturned. So, we asked for that information. And we got that information.  We know one of his subpoenas asked for REI political action committee activity.  Who contributed, how much on the employees side and where did it go on the Congressional side. And again, that was a very specific reason for that request. In the event we were able to make any connection in timing or amounts, we would have had to report that to the U.S. Attorney's Office.  As it turned out, there was no obvious connection. I should say, unsavorily connection, there was no suspicion. None of the connections between Mr. Moore and Congress turned out to be anything that even bordered or could be seen as criminal activity. And the conclusion from that phase of the inquiry was that Mr. Moore had duped his congressman.  That Mr. Frost did not know that this was a Buy REI Amendment.

7/14/14 PM Tr. at 63-65.

The second subpoena, dated February 9, 1987, also cited by the plaintiff as targeting First Amendment protected activities, focused on records relating to REI's retention and use of GAI. Pl.'s Ex. 183 at SMFC3 09279-81 (G.J. Subpoena, dated Feb. 9, 1987 ("Feb. 1987 Subpoena")). This subpoena requested not only original notebooks, diaries and other records "relative to the . . . actual services performed by [GAI] . . .." *id.* at SMFC3 09281 (Feb. 1987 Subpoena, ¶ 3), but also "original records . . . which reflect services performed by [GAI], . . . to include but not be limited to . . . (b) records reflecting the arrangement of interviews with journalists and reporters; (c) records reflecting meetings with United States Congressmen; . . . (e) records which reflect consulting services or meetings with or regarding the REI Political Action Committee . . .." *id.* (Feb. 1987 Subpoena, ¶ 2).   By the time this subpoena had issued, the Postal Inspectors were aware that REI was paying GAI $22,000 per month, $6,000 of which was supposed to be for public relations work, but altogether was more than quadruple the amount paid to better known and established consulting firms based in Washington, D.C.  This subpoena reflected an investigative effort to document any public relations services that GAI was actually performing for this large monthly retainer. 7/11/14 AM Tr. at 68 (Hartman testifying that February 1987 subpoena was intended to "look[] for any documentation that REI had that would demonstrate that Gnau & Associates really did do PR-type work for REI").  As Postal Inspector Hartman explained, "if GAI was really a PR firm for REI, then these kind of documents should exist at REI, if they, in fact, did this kind of work . . ..  But in order to make sure, we submitted a subpoena to REI, if you have any of these items, please turn them over to us." *Id.*  He could not recall "seeing anything in response to the subpoena," which "corroborate[d] the evidence we had that they did not do this work for REI." *Id.*  This lack of evidence of actual work performed by GAI contributed to the Postal Inspectors' suspicion that the $6,000-a-month public relations

contract between REI and GAI "in effect, [] was a disguise for William Spartin's influence within the post office to place managers that would be favorable to REI and GAI." *Id.* at 69. Despite the plaintiff's cherry-picking of language from the subpoenas, the timing and the subject matter of the subpoenas reflect diligent efforts by the Postal Inspectors to track funds paid by REI, indirectly through a consulting firm or through a PAC, to ascertain whether, in addition to corrupt payoffs to a BOG member, corrupt funds were paid to Congress and whether REI was getting legitimate services for the funds paid to GAI.  Simply put, these subpoenas were not issued maliciously to silence the plaintiff's lobbying and public expression activities but to gather evidence relevant to corrupt uses of REI's funds.

### 4.   *Documents Prepared by Postal Inspectors*

In addition to the November 8, 1985 memorandum and two grand jury subpoenas, the plaintiff urges that malice is reflected in four other documents prepared by the Postal Inspectors: (1) a 35-page memorandum titled "Investigative Strategies," prepared in December 1985, Pl.'s Ex. 107; (2) a 12-page outline for an "Investigative Memorandum," submitted to CPI Clauson on August 5, 1986,  Pl.'s Ex. 195; (3) a 167-page memorandum titled "Details of Offense," prepared in 1988, Pl.'s Ex. 291; and (4) an undated four-page memorandum titled "Arguments for Indicting the Corporation," Pl.'s Ex. 295, which was authored by Postal Inspector Hartman, 7/14/14 AM Tr. at 93 (Hartman testimony).  Pl.'s COL at 24-26 (referencing these four documents); *id*. at 28 ("the Inspectors . . .  drafted key documents that made clear their motivations").  Generally, these documents were prepared by various Postal Inspectors to communicate to their supervisors within the USPS Postal Inspection Service and to the DC USAO about the status and nature of the evidence collected during the investigation.  Indeed, the Postal Inspectors had the burdensome task of assisting the DC USAO with compiling and synthesizing information collected from responses to over 200 grand jury subpoenas, interviews

of over 300 people, and the grand jury testimony of about thirty witnesses. Valder Dep. at 281-82, Mar. 1, 2000. The plaintiff extracted certain phrases from these four "key documents" in an effort to persuade this Court (and the jury) that the inspectors had retaliatory or malicious motive. Two of the documents, the "Details of Offense" and "Arguments for Indicting the Corporation," according to the plaintiff, "'come close to the proverbial smoking gun' on the question of retaliatory motive." Pl.'s COL at 26 (quoting *Moore III*, 388 F. 3d at 884). The jury was not persuaded and neither is this Court.

The "Investigative Strategy" memorandum prepared in December 1985 summarized information developed to that date relevant to the investigation. This information included that between May and July, 1985, Peter Voss, Jackie Strange and another member of the BOG misrepresented to USPS management (and subsequently in testimony before Congress) that the entire BOG supported BOG's Technology Committee's expenditure of about $163 million in automation budget funds for the immediate acquisition of MLOCRs from REI, without waiting until 1987 as the decision point for a mid-course correction as previously scheduled. Pl.'s Ex. 107 at SMFC400207-08. At the July and August 1985 full Board meetings, the BOG agreed only to a mid-course correction to MLOCR and "disagreed with Peters and Voss' sole source proposal and sided with management's plan of competitive test agreements for Phases IIA and III." *Id*. at SMFC4 00209. This led to the following question: "Why would Peters and Voss make misrepresentations to the Board of Governors, Congress and postal management and participate in this alleged scheme to defraud if they had no financial interest in the outcome of the procurement process?" *Id*. at SMFC4 00238; *see* Pl.'s Ex. 229 at 318 (Zip+4 Report, noting that "[d]uring their October 23, 1985, testimony before Congressman English's committee, Governors Peters and Voss misrepresented the view of the Board of Governors when they

testified that the [BOG]'s Audit Committee supported a sole source award to REI").  As to REI, the memorandum notes that, during an interview with the plaintiff and his subordinates, Messrs. Reedy and Bray, the plaintiff did not deny speaking to AEG about splitting the contract but "stated that AEG misunderstood" and he "was merely reciting what he would do it [sic] he was Postmaster General."  *Id* at SMFC4 00201.  These REI representatives also denied any contact with BOG members Voss, Peters and Camp, even though telephone records showed otherwise and documentation requested by Vice Chairman Voss turned up in correspondence from REI to Congress.  *Id*. at SMFC4 00210-12.  This led to the following question: "Why do REI, Peters and Voss continue to lobby for sole source procurement after they were granted their wish of mid-course change to MLOCRs, and competitive agreements were signed with an expedited test frame which benefits REI?  Intense political lobbying is underway by REI's president, William Moore."  *Id*. at SMFC400239.  In order "to determine the scope of their relationships with each other and their activities as they relate to the MLOCR procurement," the Postal Inspectors listed a number of interviews to conduct and subpoenas to issue, including to REI and its consultants for, *inter alia*, "contributions to candidates for public office," and correspondence with "elected and appointed public officials."  *Id*. at MMFC4 00234.

In context, the requests for information about REI's contacts with Congress, while related to First Amendment protected activity, were for the purpose of determining the "scope" of relationships between REI and BOG members based upon analysis of the timing and over-lapping substance of Vice Chairman Voss' (and other BOG members') statements and positions and those of REI. Given the risk of misinformation being relayed to Congress from senior officials at USPS as a result of possible corrupt payments to those officials, the Postal Inspectors

properly focused on what was being communicated by whom among these suspects to Congress about this multi-million dollar technology procurement.

The plaintiff's accusation that the second document, the "Investigative Memorandum" outline, had a nefarious purpose to target "members of Congress who favored the multi-line technology," because the document references "[i]dentify[ing] all Congressman, Senators and Executive Office personnel who have taken a public position on ZIP+4 and/or multiline," and "document[ing] REI's Political Action Committee contributions to the above politicians," is misdirected. Pl.'s COL at 24. The purpose of this document was not to further the criminal investigation or target MLOCR congressional supporters but rather to provide "a comprehensive written report" concerning "the investigation and reviews of matters pertaining to the Postal Service's past, present, and pending procurement activities regarding the Zip+4 Program and the purchase of Optical Character Readers," as requested by a congressional oversight committee. Pl.'s Ex. 229 at 1 (ZIP+4 Report); *see* Edwards Dep. at 257-58, Feb. 15, 2000 (explaining: "This is an investigative memorandum. . . . this was not intended to further the criminal investigation as much as it was just to talk about the history of why we were at this point where we were, the Postal Service—I say 'we,' the Postal Service—just trying to sift out, you know, why do we make this decision or not make it or overrule it or retract it, or whatever."). The plaintiff is critical of the Postal Inspectors for revising a draft of an outline for what became the 330-page ZIP+4 Report to Congress to include reference to two topics: (1) identifying congressmen and executive office personnel "who have taken a public position on Zip+4 and on multi-line," as well as related correspondence and/or newspaper articles outlining their positions, and (2) documenting "REI's political action committee contributions to the above politicians." Pl.'s

FOF ¶ 358 (*comparing* Pl.'s Ex. 195 at Bates POS-004-0604 *with* Pl.s' Ex. 190 at Bates SMFC4 07638).

With respect to the first outline addition, the over-arching purpose of the report was to present a full picture of USPS' procurement history, and to help explain the choices made by USPS regarding OCR technology.  Documenting the input of Congress, through members' public statements, was obviously pertinent to this aspect of the requested congressional report. Indeed, Postal Inspector Edwards testified that "as I understood it, Chairman Ford wanted to know all the public statements that had been made. Once again, that's what I was told, so that's what we went out to get."  7/15/14 PM Tr. at 124-25 (Edwards testimony); *see also id.* at 258 ("Congress did have an influence on the actions management did or did not take").  The second outline addition, regarding REI's PAC contributions, must be understood in the context of the criminal investigation: Having tracked the use of REI funds to make corrupt payments to a USPS BOG Vice Chairman, Postal Inspectors also tracked REI funds to other policy makers with influence in steering USPS contracts to REI.  As Postal Inspector Edwards explained, "the investigation at this point in July of '86 was very much, a very fluidity situation, much of what was eventually found out came after this.  And there was concern that the money, you know, we didn't know where the money was, where it led to or whatever.  So I'm assuming the last part had something to do with that."  *Id*. at 125.

Notably, the plaintiff does not cite the final ZIP+4 Report to bolster his malice argument. The reason for this is clear from the report's text, which stresses, for example, in the section reviewing the "Conspiracy Investigation," that "[t]he United States Postal Inspection Service does not make any conclusion relative to the guilt or innocence of the individuals or entities identified herein," including REI, while noting the guilty pleas of Messrs. Voss, Gnau and

Marcus.  Pl.'s Ex. 229 at 291 (ZIP+4 Report).  The report summarized the "ironic" effect of the

investigation that "it will be difficult to immediately capitalize on the momentum toward multi-

line in the most efficient and economical manner because of the taint of corruption" given that

"postal managers are painfully aware the agency was being maneuvered toward multi-line

technology by corrupt conspirators," with the consequence of "plac[ing] the Postal Service in the

same relative position as in July 1984, when the process of conversion to multi-line capability

was first being discussed."  *Id.* at 5.

Finally, the plaintiff makes much of the two purported "smoking gun" documents titled

"Details of Offense" and "Arguments for Indicting the Corporation," exclaiming that these

documents are "particularly troubling" because "the Postal Inspectors seemed to believe that

engaging in lobbying activity like this was nefarious and could form the basis for a criminal

indictment . . . and that no member of the task force or supervising official in the Postal Service

would do anything to rein in this assault on constitutionally protected activity."  Pl.'s COL at 26.

The "Arguments for Indicting the Corporation" document was prepared by Postal Inspector

Hartman "sometime during 1988" for AUSA Valder during the DC USAO's consideration of

possible charges against REI.  7/11/14 Tr. at 109, 117 (Hartman testimony).  The thrust of this

document is set out in its first page, stating "CONCLUSION: This is a case of an underlying

corrupt corporate management strategy to obtain USPS business rather than the isolated and

independent overzealous actions of two corporate officers."  Pl.'s Ex. 295 at SMFC3 09861.  To

support this "CONCLUSION," the memorandum lists nine numbered paragraphs outlining

factual matters regarding REI's Board and management's awareness and support of the

plaintiff's strategy, including the corporate funding of the plaintiff's "media and political

campaign to discredit USPS management and cause financial harm to USPS;" the

"bankroll[ing]" of GAI "based primarily on their relationship with Voss;" the behavior of "REI officers" who "have been less than candid" and "Reedy lied to Postal Inspectors," without voluntary correction by other REI officers; and a prior grand jury investigation in 1977 that uncovered prior corrupt dealings by REI with USPS employees, namely REI's reimbursement of a consultant for entertaining USPS officials to obtain confidential information, resulting in the firing of the USPS employees but no prosecution. *Id.* at SMFC3 09861-62.

According to the plaintiff, this document shows that REI and the plaintiff were indicted due to the company's public criticism of USPS and, at first blush, the reference to the public criticism of USPS as the first of the nine paragraphs is a jarring statement for federal law enforcement officers to make. Postal Inspector Hartman explained, however, that the reference to the company's "media and political campaign" was intended to respond to an argument made by REI's counsel that the company should not be indicted because the "post office business was reportedly not that significant to REI" and instead by showing "how important this business was to REI and the motive for the conspiratorial actions." 7/1/14 AM Tr. at 112 (Hartman testimony).

Notwithstanding the clumsy nature of the reference to REI's public criticism of USPS, the Court credits the testimony of Postal Inspector Hartman that this document was intended to show broad corporate support for the plaintiff's activities to obtain the REI contract, not to suggest that the company—or any of its managers—was subject to indictment for criticism of USPS. 7/11/14 Tr. at 110-11 (Hartman testifies that: "The point was that it was not only the actions of Robert Reedy and William Moore that reflected violations of crime; it was the corporate strategy. In other words, whatever they did, they did it to assist the corporation. There

was a corporate purpose for what they did and that there were other people in the corporation that were also involved in that activity -- supported that activity.").

Similarly, the lengthy "Details of Offense" document was prepared initially in about February 1988 by the Postal Inspectors for AUSA Valder to summarize the evidence against the plaintiff and his co-defendants and, at some point, supplemented at the request of AUSA Valder, to respond to specific issues raised in the joint submission by counsel for REI, plaintiff and Mr. Reedy.  7/15/14 Trial at 75 (Kormann testimony noting that "[t]he document kept growing"); *id*. at 78 (Kormann testimony).  This document also refers to the plaintiff's criticism of USPS and his other lobbying efforts with Congress.  *See id*. at 78-79.  Postal Inspector Kormann testified that "when the nature of the contact between Mr. Moore and Congress was brought to our attention, we were compelled to follow that to see if there was anything . . . even possibly illegal about that . . . so we were just seeing what was the nature of the contact.  Was this completely innocent advocacy or was, in fact, either a congressional staff person or a congressman or woman possibly aware of what was happening? . . . We ultimately concluded that Mr. Moore had misled – had basically misled congressmen about his intentions."  7/15/14 Tr. at 79 (Kormann testimony).

In sum, the evidence presented at trial does not show that the investigation and indictment of the plaintiff was motivated by malice stemming from the plaintiff's public criticism of USPS or lobbying of Congress.  The attention given by the Postal Inspectors to REI's use of consultants and Congressional contacts was due to the suspicion, which turned out to be valid, that the consultants served as the conduit for illegal funds to the Vice Chairman of the USPS BOG in order for REI to obtain a sole source contract for hundreds of millions of dollars.  Moreover, this same public official funneled confidential documents to REI for use in

its lobbying efforts and made misrepresentations to Congress in furtherance of REI's goal of obtaining a sole source contract. In other words, REI's efforts to apply public, congressional and BOG pressure on USPS to speed up its switch from SLOCR to MLOCR technology, where REI was the sole supplier, were intertwined and appeared to work in tandem, with Vice Chairman Voss and GAI serving as the fulcrum. The plaintiff ignores this critical context in highlighting certain statement in documents prepared by the Postal Inspectors. Yet, this context wholly undercuts his contention that these documents support a finding of malice. The Court finds that the documents relied upon by the plaintiff do not show the requisite malice.

### D. FTCA Judgment Entered in Favor of United States

After over two decades of litigation, the plaintiff was permitted to proceed to trial on his FTCA claim for malicious prosecution. After evaluating the testimony, examining the evidence, and assessing the briefs, the result in this case is clear: The plaintiff has failed to show that he was the victim of a malicious prosecution by the United States. The plaintiff did not demonstrate by a preponderance of evidence that the Postal Inspectors improperly disclosed grand jury material, that any such disclosure caused the plaintiff's indictment, that the plaintiff's indictment lacked probable cause, or that the defendant Postal Inspectors harbored a malicious intent. Instead, the evidence at trial showed that the defendant Postal Inspectors conducted a thorough and largely routine criminal investigation into a widespread corruption scheme reaching the highest level of USPS—the Vice Chairman of the BOG. Over the course of several years, the Postal Inspectors traced the money, followed-up on evidentiary leads, and secured the cooperation (and conviction) of numerous individuals. Throughout this process, the Postal Inspectors were under the close supervision of the Chief Postal Inspector and were in constant contact with the DC USAO regarding the investigation and its tactics. The DC USAO made the ultimate decision of whether to indict the plaintiff.

Throughout the litigation, the plaintiff has faulted the Postal Inspectors for relying on circumstantial evidence regarding his knowledge of the illegal scheme, yet the plaintiff has proffered nothing but circumstantial evidence regarding the alleged malice of the Postal Inspectors—an irony not lost upon the Court.  As a result, even after trial, this Court is left in the same place as the very first judge on this Court to consider the plaintiff's claims:  "Moore has completely failed to offer any direct evidence of malicious intent by the Inspectors." *1993 Decision*, 1993 WL 405785, at *5.  After consideration of all the circumstantial evidence presented at trial, the Court reaches the same conclusion espoused by the plaintiff during his testimony:  The Postal Inspectors believed the plaintiff to be guilty of the crimes for which he was indicted, *see* 6/25/14 AM Tr. at 29, and sought his prosecution as a result.

Accordingly, the Court enters judgment for the United States on the plaintiff's FTCA claim for malicious prosecution.

## V.    THE FTCA JUDGMENT BAR

Before turning to the plaintiff's motion for a new trial on his *Bivens* claim for retaliatory inducement to prosecution, the Court first addresses the effect of the FTCA's "judgment bar" provided in 28 U.S.C. § 2676.[74] Section 2676 provides, that "[t]he judgment in an action under [the FTCA] shall constitute a complete bar to any action by the claimant, by reason of the

---

[74] Among the myriad of pretrial motions filed by the parties, the plaintiff moved for an order to be entered before the trial began setting forth procedures that would allow him to elect his remedy and avoid triggering the FTCA's judgment bar by postponing entry of judgment on his FTCA claim until after any appeal by the defendants on the *Bivens* claim, presuming he prevailed on this claim. Pl.'s Mot. For Order Governing Application of FTCA Judgment Bar, at 15, ECF No. 437 ("the Court should hold the FTCA claim in abeyance while the postal inspectors pursue their appeal. Once that appeal is resolved, the Court should give Moore the opportunity to make an election between, on the one hand, recovering on his final *Bivens* judgment and relinquishing his FTCA claim, and, on the other hand, seeking entry of judgment on his FTCA claim."). The Court denied this motion without prejudice. Minute Order (June 17, 2014). After return of the jury verdict against him, the plaintiff filed a notice, in response to the Court query, 7/21/2014 Tr. at 20, ECF No. 537, that he was not renewing his prior motion for an order governing application of the FTCA judgment bar and, instead, was reserving his right to withdraw his FTCA claim in connection with further proceeding on his *Bivens* claim. Pl.'s Notice, ECF No. 509.

same subject matter, against the employee of the government whose act or omission gave rise to the claim." The Supreme Court has noted that "the judgment bar can be raised only after a case under the Tort Claims Act has been resolved in the Government's favor." *Will v. Hallock*, 546 U.S. 345, 354 (2006). Now that the plaintiff's FTCA claim has been resolved against him, the issue presented is whether the judgment bar operates to render moot any further consideration of the plaintiff's *Bivens* claim since that claim would, even if the plaintiff presented valid arguments for a new trial, be barred.[75]

The FTCA judgment bar typically comes into play to preclude double recovery against both individual federal government agents and the federal government arising from the same facts. *See, e.g., Levin v. United States*, 133 S. Ct. 1224, 1228 (2013) (under § 2676, "[j]udgment against the United States in an FTCA action would bar a subsequent action against the federal employee whose conduct gave rise to the claim"); *Henderson v. Bluemink*, 511 F.2d 399, 404 (D.C. Cir. 1974) (stating that section 2676 "provides that a judgment against the United States shall operate as a bar to any action against the individual employee, but that section proscribes a double recovery, not a suit against the against the individual employee in the first instance"); *Engle v. Meecke*, 24 F.3d 133, 134 (10th Cir. 1994) (upholding damages award on plaintiff's FTCA claim and vacating the *Bivens* jury verdict based on FTCA judgment bar); *Ting v. United States*, 927 F.2d 1504, 1513 n.10 (9th Cir. 1991)( "[A] plaintiff may maintain both an FTCA and a *Bivens* action, [but] he may not receive double recovery."); *Sanchez v. Rowe*, 870 F.2d 291, 292 (5th Cir. 1989) (upholding the district court's decision forcing the plaintiff to choose between *Bivens* and FTCA award). That is not the concern here since the plaintiff did not prevail on his *Bivens* claim.

---

[75] The parties have not briefed or otherwise addressed this issue.

Rather, the question is whether the plaintiff's failure to prevail on the FTCA claim renders his new trial motion moot and any evidentiary or procedural error he cites harmless. Other courts have so held. *See, e.g., Unus v. Kane*, 565 F.3d 103, 122 (4th Cir. 2009) (holding *Bivens* action moot after entry of judgment in favor of government on FTCA claim, pursuant to FTCA judgment bar); *Manning v. United States*, 546 F.3d 430, 434 (7th Cir. 2008) (FTCA judgment in government's favor barred *Bivens* claim arising from same occurrence pursuant to FTCA's judgment bar, even though both claims were raised in same lawsuit); *Harris v. United States,* 422 F.3d 322 (6th Cir.2005) (finding judgment entered on the merits in favor of government on FTCA claim barred *Bivens* claim against arresting federal agents); *Accord Arevalo v. Woods*, 811 F.2d 487, 490 (9th Cir. 1987) (holding FTCA claim barred *Bivens* claim "[t]he moment judgment was entered against the government");  *Serra v. Pichardo*, 786 F.2d 237 (6th Cir. 1986) (finding that FTCA judgment against the government for negligence of prison doctor and warden barred *Bivens* action against doctor and warden).

The Supreme Court has explained that "[a]lthough the statutory judgment bar is arguably broader than traditional res judicata, it functions in much the same way, with both rules depending on a prior judgment as a condition precedent and neither reflecting a policy that a defendant should be scot free of any liability." *Will v. Hallock*, 546 U.S. at 354.  Like issue preclusion or *res judicata*, the purpose of the FTCA judgment bar is to "avoid[] duplicative litigation, 'multiple suits on identical entitlements or obligations between the same parties.'" *Id.* at 354 (citing18 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4402, p. 9 (2d ed.2002) (internal quotation marks omitted) (2006)).  Here, the plaintiff's *Bivens* claim for retaliatory inducement to prosecution and his FTCA claim for malicious prosecution share the same element requiring an absence of probable cause. *See Moore II* 213 F.3d at 709-10 (listing

as an element of an FTCA claim the "absence of probable cause for the proceeding" and as an element for a retaliatory prosecution claim that "the government lacked probable cause to bring the criminal prosecution against the appellant"). Thus, whether analyzed as an application of the FTCA judgment bar or issue preclusion, the failure of the plaintiff to meet the no-probable cause requirement for his FTCA claim would also bar his ability to prevail on his *Bivens* claim.

Accordingly, the *Bivens* action is now moot and any possible error that the plaintiff claims justifying new trial on the *Bivens* action is rendered harmless as a result. Nevertheless, as discussed next, all the plaintiff's arguments for new trial fail for the reasons set forth below.

## VI.   MOTION FOR NEW TRIAL

The plaintiff presents three principal grounds of alleged error as his basis for a new trial. Specifically, the plaintiff finds fault in (1) a procedural ruling during jury selection; (2) certain evidentiary rulings prior to and during trial; and (3) certain instructions provided to the jury. *See generally* Pl.'s Mem. Supp. Mot. New Trial ("Pl.'s Mem."), ECF No. 511-1.[76] According to the

---

[76]The plaintiff also contests the jury verdict in favor of the defendants as "against the great weight of the evidence." Pl.'s Mem. at 32. In support of its verdict, the jury made the specific findings that the plaintiff had not proven, by a preponderance of the evidence, that (1) any defendant "acted, at least in part, with a purpose to retaliate against or deter the plaintiff's exercise of his First Amendment rights," Verdict Form ¶ 1, ECF No. 506; (2) any defendant "induced the bringing of criminal charges in an indictment against the plaintiff," *id.* at ¶ 2; (3) "that the plaintiff would not have been charged in an indictment without the inducement of " each named defendant, *id.* at ¶ 3; and (4) "there was no probable cause to bring criminal charges in an indictment against the plaintiff," with the jury finding affirmatively that "THERE WAS PROBABLE CAUSE," *id.* at ¶ 4 (capitalization in original). The plaintiff's challenge to each of these jury findings faces an uphill battle since courts "will not overturn a jury verdict 'unless the evidence and all reasonable inferences that can be drawn therefrom are so one-sided that reasonable men and women could not disagree.'" *Williams v. Johnson*, 776 F.3d 865, 870 (D.C. Cir. 2015) (quoting *Scott v. District of Columbia*, 101 F.3d 748, 753 (D.C. Cir. 1996)); *see also Swanks v. WMATA*, 179 F.3d 929, 936 (D.C. Cir. 1999) ("Our standard of review here is deferential: a jury's verdict may be overturned only if no reasonable juror could find [for the plaintiff].""); *Pitt v. District of Columbia*, 558 F. Supp. 2d 11, 15 (D.D.C. 2008)("[t]he Court may not grant the motion unless the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached." (internal citations and quotations omitted)); *Maxloum v. District of Columbia Metropolitan Police Department*, 576 F. Supp. 2d 25, 31-32 (D.D.C. 2008) (a jury verdict should only be disturbed and a new trial motion granted "where the court is convinced the jury verdict was a seriously erroneous result and where denial of the motion will result in a clear miscarriage of justice").

The plaintiff plainly does not meet this high bar for setting aside the jury's verdict. The plaintiff presented the evidence for his *Bivens* and FTCA claims simultaneously, as both claims arise from the same facts, and the

plaintiff, each alleged error, on its own, subverted the plaintiff's substantial rights and warrants a new trial.  Yet, many of the alleged grounds of error reflect nothing more than strategic choices made by plaintiff's counsel during the course of a multi-week trial.  The plaintiff now attempts to escape from the burden of those strategic decisions.  As discussed below, however, even if the plaintiff's *Bivens* claim were not barred, *see supra* Part V, none of the grounds urged by the plaintiff would constitute error or otherwise warrant upsetting the jury verdict in this case.  Each allegation of error will be addressed *seriatim* below.

## A.  Procedural Rulings Prior to Trial

Prior to trial, the plaintiff moved to limit the number of peremptory challenges afforded to the five defendants to the same number of such challenges afforded to the single plaintiff.  *See* Mot. to Limit Defendants to Three Peremptory Challenges, ECF No. 472.  After hearing argument from the parties, the Court denied the plaintiff's motion.  *See* Minute Order (June 17, 2014).  During jury selection, the plaintiff was afforded three peremptory challenges and the defendants were afforded a cumulative total of six peremptory challenges.  Following jury selection, before swearing-in the jurors, the Court asked the plaintiff whether he objected to the constitution of the jury.  The plaintiff did not.  *See* 6/23/14 Tr. at 244-45.  The plaintiff now argues that the disproportionate allotment of peremptory challenges requires a new trial, even though the plaintiff failed to object to the composition of the jury following selection and even though the disproportionate allotment of peremptory challenges between sides is expressly permitted by statute.

---

findings of fact set out, *supra*, in Part III, demonstrate that the jury reached the proper conclusions regarding the existence of probable cause to prosecute the plaintiff and the insufficiency of proof that his indictment was due to retaliatory animus for his First Amendment-protected activities.

By statute, "[i]n civil cases, each party shall be entitled to three peremptory challenges."
28 U.S.C. § 1870.   Where a side has multiple parties, however, "[s]everal defendants or several
plaintiffs *may be* considered as a single party for the purpose of making challenges, or the court
*may allow additional* peremptory challenges and permit them to be exercised separately or
jointly."  *Id.* (emphasis added).   The statute does not proscribe the factors that should drive a
court's exercise of its discretion and there is no legal requirement that each side in a civil case be
able to exercise the same number of peremptory challenges.   Indeed, courts in multi-defendant
civil suits have regularly allocated an uneven number of peremptory challenges between the
sides.   *See, e.g.,  Tidemann v. Nadler Golf Cart Sales, Inc.*, 224 F.3d 719, 725 (7th Cir. 2000)
(upholding district court's grant of three peremptory challenges to plaintiff and six total to the
defendants and recognizing that the "allocation of peremptories in multiple defendant cases is
left to the discretion of the trial court.");  *Mann v. Univ. of Cincinnati*, 1997 U.S. App. LEXIS
12482 (6th Cir. May 27, 1997) (upholding district court's decision to allow three defendants to
share six peremptory challenges while providing only four peremptory strikes to the plaintiff);
*Standard Indus., Inc. v. Mobil Oil Corp.*, 475 F.2d 220, 225 (10th Cir. 1973) (finding no abuse of
discretion in the trial court's granting of six peremptory challenges to two plaintiffs, and ten
peremptory challenges to five defendants); *Pedroza v. Lomas Auto Mall Inc.*, 2009 WL 1562607,
at *2 (D.N.M. May 18, 2009) (providing seven peremptory challenges to the three defendants
and four peremptory challenges to the two plaintiffs).   Such disparate allocation reflects the well-
accepted principal that the trial court "has broad discretion in determining the appropriate
number of peremptory challenges in multiparty civil cases." *Dunham v. Frank's Nursery &
Crafts Inc.*, 919 F.2d 1281, 1287 (7th Cir. 1990); *see also Fedorchick v. Massey-Ferguson, Inc.*,
577 F.2d 856, 858 (3d Cir. 1978); *Nehring v. Empresa Lineas Maritimas Argentinas*, 401 F.2d

767 (5th Cir. 1968); *Moore v. S. African Marine Corp.*, 469 F.2d 280, 281 (5th Cir. 1972); *In re Air Crash Disaster*, 86 F.3d 498, 518–519 (6th Cir. 1996); *Pedroza* 2009 WL 1562607, at *2.

Nonetheless, the plaintiff relies primarily on a First Circuit opinion for the proposition that where the parties' interests on one side are identical, the grant of an unequal number of peremptory challenges as between the two sides is an abuse of discretion. *See* Pl.'s Mem. at 7 (citing *Goldstein v. Kelleher*, 728 F.2d 32, 37 (1st Cir. 1984)). This constraint on the discretion of the trial court is not found in the language of the governing statute.[77] Consequently, numerous circuits, other than the First Circuit, have upheld the grant of disparate numbers of peremptory challenges without a prior finding of divergent interests. *See, e.g.*, *Standard Indus.*, 475 F.2d at 225 (granting uneven number of peremptory challenges without first analyzing whether two plaintiffs and five defendants have aligned interests); *Tidemann*, 224 F.3d at 725 (same). In fact, the Second Circuit, even after finding the defendants' factual interests aligned, upheld the trial court's provision of a disparate number of peremptory challenges.[78] *See Doralee Estates, Inc. v. Cities Serv. Oil Co.*, 569 F.2d 716, 724 (2d Cir. 1977). Accordingly, the Court declines to adopt the First Circuit's approach in *Goldstein*.

In any event, even under the approach articulated by the First Circuit—and urged on this Court by the plaintiff—there is no demonstrated harm to the plaintiff from the provision of peremptory challenges. The First Circuit requires "some convincing indication in the record that if a further peremptory challenge had been allowed, [the aggrieved party] meant to challenge one or more jurors." *Goldstein*, 728 F.2d at 38. The plaintiff has not attempted to make such a

---

[77] Indeed, by the terms of 28 U.S.C. § 1870, the Court could have permitted the defendants to exercise a total of fifteen peremptory challenges while permitting the plaintiff only three.

[78] The Second Circuit decision arose in the context of the defendants with the aligned interests challenging the trial court's decision not to grant three peremptory challenges to each but instead to allow only one peremptory challenge each and three peremptory challenges jointly. *Doralee Estates, Inc. v. Cities Serv. Oil Co.*, 569 F.2d 716, 724 (2d Cir. 1977).

showing in this case and as noted, the plaintiff did not object to the final jury as selected.  *See*

6/23/14 Tr. at 244–45.  Thus, in addition to not showing any legal error, the plaintiff cannot

show any harm resulting from the disparate award of peremptory strikes.  Therefore, the plaintiff

is not entitled to a new trial on this ground.

## B.  Evidentiary Rulings

The plaintiff challenges four evidentiary rulings:  (1) the exclusion of evidence regarding

the potential indemnification of the defendants; (2) the exclusion of a prior judicial opinion; (3)

the admission of testimony volunteered by the plaintiff's own witness regarding the plaintiff's

membership in a racially discriminatory country club; and (4) the admission, without instruction,

of certain out-of-court statements.  Although evidentiary issues can be a proper basis for an

award of a new trial, as previously noted, "[t]he standard for granting a new trial is not whether

minor evidentiary errors were made but rather whether there was a clear miscarriage of justice."

*Rice*, 818 F. Supp. 2d at 60.  As discussed below, the plaintiff cannot demonstrate error, let alone

a "clear miscarriage of justice."  *Id.*

### 1.  Exclusion of Indemnification Evidence

Prior to trial, in an omnibus motion *in limine*, the defendants moved, under Federal Rule

of Evidence 403, to exclude evidence or argument at trial that the defendants might seek

indemnification following any adverse judgment.  *See* Defs.' Mots. In Limine, ECF No. 417;

Mem. Supp. Defs.' Mots. In Limine at 25, ECF No. 419.  Simultaneously, the plaintiff moved for

an order permitting him to introduce evidence that the defendants would be indemnified for any

judgment against them.  *See* Pl.'s Mot. Source of Payment of any Judgment at 1, ECF No. 422.

The motions were granted in part and denied in part.  The Court placed a standard condition on

the plaintiff's ability to introduce evidence that the defendants would be indemnified by the

government for any jury award:  The plaintiff would be permitted to introduce evidence of

indemnification if the defendants put at issue their financial ability to pay any judgment and thereby "opened the door" to such evidence. *See* June 17, 2014 Minute Order. Otherwise, the admission of indemnification evidence in this case would result in "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." *See* Fed. R. Evid. 403.

Indemnification evidence may have been relevant to the extent the defendants placed at issue their financial resources and ability to pay any damages award, which the defendants did not do. Moreover, the admission of any evidence of indemnification would have resulted in a lengthy and prejudicial evidentiary excursion into a collateral issue. The parties would have needed to present evidence of whether the defendants would in fact be indemnified in the present dispute, as the pertinent postal regulations admit only the possibility of indemnification, not the guarantee. *See* United States Postal Service Employee and Labor Relations Manual § 668.22, *available at* http://about.usps.com/manuals/elm/elm.htm. Thus, to ensure fairness, the parties would have needed to present evidence regarding the likelihood of indemnification—a distraction that might have misled the jury regarding the actual issue in the case regarding the defendants' liability. Although the plaintiff offers an observation from a law review article that indemnification is all but assured, *see* Cornelia Pillard, *Taking Fiction Seriously: The Strange Results of Public Officials' Individual Liability Under* Bivens, 88 Geo. L. J. 65, 77 (1999), other authority suggests that indemnification is not assured, *see Anderson v. Creighton*, 483 U.S. 635, 641 n.3 (1987) (observing that the plaintiffs "do not and could not reasonably contend that the programs to which they refer make reimbursement sufficiently certain and generally available"). Given this uncertainty regarding indemnification, the defendants would also have needed to present evidence of their financial assets. Such evidence posed the risk of unfair prejudice to the

plaintiff in two different ways: First, the jury could have been affected by the imbalance between the significant assets of the plaintiff, in combination with his request for hundreds of millions of dollars in damages, and the likely lesser assets of the defendants, all of whom are retired federal employees.  Second, the jurors could have been disturbed by the notion that taxpayer funds would be the source of indemnification, thus shifting the burden of paying a possible quarter billion dollars in damages from the defendants to the public fisc and indirectly, themselves. Conversely, indemnification evidence might prejudice the defendants because the information might encourage the jury to inflate an award of damages.  *See Griffin v. Hinkle*, 804 F.2d 1052, 1057 (8th Cir. 1987).

On the tenth day of trial, the plaintiff renewed his request to introduce indemnification evidence on the theory that the defendants had opened the door to such evidence during their opening statement and during the cross examination of the plaintiff's expert witness, Dan Cruse. *See* Mot. Admission Indemnification Evid., ECF No. 495.  As discussed below, the Court disagreed with the plaintiff's assessment, concluding that brief, wholly accurate references to the nature of the lawsuit during an opening statement and three questions on cross examination of the plaintiff's witness did not sufficiently open the door to permit evidence of potential indemnification.  As a result, the Court restated the basis for its pretrial ruling: evidence relating to the defendants' financial ability to pay a jury award opens the door to evidence of indemnification.  Consistent with this ruling, the Court afforded the plaintiff the option to present indemnification evidence and simultaneously permit the defendants to open that door by introducing evidence regarding the defendants' assets, ability to pay, and likelihood of indemnification.  Rather than opening that door, plaintiff's counsel made the strategic choice to withdraw his renewed motion – perhaps to avoid the potential adverse risks to the plaintiff

outlined above -- and not to seek the admission of evidence relating to indemnification.  *See* 7/9/14 AM Tr. at 53–55.  Thus, the plaintiff did not present indemnification evidence and the defendants did not present evidence of their financial assets and the possible hardship that the payment of a damages award in the amount of $235 million (as requested by the plaintiff) would have on former, and now retired, government employees.

Despite withdrawing his motion, the plaintiff now objects to the Court's determination that the defendants had not already opened the door to indemnification evidence.  In seeking to revisit the Court's pre-trial and trial rulings, the plaintiff urges the same case law and arguments already considered and rejected by the Court on two prior occasions.

As support, the plaintiff cites to two instances where the defendants purportedly opened the door to indemnification evidence.  First, during the defendants' opening statement, defense counsel stated on three occasions that the plaintiff was suing the defendants "personally."  *See* 6/24/14 AM Tr. at 66, 86.  The plaintiff made no objection during or immediately following the opening statements.  Second, the plaintiff points to the questions posed by defense counsel on cross examination of one of the plaintiff's damages expert witnesses.  Specifically, during cross examination of Dan Cruse, defense counsel inquired whether: (1) the expert was aware that the defendants were being sued "personally," *see* 6/26/14 PM Tr. at 17; (2) the expert understood that the plaintiff was suing the defendants for "a very large sum of money," *see id.* at 18; and (3) the expert had ever met the defendants (to whom he subsequently introduced the expert), *see id.* at 18.[79]  The plaintiffs did not object to these questions during the examination.  Nevertheless,

---

[79]   The plaintiff also appears to object to the defendants asking a different expert witness, Mr. Fanara, the following:

> Q: Now, the plaintiff—that's the one who's asking something from the defendant, correct?
> A: Yes.
> Q: And in this case, the plaintiff, Mr. Moore, is asking for money, right?

eight trial days after opening statements and five trial days after the cross examination of Cruse, the plaintiff filed a motion seeking to introduce indemnification evidence because those statements and questions, in the plaintiff's view, opened the door to indemnification evidence. *See* Mot. Admission Indemnification Evid., ECF No. 495.

Generally, evidence of payments from collateral sources is inadmissible. *See Lawson v. Trowbridge*, 153 F.3d 368, 378–80 (7th Cir. 1998) (collecting cases); *see also* Fed. R. Evid. 411 ("Evidence that a person was or was not insured against liability is not admissible to prove whether the person acted negligently or otherwise wrongfully."). "The reasoning behind this rule with regard to testimony or argument concerning the defendant's insurance or indemnity protection is that it will result in an unduly generous award of damages by the jury." *Griffin*, 804 F.2d at 1057. Moreover, such evidence may distract the jury from the main issues of the case. "Instead of focusing the jury's attention on the injury actually suffered by the plaintiff, we would be subjecting the jury to a flurry of largely irrelevant assertions and counter-assertions concerning who may or may not be financially harmed by a particular award." *Larez v. Holcomb*, 16 F.3d 1513, 1519 (9th Cir. 1994)

Certain out-of-circuit courts have permitted evidence of indemnification in limited circumstances. In *Lawson v. Trowbridge*, the Seventh Circuit reversed the exclusion of indemnification evidence because the defendants "direct testimony 'opened the door'" to such evidence. 153 F.3d at 378–80. Similarly, in *Cowens v. Siemens-Elema*, 837 F.2d 817, 824 (8th Cir. 1988), the Eighth Circuit recognized "that a [party's] testimony on direct examination may make evidence of payments from a collateral source relevant and necessary for purposes of

---

A: I think in this case that's one of the things . . . ."
6/27/14 AM Tr. at 43. To the extent the plaintiff is challenging this exchange, the plaintiff's challenge fails for the same reasons discussed above.

rebuttal."  The touchstone in both cases was the direct testimony of a party regarding their

financial inability to satisfy a judgment.  Subsequent district court opinions have likewise

permitted evidence of indemnification where a defendant "testifies to his/her financial hardship,"

*Betts v. City of Chicago*, 784 F. Supp. 2d 1020, 1030–31 (N.D. Ill. 2011), or "proffer[s] evidence

of their financial resources," *Dallas v. Goldberg*, 2002 WL 1013291, at \*4–\*5 (S.D.N.Y. May

20, 2002).  Both district court cases involved either direct testimony or direct evidence regarding

the defendant's financial resources.  By contrast to those circuit and district court cases,

however, the defendants did not offer direct testimony or evidence regarding their financial

resources.

The plaintiff also relies on *Khorrami v. Mueller*, No. 07-812, 2014 WL 47059, at \*5

(E.D. Wis. Jan. 6, 2014), where evidence of indemnification was presented after defense counsel

expressed a wish to "explain to the jury," presumably during argument, that relief was being

sought against the defendant in his personal capacity.  *Id.*  The court concluded that such

argument would imply that the defendant's personal assets were in danger and would justify the

introduction of evidence relating to indemnification.  *Id.*  The judge in that case cited no

authority in prior case law to reach his decision, nor did the court elaborate on how much time or

attention defense counsel wished to draw to the fact that the defendant was being sued

individually.  As a result, it is unclear from the opinion whether *Khorrami* is factually analogous

to the present case.  In any event, *Khorrami* is neither binding on this Court nor persuasive

authority.

A review of the statements alleged to open the door in the present case illustrates why the

admission of indemnification evidence would have been wholly inappropriate.  The plaintiff first

complains that during opening statements, the defendants made the simple, and legally accurate,

observation that the plaintiff was suing the defendants personally.[80]  Yet, this same observation

was already provided to the venire panel prior to jury selection, *see* 6/23/14 Tr. at 37 (providing

description of the case), and to the jury following jury selection, *see id.* at 252 (same).[81]  The

plaintiff did not object to the description then, nor could he, since (1) it is a legally accurate

reflection of the plaintiff's own cause of action, and (2) plaintiff's counsel subsequently made

the same representation to the jury.  In his case-in-chief, plaintiff's counsel re-enacted the

following exchange from one of the defendants' May 7 and May 8, 1998 deposition testimony:

"Mr. Pohl: You understand then that the current state of the case that you are being sued

individually?" To which the reader (standing in for Postal Inspector Hartman) responded, "Yes."

7/7/14 AM Tr. at 18.  Plaintiff's counsel's own representation to the jury that defendant Hartman

was being sued in a personal capacity severely undermines the plaintiff's argument that such

information is so suggestive of poverty or inability to pay, that it necessarily opens the door to

evidence of indemnification.

    The plaintiff's next argument for his view that defense counsel opened the door fares no

better.  As noted, the plaintiff argues that defense counsel opened the door to indemnification

evidence when defense counsel questioned whether the plaintiff's expert understood that the

plaintiff was suing the defendants for "a very large sum of money."  6/26/14 PM Tr. at 18.  Yet,

once again, plaintiff's counsel made *the same observation* to the jury.  During the plaintiff's

opening statement, when discussing the requested damages, plaintiff's counsel noted that the

amount made by the plaintiff during his career constituted "a lot of money,"  6/24/14 Tr. at 45,

---

[80] Neither the tone nor the demeanor of defense counsel in making these statements suggested to the jury anything other than the simple and legally accurate fact that the defendants were being sued individually.

[81] The joint statement of the case, which both sides agreed on, and which this Court read to prospective jurors and to the jury in the preliminary instructions, indicated that: "The plaintiff, William G. Moore, Jr., has brought this action against five defendants *individually* who were U.S. Postal Inspectors . . . [t]he defendants are Michael Hartman, Frank Kormann, Robert Edwards, Pierce McIntosh, and Norman Robbins . . . ." 6/23/14 Tr. at 252 (emphasis added).

but that the plaintiff was requesting even more in damages, noting that the damages number

"gets beyond 50 million and even beyond 100 million," *see id.* at 46.  In total, the plaintiff was

seeking approximately $235 million in damages.  6/27/14 Tr. at 39–40.  Even plaintiff's counsel

described this amount as "astronomical."  *Id.*  Defense counsel was merely stating the obvious:

the plaintiff chose to bring a suit alleging nearly a quarter billion dollars in damages—a very

large sum of money.  Such observation, repeated by the plaintiff and defendants alike, is not

sufficient to open the door to indemnification evidence.

Finally, the plaintiff challenges the introduction of the plaintiff's expert witness to the

individual defendants.  *See* 6/26/14 Tr. at 18.  This low-key approach permitted the defendants to

counterbalance the plaintiff's attempt to demonize the defendants, and amounted to effective trial

strategy.  Mere introduction of the defendants does not amount to the defendants' direct

testimony, let alone an argument regarding their financial ability to pay, and is not the type of

evidence that would justify or warrant the introduction of indemnification evidence.  *See*

*Lawson,* 153 F.3d at 378–80 (testimony); *Cowens*, 837 F.2d at 824 (testimony), *Betts*, 784 F.

Supp. 2d at 1030–31 (testimony); *Dallas*, 2002 WL 1013291, at *4–*5 (proffered evidence);

*Khorrami*, 2014 WL 47059, at *5 (argument).

The defendants never opened the door to indemnification evidence and therefore its

exclusion was appropriate.

## 2.  *Exclusion of Prior Judicial Opinion*

The plaintiff laments the Court's pre-trial exclusion of references to, and use of, the

opinion issued by Judge George Revercomb on November 20, 1989, *see Recognition Equip.,*

*Inc.*, 725 F. Supp. 587 ("Rule 29 Opinion"), granting the plaintiff's (then the defendant's) motion

for an acquittal, under Federal Rule of Criminal Procedure 29, and dismissing the criminal

charges against the plaintiff.  *See* June 17, 2014 Minute Order.  The Rule 29 Opinion contained

several comments critical of the prosecution's case, including: (1) "Much of what the government characterizes as incriminatory evidence is not persuasive of guilt when viewed in its full context" and that "some of the government's evidence is exculpatory and points toward innocent conduct of the Defendants;" and (2) certain government contentions were "manifestly without merit" after having conducted "a full review of the evidence." *Id.* at 587–88, 592.  The plaintiff hoped to leverage these statements into his case in order to "demonstrate[] that [the] government's evidence was abysmally weak" and because a jury could infer a retaliatory motive from such a weak criminal case.  *See* Pl.'s Mem. at 23.  Even if the Rule 29 Opinion had marginal probative value—and it is not clear what probative value this evidence would have—such value is significantly outweighed by dangers of unfair prejudice and jury confusion.

Under Rule 403, even relevant evidence may be deemed inadmissible and subject to exclusion if "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FED. R. EVID. 403; *see also United States v. Moore*, 651 F.3d 30, 63 (D.C. Cir. 2011) (court must "engage in on-the-spot balancing of probative value and prejudice and . . . exclude even factually relevant evidence when it fails the balancing test" (internal quotation marks omitted)).  "'[U]nfair prejudice within [the Rule 403] context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'"  *United States v. Ring*, 706 F.3d 460, 472 (D.C. Cir. 2013) (quoting FED. R. EVID. 403 advisory committee's notes) (internal quotation marks omitted). Within this district, "[c]ourts have consistently avoided potential jury confusion and unfair prejudice in related actions by excluding judicial findings, convictions, and similar evidence on Rule 403 grounds."  *Athridge v. Aetna Cas. & Sur. Co.*, 474 F. Supp. 2d 102, 109 (D.D.C. 2007).

This is for good reason as "it is likely that judicial findings of fact would be given undue weight by a jury which would result in a serious danger of unfair prejudice to" the party opposing admission. *Hairston v. Washington Metro. Area Transit Auth.*, No. 93-2127, 1997 WL 411946, at *2 (D.D.C. Apr. 10, 1997).

Allowing the plaintiff to exploit and present the Rule 29 Opinion to the jury would have resulted in unfair prejudice to the defendants for two main reasons.  First, this would have posed the significant risk that the jury would give undue weight to the judicial findings in the Rule 29 Opinion.  *See id.*  As the First Circuit Court noted, "[a] lay jury is quite likely to give special weight to judicial findings merely because they are judicial findings." *Faigin v. Kelly*, 184 F.3d 67, 80 (1st Cir. 1999); *see also Nipper v. Snipes*, 7 F.3d 415, 418 (4th Cir. 1993) (noting that "judicial findings of fact present a rare case where, by virtue of their having been made by a judge, they would likely be given undue weight by the jury") (internal quotation marks and citations omitted).  This risk was compounded by the fact that the jury was asked during *voir dire* if they could follow the Court's instructions and was subsequently instructed to follow the Court's instructions, thereby emphasizing the adherence required of the jury to judicial directions.  Consequently, admitting the Rule 29 Opinion would have unfairly prejudiced the defendants because the jurors might have accorded more weight to the analysis of the evidence laid out in the Rule 29 Opinion than to their own perceptions of the evidence simply because the opinion was authored by a judge.  This was presumably the plaintiff's goal in seeking to admit the opinion.  Furthermore, to the extent the Rule 29 Opinion evinced findings that differed from the jury's evaluation of the evidence, the Rule 29 Opinion could have actually confused or undermined the jury's adherence to the Court's instructions in this case.

Second, the Rule 29 Opinion might have also "confuse[d] the issues" and "mislead[] the jury," because the Rule 29 Opinion was issued in the context of a Federal Rule of Criminal Procedure 29 judgment of acquittal.  FED. R. EVID. 403.  Evaluation of a Rule 29 motion requires application of a different legal standard from the legal standard the jurors were required to apply to the evidence in this case.  The Rule 29 Opinion analyzed the evidence, as required under Rule 29, by determining whether "a reasonable trier of fact would have a reasonable doubt as to the existence of any of the essential elements of the crime." *Recognition Equip, Inc.*, 725 F. Supp. at 588; *id.* at 596 ("The Rule 29 standard is not simply whether there are instances of evidence in the government's case which on their own may reasonable support an inference of guilt but whether all those inferences constitute 'evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt.'" (quoting *Curley v. United States*, 160 F.2d 229, 232–33 (1947)).  For example, the Rule 29 Opinion remarked that certain government evidence did not establish "a reasonable inference of guilty knowledge" on the part of the plaintiff, and that "[a]ny suggestion by the government [to the contrary] is conjecture that should be precluded under the Rule 29 standard." *Id.* at 593–94.  Although the jury here was tasked with evaluating some of the same evidence as before the court in the plaintiff's criminal case, the jury assessed the evidence in light of the probable cause standard, not the Rule 29 standard.  The impressions of the evidence contained in the Rule 29 Opinion, however, might have colored the jurors' evaluation and led them to conclude improperly that the evidence was insufficient to show probable cause because the same evidence was insufficient to withstand a motion for judgment of acquittal.  Moreover, the Rule 29 Opinion was issued without the benefit of certain inculpatory evidence regarding missing pages from the plaintiff's postal notebook, which evidence tended to support an inference of the plaintiff's knowledge of the illegal scheme and

purposeful destruction of evidence.  *See* 7/11/14 AM Tr. at 93–94; 7/14/14 AM Tr. at 134–36

(describing pages missing from the plaintiff's postal notebook).  In this respect, the jury in this

action confronted different evidence and a different legal standard than the court in the plaintiff's

criminal case.  Accordingly, the Rule 29 Opinion would have been highly misleading to the jury.

Finally, a cautionary instruction would not overcome the unfair prejudice of admitting the

prior judicial opinion because of both the nature of the evidence and its judicial source.  The jury

must follow the Court's instructions on the law and presenting the Rule 29 Opinion only would

have confused the jury as to the relevant and applicable source of law.  *See Dodson v. CBS*

*Broad. Inc.*, 423 F. Supp. 2d 331, 334–35 (S.D.N.Y. 2006) (excluding determination letter from

EEOC stating that there was probable cause of a violation given the prejudicial nature of the

letter under Rule 403 that could not be cured by "any limiting instruction").

In short, excluding the Rule 29 Opinion was proper and not error.

### 3.  Plaintiff's Country Club Membership

During cross-examination and without prompting, the plaintiff's witness—NFL Hall of

Fame Quarterback Roger Staubach—volunteered that the plaintiff's country club, the Dallas

Country Club, had a history of not admitting "just the right people" and cited this as his reason

for not joining.  *See* 7/9/14 AM Tr. at 27–28.  The plaintiff now objects that the Court did not

exclude evidence volunteered by the plaintiff's own witness.  The plaintiff's objection is without

merit.

From the outset, the plaintiff has claimed reputational ruin as a central theme of his case

and a key component of his damages claim.  *See* Compl. ¶ 29 (alleging that the plaintiff's

indictment resulted in a "loss of reputation in and among business associates, friends and

family"); Joint Pretrial Statement at 10 (claiming damages for reputational injury).  During the

plaintiff's own direct testimony, the plaintiff testified that the indictment and criminal

prosecution negatively impacted him and his family's social status within the community.

6/24/14 PM Tr. at 68.  The plaintiff sought Mr. Staubach's testimony in order to buttress his

argument regarding his fallen standing within the Dallas, Texas business community.

Unsurprisingly, the defendants disputed the plaintiff's narrative and attempted to undermine the

plaintiff's central conceit during the cross-examination of Mr. Staubach.  During cross-

examination, the defense inquired whether Mr. Staubach and the plaintiff were both members of

the Dallas Country Club.  Without further prompting, Mr. Staubach volunteered that he never

joined the Dallas Country Club because he "wasn't crazy about its lack of allowing just the right

people" to join.  7/9/14 AM Tr. at 27–28.  After being asked for clarification, Mr. Staubach

explained that minorities were not admitted to the club and that he refused to join the club as a

result.  *Id.* at 28.[82]  The plaintiff offered no objection.[83]

After a different line of questioning, defense counsel indicated that he wished to return to

the topic of the Dallas Country Club.  Defense counsel then asked whether Mr. Staubach was

aware that the plaintiff was admitted to the Dallas Country Club after he was indicted.  The

plaintiff objected.  During a bench conference, the plaintiff accused the defense of attempting to

"play a race card."  *Id.* at 32.  Defense counsel's question, however, went to the very heart of the

issue regarding the plaintiff's alleged reputational injury—the plaintiff's admission to an

exclusive country club after his indictment belies his claim that his reputation was irreparably

---

[82] The witness clarified that the Dallas Country Club has subsequently amended its admissions practices. *Id.* at 28.

[83] Several days earlier, when defense counsel first asked the plaintiff whether he was a member of the Dallas Country Club, the plaintiff objected on relevance grounds, not unfair prejudice under Federal Rule of Evidence 403.  *See* 6/25/14 PM Tr. at 14–15.  Therefore, only the plaintiff's objection to the general relevance of the country club testimony was preserved (not the plaintiff's objection based on any unfair prejudice resulting from the club's race-based admission policies).  Nevertheless, regardless of whether the plaintiff's objection was preserved, the defense's line of questioning was entirely appropriate.

tarnished by the indictment.  The objection was overruled and, following the bench conference, defense counsel asked two additional questions: whether the witness was aware that the plaintiff joined the Dallas Country Club post-indictment and whether the plaintiff's admission to the country club suggested that the indictment did not tarnish his reputation within the Dallas business community.  *Id.* at 34–35.  Defense counsel did not return to the subject.

The plaintiff now faults this Court for not excluding "irrelevant and unfairly prejudicial evidence about the Dallas Country Club's alleged exclusionary, race-based admission policies." Pl.'s Mem. at 26–27.  As an initial matter, it is unclear how the Court could exclude in advance evidence volunteered by the plaintiff's witness and without an objection pending.  In addition, the plaintiff never moved to strike the answer or request a limiting instruction regarding the club's race-based admission policies in order to cure the alleged unfair prejudice and defense counsel did not ask questions, solicit evidence, or argue during summation about the race-based admissions policies of the Dallas Country Club.  Thus, any prejudice from the plaintiff's witness's testimony was minimal.

The line of questioning by defense counsel regarding the plaintiff's and the witness's membership in a country club was entirely appropriate.  Evidence that the plaintiff was admitted to an exclusive country club *after* his indictment, is highly probative of the alleged reputational harm (or lack thereof) to the plaintiff.  While the plaintiff may not like the answers volunteered by his own witness, such dislike does not establish the basis for an objection relating to a properly-formed question regarding a highly probative topic.

The plaintiff made the strategic choice to call as a character and damages witness, Roger Staubach, a man who has been in the public eye since he was a Heisman trophy winner and star quarterback at the United States Naval Academy.  Unsurprisingly, Mr. Staubach is well practiced

in protecting his public image and his testimony in a public courtroom reflected his desire not to be associated with an institution that might tarnish that image.

The plaintiff is not entitled to a new trial on this ground.

### 4.  *Admission of Hearsay Evidence*

The plaintiff next challenges the Court's admission of, and then subsequent refusal to provide a jury instruction regarding, certain hearsay evidence.  Specifically, the plaintiff challenges the admission of "interview memoranda," "field notes," and "summaries of the evidence" created during the course of the investigation of the plaintiff.  Pl.'s Mem. at 13.  Although couched as an objection to the admission of, and rejection of his proposed instruction regarding, such evidence, the plaintiff's criticism ultimately reduces to a complaint about his burden to disprove probable cause.

The present case involved significant amounts of hearsay evidence.  This was not surprising as several unique factors converged to create the somewhat unusual evidentiary record in this case.  First, the events in question occurred in the mid-to-late 1980s leaving behind a documentary trail but also the risk of faulty recollections and unavailable witnesses.  Second, this case turned critically on whether probable cause existed to charge the plaintiff and whether the defendants acted with retaliatory motive.  Hearsay evidence may form the basis of a probable cause determination, *see Illinois v. Gates*, 462 U.S. 213, 238 (1983), and out-of-court statements may be admissible when offered not for the truth of the matter asserted but to show the effect on the state of mind of the listener.  *See United States v. Sesay*, 313 F.3d 591, 598–99 (D.C. Cir. 2002).  The key inquiry regarding probable cause is the reasonableness of the officer's belief at the time of the challenged action.  As a result, both sides made significant use of hearsay evidence in order to prove the lack of probable cause (the plaintiff) or the existence of probable

cause (the defendants), and the relevant motive and intent of the defendants in investigating the plaintiff.

Although the plaintiff now criticizes the admission of out-of-court statements, the plaintiff made extensive use of out-of-court statements during his case-in-chief. *See, e.g.*, Pl.'s Ex. 44 (handwritten notes of interview with Frank Bray); Pl.'s Ex. 92 (handwritten notes of Postal Inspector Hartman during interview of William Chapp); Pl.'s Ex. 101 (summary memorandum of interview with Kurt Scheidhauer); Pl.'s Ex. 105 (memorandum of interview of plaintiff); Pl.'s Ex. 110 (memorandum of interview of Peter Voss). In fact, the plaintiff made extensive use of the hearsay evidence about which he now complains, such as interview notes. *See generally id.* This is not surprising. As early as the pre-trial statement, when making objections to the defendants' proposed exhibit list, the plaintiff recognized the propriety of admitting out-of-court statements because such evidence would be admissible not for the truth of the matters asserted but-for other non-hearsay purposes relating to probable cause and motive. *See* Joint Pretrial Statement at 2 n.1, ECF No. 438-4 ("Memoranda, notes, and other records purporting to document the conduct of Defendants . . . are inadmissible hearsay to the extent introduced against Moore for the truth of the matters asserted therein . . . [but] the exhibits may be admissible for other purposes."). This is hornbook evidence law. *See* 2 McCormick On Evid. § 249 (Kenneth S. Broun ed.,7th ed. 2013) ("If the statement is not an assertion or is not offered to prove the facts asserted, it is not hearsay."). Indeed, the plaintiff's own request for a new trial also recognizes the propriety of admitting such evidence for non-hearsay purposes. *See* Pl's Mem. at 13–14 ("Nearly all of these documents and related testimony had some arguable relevance to one or more of the issues presented to the jury, including whether Defendants

harbored retaliatory motives against Moore, whether they induced Moore's prosecution, and whether the evidence accumulated gave rise to probable cause.").

Due to the nature of the plaintiff's claims, the parties largely built their respective cases upon out-of-court statements and documents and, as such, the plaintiff's general criticism that the Court erred in admitting hearsay testimony misses the mark entirely. As the plaintiff recognized, the exhibits were not admitted for the truth of the matters asserted but for their relevance to other critical issues, including motive and intent.

Closer to the mark, however, is the plaintiff's complaint regarding the lack of an instruction concerning the permissible purposes of the admitted evidence. Ordinarily, under Federal Rule of Evidence 105, if evidence is admitted for a limited purpose, a party may request an instruction informing the jury of the purpose for which the evidence was admitted and the need to consider only that purpose. The party's request "should be 'timely,' 'specific,' and 'of record.'" Kenneth W. Graham Jr., 21A Fed. Prac. & Proc. Evid. § 5065 (2d ed. 2014); *see also United States v. Thirion*, 813 F.2d 146, 155–56 (8th Cir. 1987) ("A request for a limiting instruction should be specific and timely."); *Luty v. City of Saginaw*, No. 07-2035, 2009 WL 331621, at *5 (6th Cir. Feb. 10, 2009). In this case, the plaintiff's request was neither timely nor specific and would have resulted in needless confusion for the jury. As a result, the plaintiff's request was denied.

The plaintiff first requested a limiting instruction on the thirteenth day of trial, following the defendants' introduction of Defense Exhibit 228, a chart originally prepared during the events in question that summarized information collected by the defendants from various sources during the course of the original investigation into the plaintiff. *See* 7/11/14 AM Tr. at 53–54. This request was made long after other similar hearsay evidence was introduced by both the

plaintiff and the defendants.  Singling out Defense Exhibit 228 for a limiting instruction, when

the plaintiff had already admitted without objection at least fifty-eight other similar exhibits

dating from the same period and ostensibly subject to the same limiting instruction, raised

apparent fairness issues.  As a result, due to the significant volume of out-of-court statements

admitted not for the truth of the matter asserted, both parties were requested to work towards an

instruction regarding this type of evidence.

Five days later, the plaintiff again raised the issue of a limiting instruction.  *See* 7/16/14

AM Tr. at 5–6.  Only this time, the plaintiff's request was not limited to Defense Exhibit 228, but

instead covered "interview reports" generally.  *See id.* ("[L]ast Friday we had a colloquy about

interview reports coming into evidence . . . and I raised with the Court whether we could have an

instruction that indicates that such interview reports which contain hearsay are not necessarily

coming in for the truth of the contents . . . .").  The plaintiff likewise provided a proposed draft

instruction, which the defendants opposed.  The proposed instruction was not tethered to any

piece of evidence but instead made blanket reference to all "summary statements, interview

memoranda, summary charts, handwritten notes and other similar documents that were authored

by the postal inspector defendants and/or Assistant U.S. Attorney Joseph Valder . . . ."  *See* Ex.

A, Pl.'s Mem, ECF No. 511-2.  With respect to all such documents, the requested instruction

stated:

> You may not consider such summary statements . . . as evidence of the truth of
> the facts asserted by the persons interviewed.  These exhibits may be considered
> by you as evidence of the process used during the investigation and as evidence of
> the state of mind of the creators of the documents.  For example, a memorandum
> of [an] interview of a third person may be evidence that an interview was done on
> a particular date [for] a particular witness but statements contained in the memo
> attributed to others, including the person interviewed are not evidence of the truth
> of those statements.

You are permitted to consider these summary statements . . . as evidence of the investigation conducted by, and the thought process of, the postal inspector defendants and Mr. Valder, including as evidence of what they were told by the persons they interviewed, what information they considered significant, and how they interpreted, processed and used that information.  When considering this evidence in this manner, it is for you to decide whether or not to believe the evidence.

*Id.*

The plaintiff requested the instruction to be "given before the close of evidence" rather than during the final instructions.  *See* 7/16/14 AM Tr. at 5–6.  The defendants objected to the proposed instruction on the ground that it would unfairly confuse the jury and was unfairly prejudicial given that the plaintiff had admitted much of the same type of evidence earlier at trial. *See id.* at 9–10.  The plaintiff's proposed instruction was denied.

The plaintiff's instruction would have needlessly confused the jury, since it was unconnected to any piece of evidence and was divorced from the time of admission of the pertinent evidence.  The reason a party's request for an instruction must be timely and specific is because the jury needs clarity regarding the proper use of the evidence.  By failing to specifically object throughout trial as evidence was admitted, and by providing only a vague and generalized proposed instruction subsequently, the plaintiff failed to abide by the requirements for a limiting instruction.  *See Thirion*, 813 F.2d at 155–56.  An instruction regarding the limited purpose of certain evidentiary admissions is intended to clarify for the jury the nature of the evidence and the jury's role in evaluating such evidence.  The plaintiff's proposed instruction would not have served that purpose and would have only confused a jury already confronting a complex and difficult record.  The refusal to provide the proposed instruction was warranted.[84]

---

[84] Even if the instruction should have been provided, the failure to do so amounts to harmless error as it does not impact the plaintiff's substantial rights, as the defendants note.  *See* Defs.' Opp'n at 12–13.  The plaintiff provides no basis for determining how the jury could have misused the admitted hearsay evidence given that the instant case did not require a retrial of the plaintiff's original criminal prosecution, only whether the defendants

### C.  Jury Instructions

Finally, the plaintiff finds fault with certain instructions provided to the jury.  The plaintiff faults the Court for failing to provide an instruction regarding concerted action, for failing to use the plaintiff's suggested language regarding probable cause, for providing an incorrect instruction regarding inducement, and for providing instructions *sua sponte* that the plaintiff now claims may have tarnished the jury's perception of the plaintiff's case and counsel.  Each of plaintiff's alleged errors is addressed below.

#### 1.  *Concert of Action Instruction*

Prosecutorial immunity prevents the plaintiff from bringing suit against Joseph Valder, the line prosecutor in the underlying criminal action.  *See Moore II*, 213 F.3d 705 (dismissing claims against Valder).  Nonetheless, the plaintiff attempted to bootstrap actions taken by AUSA Valder into his case against the defendants through his request of a "concert of action" jury instruction.  *See* Annex M, Joint Pretrial Statement at 15, ECF No. 438-13.  By rejecting the plaintiff's proposed joint venture or concert of action instruction, the Court rejected the plaintiff's attempt to circumvent the strictures of prosecutorial immunity.  Although the plaintiff now finds fault, the exclusion of the concerted action instruction was not error and does not warrant a new trial.

Under *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009), plaintiffs in *Bivens* actions are required to produce evidence "that each Government-official defendant, *through his own individual actions*, has violated the Constitution." (emphasis added).  As a result, "[o]nly those [officials] who *cause* a violation of a right secured by the Constitution are liable."  *Elkins v.*

---

acted improperly in pursuing the criminal charges.  Thus, the only possible use by the jury of the challenged evidence was the proper non-hearsay use: whether the defendants lacked probable cause and harbored a retaliatory intent.

*District of Columbia*, 690 F.3d 554, 564 (D.C. Cir. 2012) (emphasis added). This limitation results "[b]ecause vicarious liability is inapplicable to *Bivens* . . . suits . . . ." *Iqbal*, 556 U.S. at 676. Importantly for purposes of the present action, "conspiracy . . . is a means for establishing vicarious liability." *Halberstam v. Welch*, 705 F.2d 472, 479 (D.C. Cir. 1983).

The plaintiff contends that conspiratorial liability remains in *Bivens* suits and cites a string of cases for the proposition that "conspiratorial liability for constitutional torts 'remains good law following . . . *Iqbal*.'" Pl.'s Mem. at 9 n.2 (quoting *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 178 (3d Cir. 2010)). The plaintiff is correct, but only up to a point. The authorities on which the plaintiff relies demonstrate that conspiratorial liability is relevant to *Bivens* actions in two ways. First, a plaintiff may plead an independent conspiracy claim, *i.e.* a conspiracy to deprive a plaintiff of a constitutionally protected right.[85] Second, in certain jurisdictions, a plaintiff may use evidence of concerted action to demonstrate that an erstwhile private party should be treated as a federal official.[86] The plaintiff's claim does not fall into either category. Although the plaintiff's complaint does reference concerted action amongst

---

[85] The plaintiff cites examples of such cases concerning independent conspiracy claims. *See* Pl.'s Mem. at 9 n.2 (citing *Great W. Mining*, 615 F.3d at 161 (pleading conspiracy to violate constitutional rights); *Brennan v. William Paterson College*, 2014 WL 3673038, at *11 (D.N.J. July 23, 2014) ("Defendants next contend that Plaintiff's Count V, alleging a conspiracy . . . "); *Hill v. City of Chicago*, 2014 WL 1978407, at *8 (N.D. Ill. May 14, 2014) ("[The Plaintiff] brings two conspiracy claims . . ."); *Uduko v. Cozzens*, 975 F. Supp. 2d 750, 756 (E.D. Mich. 2013) ("Uduko alleges that 19 Defendants conspired to retaliate and discriminate against him to deprive him of his constitutional rights because he filed complaints and grievances.")).

[86] The plaintiff cites cases addressing whether private parties should be treated as government officials. *See* Pl.'s Mem. at 9 n.2 (citing *Great W. Mining*, 615 F.3d at 176 ("[I]n order to state a claim under § 1983, [the plaintiff] must have adequately pled the existence of a conspiracy between Defendants, who are private parties, and the judges of the Pennsylvania court system.")); *see also Platt v. Ihle*, 996 F.2d 1212 (4th Cir. 1993) ("We need not address the question of whether *Bivens* type action may have maintained against private persons, for we are of opinion that, even if *Bivens* actions are maintainable against private individuals under some circumstances, Platt has failed to allege with even minimal specificity any concerted action on the part of the Ihles with the FAA in this case."); *Stouffer v. Eulberg*, No. 09-cv-0320, 2009 WL 4724272, at *2 (W.D. Okla. Dec. 7, 2009); *Nwanze v. Philip Morris Inc.*, 100 F. Supp. 2d 215, 221 (S.D.N.Y. 2000) ("[T]he lack of an adequately pleaded allegation of joint or concerted action on behalf of the private party defendants and a federal agent renders a *Bivens* claim inappropriate."); *Dobkin v. Johns Hopkins Univ.*, No. 93-cv-2228, 1995 WL 45789, at *2 (D. Md. Jan. 19, 1995) (dismissing claim because "amended complaint does not set forth any facts which, if proved, show a concerted action on the part of the [private] defendants and the federal government").

the defendants, *see* Compl. ¶ 4, the mere invocation of the words "conspire" or "acting individually and/or in concert with" in a paragraph of the complaint describing the parties to the suit does not create the basis for an independent cause of action.  The plaintiffs made a strategic decision regarding which causes of action to bring in this two-decades old lawsuit, and the plaintiff did *not* bring a conspiracy claim as an independent cause of action.[87]  *See* Compl. ¶¶ 32–36 (identifying five causes of action, but no cause of action for conspiracy to deprive the plaintiff of a constitutionally protected right); *see also* Joint Pretrial Statement at 2 ("The above-captioned cases, which have been consolidated for trial, comprise two causes of action—for retaliatory inducement to prosecute in violation of the First Amendment and for malicious prosecution under the Federal Tort Claims Act—both arising out of the government's unsuccessful criminal prosecution of plaintiff William G. Moore, Jr.").  With respect to the second category of cases, there is no dispute that the defendants are federal officials.  Thus, the cases relied upon by the plaintiff as permitting evidence of concerted action under different circumstances than those present here are inapposite.

The plaintiff also relies heavily on the D.C. Circuit's decision in *Wesby v. District of Columbia*, 765 F.3d 13 (D.C. Cir. 2014), for the proposition that defendants in *Bivens* actions may be held liable for actions taken by others.  *Wesby* concerned an action under 42 U.S.C. § 1983 for false arrest.  The D.C. Circuit confronted the question of whether two police officers who "did not personally arrest each of the Plaintiffs" could nonetheless be held liable for false arrest.  *Id.* at 29.  The D.C. Circuit determined that the police officers could be held liable notwithstanding their failure to engage in the ultimate act of arrest.  As such, the plaintiff

---

[87] The plaintiff suggests that the Court, without any motion to amend the pleading, should have permitted the plaintiff to amend his complaint to add a new theory of liability, on the eve of trial, after over *twenty years* of litigation and multiple trips to the D.C. Circuit and the Supreme Court.  *See* Pl.'s Mem. at 9–10 n.3.  Although leave to amend should be given freely, the plaintiff's suggestion stretches this liberal standard beyond the breaking point.

interprets *Wesby* to endorse the view that, in constitutional torts, "the acts of other[]
[government] officials . . . may be attributed to those defendants who personally participated in
the investigative activity."  Pl.'s Reply. Mem. Supp. Mot. New Trial at 5, ECF No. 518.

The plaintiff distorts *Wesby*, which concerned proximate causation, not vicarious
liability.  *Wesby* addressed the question of whether the actions of the police officers *caused* the
false arrest.  The D.C. Circuit held that "the *cause* of the group arrest was the investigation and
erroneous determination regarding probable cause" and that liability attached because both
police officers "were the hub of that investigation."  *Wesby*, 765 F.3d at 29 (emphasis added).
Thus, the defendants were not held liable for the actions of others; rather, they were held liable
for their individual actions that *caused* the harm.

The plaintiff appears to miss the fact that rather than support his cause, *Wesby* supports
the decision to deny a jury instruction in the present case.  *Wesby* recognizes that a plaintiff is
"required to 'produce evidence that each [officer], through [his] own individual actions, has
violated the Constitution.'"  *Id.* (quoting *Elkins*, 690 F.3d at 564).  It is the actions of the
individual defendant that controls the liability determination.  The key inquiry for the jury is to
determine whether the defendants' individual actions *caused* the alleged constitutional harm.  In
contrast, the plaintiff's proposed jury instruction would permit liability to attach to one defendant
on the basis of the actions of others.  *See* Joint Pretrial Statement at 15 ("[Y]ou may consider the
actions of one defendant as evidence against another defendant . . . .").  Accordingly, a concerted
action instruction was both unwarranted and inappropriate in this case.[88]

---

[88] In any event, even if such an instruction were appropriate, the refusal to provide the instruction was
harmless.  As the government notes, the jury did not find that any of the defendants harbored a retaliatory intent.
Accordingly, none of the defendants committed an otherwise unlawful conduct.  *See Martin v. D.C. Metro. Police
Dep't.* 812 F.2d 1425, 1431 (D.C. Cir. 1987), *vacated in part*, 817 F.2d 144 (D.C. Cir. 1987), *reinstated*, 824 F.2d

## 2. *Probable Cause Instruction*

The plaintiff objects that the Court did not adopt in full his proposed jury instruction regarding the meaning of probable cause, but instead used the standard instruction employed in D.C. Civil Jury Instructions ("Blue Book") § 18.03, as modified for this case.[89]  Notably, and ultimately fatal to the plaintiff's argument, the plaintiff does not allege that the probable cause instruction provided to the jury reflected an incorrect statement of the law.  Indeed, the instruction provided in this case was perfectly consistent with the D.C. Circuit's recent decision outlining the requirements of probable cause. *See Wesby*, 765 F.3d at 19–31.  Rather, the plaintiff complains that the Court failed to use particular language that the plaintiff felt most useful to his argument.  This is not the standard and the plaintiff's claim must be rejected.

---

1240 (D.C. Cir. 1987).  In the absence of a wrongful act, the defendants could not be liable individually or on a conspiracy theory.

[89] The probable cause instruction provided to the jury by the Court stated, in relevant part:

> To meet his burden on the third element of his claim—absence of probable cause—you must find that the Plaintiff has proven by a preponderance of the evidence that the criminal charges contained in the indictment against him were not supported by probable cause. The indictment filed against the plaintiff charged him with the following crimes, for which he was either acquitted or which were withdrawn by the prosecutor at the plaintiff's criminal trial: conspiracy to defraud the United States, theft, receiving stolen property, mail fraud, and wire fraud. . . .

> Probable cause justifying the filing of criminal charges in an indictment exists so long as the facts and circumstances known to the prosecution at the time the charges were filed (together with the reasonable inferences from those facts) supported a reasonable belief that an offense had been committed and that the plaintiff committed it. Reasonable belief is an objective standard and exists if a reasonable person, considering the totality of the evidence known at the time of an indictment, could reasonably believe that a crime may have been committed and that the plaintiff committed it. Only the probability of criminal activity, not an actual showing, is the standard of probable cause.

> Although probable cause is determined by what was known to the prosecution at the time the charges were filed, the plaintiff may also show a lack of probable cause by showing that the defendants withheld material information from the prosecutor, that, as a result, the prosecutor did not have complete information when the charges were filed, and that if the prosecutor had had the complete information he would not have filed the charges.

> The fact that the criminal charges were ultimately dismissed does not necessarily mean that the charges were not supported by probable cause at the time that the prosecution was initiated.

Jury Instructions at 8, ECF No. 500.

"Jury instructions are proper if, when viewed as a whole, they fairly present the applicable legal principles and standards." *Czekalski v. LaHood*, 589 F.3d 449, 453 (D.C. Cir. 2009) (internal quotation marks and citations omitted); *see also Ponce v. Billington*, 679 F.3d 840, 846 (D.C. Cir. 2012) (upholding jury instruction because it "fairly and adequately conveyed the law to the jury"). "'[A]s long as a district judge's instructions are legally correct . . . he is not required to give them in any particular language.'" *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 556 (D.C. Cir. 1993) (quoting *Miller v. Poretsky*, 595 F.2d 780, 788 (D.C. Cir. 1978)). Ultimately "[i]t is sufficient if the substance of the instruction as given be correct in law, adapted to the issues developed at trial and adequate for guidance of the jury." *Heflin v. Silverstein*, 405 F.2d 1075, 1077 (D.C. Cir. 1968).

The plaintiff levels three criticisms at the probable cause instruction in this case. First, although the instruction admonished the jury to consider the "totality of the circumstances," the instruction did not explicitly state "the need to consider the exculpatory evidence" as contained in the plaintiff's proposed instruction. Pl.'s Mem. at 21. Second, the instruction omitted the plaintiff's proposed language about "the need for a 'full and fair investigation.'" *Id.* at 22. Finally, although the instruction defined probable cause as an objective standard, the plaintiff's proposed instruction included additional language stating probable cause did not depend on what "these defendants or the prosecutor personally believed." *Id.* The plaintiff believes such language was necessary to provide more "express direction" regarding the objective standard of probable cause. *Id.* None of the plaintiff's criticisms fault the legal accuracy of the instruction, only its wording and emphasis. Yet, a court is "not required to give [an instruction] in any particular language." *Bell Helicopter*, 999 F.2d at 556. Notably, the plaintiff fails to cite any model or pattern instructions reflecting his proposed language. Indeed, a limited survey of

pattern instructions from other jurisdictions reveals that none include the plaintiff's requested language regarding the need to consider exculpatory evidence or conduct a full and fair investigation.[90]  Thus the plaintiff cannot meet his burden in demonstrating any alleged failings in the Court's probable cause instruction.[91]

### 3.  Inducement Instruction

The plaintiff also challenges the jury instruction concerning "inducement."  Although the plaintiff phrases his challenge as one relating to "inducement," the real target of the plaintiff's ire is the instruction requiring that the plaintiff prove "but-for" causation.  The plaintiff does not dispute that he was required to prove as part of his constitutional tort claim that the defendants took actions to persuade, or otherwise induce, the prosecutor to bring charges.  *See* Pl.'s Reply at 13 (noting that the plaintiff's proposed instruction "would have required the jury to find that the improperly motivated officer actually took some action adverse to Moore" but expressing concern about further instructing the jury on "how to prove whether such improperly motivated acts *caused* the prosecutor to prosecute" (emphasis added)).

The instruction provided to the jury and challenged by the plaintiff provides in relevant part:

---

[90] *See* Pattern Criminal Jury Instructions for the District Courts of the First Circuit (1997), www.rid.uscourts.gov/menu/judges/jurycharges/PJI.pdf; Third Circuit Model Civil Jury Instructions § 4.013 at 171–172 (2014), *available at* http://www.ca3.uscourts.gov/model-jury-instructions;  Fifth Circuit Civil Jury Instructions § 10.1 at 83–84 (2014), *available at* http://www.lb5.uscourts.gov/juryinstructions/; Federal Civil Jury Instructions of the Seventh Circuit § 7.06 at 138 (2005 rev.), *available at* http://www.ca7.uscourts.gov/Pattern_Jury_Instr/pattern_jury_instr.html; Manual of Model Civil Jury Instructions for the District Courts of the Eighth Circuit § 4.40 at 53 (2014), *available at* http://www.juryinstructions.ca8.uscourts.gov/index.htm; Ninth Circuit Manual of Model Jury Instructions: Civil § 9.20 at 180 (2007), *available at* http://www3.ce9.uscourts.gov/jury-instructions/model-civil; Eleventh Circuit Civil Pattern Jury Instructions § 5.2 at 352 (2013), *available at* http://www.ca11.uscourts.gov/pattern-jury-instructions.

[91]  As noted by the defendants, any alleged error was harmless.  *See* Defs.' Opp'n at 15.  In addition to finding that probable cause existed for the plaintiff's indictment, the jury found that the defendants did not harbor a retaliatory intent and did not improperly induce the prosecution.  Thus, even if the instruction infected the jury's determination of probable cause, the defendants would still not be liable.

To meet his burden on the second element—retaliatory inducement of prosecution—you must find that the plaintiff has proven by a preponderance of the evidence that each defendant acted in retaliation and also induced the prosecutor to bring the *charges that would not have been initiated without the defendant's urging*. . . .

[Y]ou must find that the defendant you are considering induced the prosecutor to file criminal charges against the plaintiff, and the prosecutor would not have filed the charges without that inducement. Inducement is defined as intentionally taking an action to convince another individual to do something that he or she would not have otherwise done. You may, but are not required, to infer that the defendants induced the prosecutor to bring the criminal case if the plaintiff has shown that the defendants intentionally withheld evidence from the prosecutor or that they misrepresented or falsified evidence presented to the prosecutor.

Jury Instructions at 6–7 (emphasis added).  The plaintiff claims that this instruction was error because "a plaintiff who proves retaliatory motive on the part of the official urging prosecution coupled with the absence of probable cause for the charges need not further prove that the charges would not have otherwise been filed."  Pl.'s Mem. at 24.

The basis for the instruction given is the Supreme Court's decision in this very case, *Hartman v. Moore*, 547 U.S. 250 (2006).  *Hartman* addressed the issue of causation for claims of retaliatory inducement to prosecution, and added the requirement that the plaintiff plead and prove no probable cause as an element of the claim.  *Hartman* reasoned that "the need to prove a chain of causation from animus to injury, with details specific to retaliatory prosecution cases, . . . provides the strongest justification for the no-probable cause requirement."  *Id.* at 259. Retaliatory prosecution claims differ from ordinary retaliation claims in two ways.  First, because of the probable cause requirement for obtaining an indictment and initiation of a prosecution, "there will always be a distinct body of highly valuable circumstantial evidence available and apt to prove or disprove retaliatory causation," in the form of the evidence underlying the probable cause determination.  *Id.* at 261.  Second, a retaliatory prosecution case involves a more complex causal determination because the "defendant will be a nonprosecutor,

an official, . . . who may have influenced the prosecutorial decision but did not himself make it . . . ." *Id.* at 262.  As such, "the causal connection . . . is not merely between the retaliatory animus of one person and that person's own injurious action, but between the retaliatory animus of one person and the action of another." *Id.*  In this sense, "the cause of action will not be strictly for retaliatory prosecution, but for successful retaliatory inducement to prosecute." *Id.*  Accordingly, *Hartman* requires a showing of no probable cause as an element of the claim in order to "bridge the gap between the nonprosecuting government agent's motive and the prosecutor's action." *Id.* at 263.

In deciding to add a no-probable cause requirement, *Hartman* detailed the difficulties of the causal inquiry for cases of retaliatory inducement to prosecute.  *Hartman* did not waver, however, in its recognition that "a plaintiff like Moore must show that the nonprosecuting official acted in retaliation, and must also show that he induced the prosecutor to bring charges that *would not have been initiated without his urging*." *Id.* at 262 (emphasis added).  This is the language of "but-for" causation and the same language found in the jury instructions of which the plaintiff now complains.  *See* Jury Instructions at 6 ("[Y]ou must find that the plaintiff has proven by a preponderance of the evidence that each defendant acted in retaliation and also induced the prosecutor to bring the charges that *would not have been initiated without the defendant's urging*." (emphasis added)).  This reflects *Hartman's* recognition that "causation is understood to be but-for causation." *Hartman*, 547 U.S. at 260.  In other words, an "action colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway." *Id*.  The Supreme Court further explained that, "[e]vidence of an inspector's animus does not necessarily show that the inspector induced the action of a prosecutor *who would not have pressed charges otherwise*." *Id.* at 263 (emphasis added).  A

lack of probable cause, however, "may not be conclusive that the inducement succeeded and showing its presence does not guarantee that inducement was not the but-for fact in a prosecutor's decision" to prosecute. *Id.* at 265. As a result, the lack of probable cause creates only a "prima facie inference that the unconstitutionally motivated inducement infected the prosecutor's decision to bring the charge." *Id.* at 265. While the lack of probable cause, coupled with a showing of retaliatory motive, may suffice to create a prima facie showing of causation, it does not conclusively establish the but-for causation necessary to prove the claim. Accordingly, *Hartman* does not remove the traditional tort requirement (reflected in the challenged jury instruction) that the plaintiff demonstrate but-for causation. Rather, *Hartman* adds an element— a showing of no probable cause—to retaliatory inducement to prosecute claims.

The plaintiff interprets *Hartman* differently. According to the plaintiff, *Hartman* did not add an element to claims for retaliatory prosecution; rather, *Hartman* created a "special rule of proof," whereby the traditional causation element is supplanted by the requirement to show a lack of probable cause. *See* Pl.'s Mem. at 24. As a result, according to the plaintiff, a showing of lack of probable cause fully satisfies the requirement that the defendant's retaliatory motive caused the wrongful prosecution. This position is not without support.[92] *Hartman* could be read to distinguish between the "but-for" causation required of traditional retaliation claims and the causation required for retaliatory prosecution claims. *Id.* at 260 ("When the claimed retaliation for protected conduct is a criminal charge, however, a constitutional tort action will differ from [an ordinary retaliation case] in two ways."). Under the plaintiff's reading, the distinguishing

---

[92] Indeed, the Ninth Circuit has accepted the plaintiff's view that "a showing of a 'retaliatory motive on the part of an official urging prosecution combined with an absence of probable cause supporting the prosecutor's decision' will suffice to . . . settle the causation issue." *Beck v. City of Upland*, 527 F.3d 853, 865 (9th Cir. 2008) (quoting *Hartman*, 547 U.S. at 265). The Tenth Circuit has also suggested that the lack of probable cause and the causation requirement are one and the same. *See Esparza v. Bowman*, 523 F. App'x 530, 535 n.4 (10th Cir. 2013) (rejecting argument that plaintiff needed to submit "other evidence linking [the defendant's] retaliatory animus to the officials who . . . subsequently prosecuted her" once the absence of probable cause was established).

features of a retaliatory inducement to prosecute claim—the "distinct body of highly valuable circumstantial evidence," underlying the probable cause determination, and the complexity associated with "the retaliatory animus of one person and the action of another"—would result in eliminating altogether but-for-causation as an element of the claim and substituting for proximate causation only a showing of the lack of probable cause. *Id.* at 262–63. According to the plaintiff, *Hartman's* recognition that a showing of probable cause "is not necessarily dispositive" of causation is merely an acknowledgement that the lack of probable cause is an imperfect proxy for causation, not an admission that the lack of probable cause does not fully satisfy the causation requirement. *See* Pl.'s Mem. at 25 n.12 (citing Hartman, 547 U.S. at 265).

The plaintiff's reading of *Hartman* is too narrow. First, the plaintiff's reading cannot square with *Hartman's* admonition that "Moore must show that the nonprosecuting official acted in retaliation, and must also show that he induced the prosecutor to bring charges that *would not have been initiated without his urging.*" *Id.* at 262 (emphasis added). *Hartman* stressed this point again noting that "[e]vidence of an inspector's animus does not necessarily show that the inspector induced the action of a prosecutor *who would not have pressed charges otherwise.*" *Id.* at 263 (emphasis added). The D.C. Circuit likewise repeated this requirement when interpreting *Hartman* subsequently: "A retaliatory inducement to prosecution plaintiff must show that the nonprosecuting defendant official not only acted in retaliation but also 'induced the prosecutor to bring charges *that would not have been initiated without his urging.*'" *Moore V*, 644 F.3d at 425 (emphasis added) (quoting *Hartman*, 547 U.S. at 262). The plaintiff would ignore this language. This Court cannot. The challenged instruction comports with the clear language from the D.C. Circuit and the Supreme Court regarding the showing necessary both for retaliatory inducement claims generally and for the plaintiff in this case particularly.

Second, case law from other circuits supports this Court's view that the absence of probable cause requirement is a separate element of the tort and not the method of proving causation.  In *Rehberg v. Paulk*, 611 F.3d 828, 848–49 (11th Cir. 2010), the Eleventh Circuit held that "[t]o sue for retaliatory prosecution, a plaintiff must establish a 'but-for' causal connection between the retaliatory animus of the non-prosecutor and the prosecutor's decision to prosecute."  A showing of retaliatory motive and the absence of probable cause amounts only to "a prima facie case of this but-for causal connection."  *Id.*  Although not addressed explicitly, the Seventh Circuit reached a similar conclusion in *Pearls v. Terre Haute Police Dep't*, 535 F.3d 621, 626 (7th Cir. 2008).  The *Pearls* court described the necessary elements of a retaliatory inducement claim, stating that "[t]o succeed on such a claim, the plaintiff must show a causal connection between the official's retaliatory animus and a subsequent injury in a retaliation action."  *Id.*  Next, "[t]he plaintiff *also* must plead and prove, as an element of his case, that there existed no probable cause to support the underlying charge."  *Id.* (emphasis added).  The implication from *Pearls* is that the causal inquiry and the lack of probable cause are separate, albeit related, inquiries.  *See also Miller v. Mitchell*, 598 F.3d 139, 154 (3d Cir. 2010) (interpreting *Hartman* to require "that plaintiffs bringing retaliatory prosecution claims must allege and prove lack of probable cause *as an element of causation*" and not as the entirety of the causation analysis (emphasis added)); s*ee also Pellegrino v. U.S. Transp. Sec. Admin.*, No. 09-cv-5505, 2014 WL 3952936, at *4 (E.D. Pa. Aug. 12, 2014) (evaluating causation and lack of probable cause as distinct elements in claim for retaliatory inducement to prosecution); *cf. Halsey v. Pfeiffer*, 750 F.3d 273, 297–300 (3d Cir. 2014) (evaluating causation and lack of

probable cause as distinct elements in claim for malicious prosecution brought against investigating police officers).[93]

Third, by removing the traditional requirement of but-for causation, the plaintiff would upend the structure of the criminal justice system, which places the decision to file charges squarely on the prosecutor, not the investigator. "The role of a prosecutor is to see that justice is done." *Connick v. Thompson*, 131 S.Ct. 1350, 1365 (2011). The prosecutor "is the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer." *Berger v. United States*, 295 U.S. 78, 88 (1935). Accordingly, the prosecutor has a "duty to refrain from improper methods calculated to produce a wrongful conviction . . . ." *Id.* This duty begins prior to trial and conviction: the prosecutor has an independent duty to review and assess the evidence prior to initiating charges and bringing suit. The U.S. Attorneys' Manual provides that the "failure to meet the minimal requirement of probable cause is an absolute bar to initiating a Federal prosecution" and may subject the prosecutor to non-criminal sanctions. United States Attorneys' Manual § 9-27.200 Comment. Probable cause clears only the initial hurdle in bringing suit, however. The prosecutor must also make several additional judgment calls: a prosecutor should only "initiate or recommend Federal prosecution if he/she believes that the person's conduct constitutes a Federal offense and that the admissible evidence probably will be sufficient to obtain and sustain a conviction." *Id.* § 9-27.220 Comment. Even where both criteria are met, however, a prosecutor should not "necessarily . . . initiate or recommend prosecution." *Id.* Rather, the prosecutor must still determine whether (1) "a substantial Federal

---

[93] The D.C. Circuit's recent opinion in *Amobi v. D.C. Dep't of Corr.*, 755 F.3d 980 (D.C. Cir. 2014), also evinces support for this position. *Amobi* recognized that a "malicious prosecution claim is sustained where the proceeding is 'induced by fraud, corruption, perjury, fabricated evidence, or other wrongful conduct undertaken in bad faith.'" *Id.* at 992 (citing *Moore v. Hartman,* 571 F.3d 62, 67 (D.C. Cir. 2009)). *Amobi* indicates that there must be *actual* inducement, *i.e.*, the actions taken by the investigators must be a but-for cause of the prosecution.

interest would be served by the prosecution;" (2) "the person is subject to effective prosecution in another jurisdiction;" and (3) "there exists an adequate non-criminal alternative to prosecution." *Id.* Altogether, the prosecutor plays the key role and is the final arbiter on whether to initiate charges.[94]  To fault the investigators for an incorrect determination of probable cause by the prosecutor would be manifestly unjust and contrary to the central structure of the prosecutorial system.[95]

    *Hartman's* recognition that a lack of probable cause may rebut the "presumption of prosecutorial regularity" is not to the contrary.  547 U.S. at 263.  The presumption of prosecutorial regularity reflects the reality that "'the decision to prosecute is particularly ill-suited to judicial review.'"  *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 489–490 (1999) (quoting *Wayte v. United States,* 470 U.S. 598, 607–08 (1985).  As a result, a prosecutor is immune to suit.[96]  In light of the presumption of prosecutorial regularity, *Hartman* addressed the narrow circumstance that would permit a retaliatory inducement to prosecution suit to proceed against the investigating officials as opposed to the prosecutor.  *Hartman* held that the presumption of prosecutorial regularity can be rebutted by showing that probable cause did not exist for the indictment, thus permitting a civil suit to be brought against an investigator for

---

[94] Put in the language of classical tort law, the prosecutor is an intervening cause in any retaliatory prosecution claim.  Indeed, in the present case, the decision to prosecute was ultimately made by then-United States Attorney Jay Stephens.  *See* 7/2/14 AM Tr. at 45, 66.

[95] The plaintiff has even suggested an alternative reason for the prosecution than retaliation by the Postal Inspectors by pointing to AUSA Valder's lunchtime conversation with William Hittinger, in which AUSA Valder commented on the possible impact of the prosecution on his private practice career prospects.  *See* 1993 Decision, 1993 WL 405785, at *5.  Notably, AUSA Valder confirmed at trial his recollection of speaking to Mr. Hittinger about "the future-getting-a-job thing" and that, later, "Mr. Hittinger said to me, Well, does it make any difference to you whether Mr. Moore and Mr. Reedy are guilty? And I said, it makes no difference to me personally whether they are guilty or not."  7/17/14 AM Tr. at 101.  According to the Hittinger Affidavit, Mr. Hittinger read these two discussions in conjunction with one another to come to the conclusion that AUSA Valder was prosecuting the plaintiff to improve his future career prospects. AUSA Valder indicated that this was a misinterpretation of what he said, *id.* at 46, and that he meant "[p]rosecutors should never ever… get personally involved in a case," *id.* at 102.

[96] The prosecutor was dismissed from this action prior to trial on the basis of prosecutorial immunity.  *See Moore II*, 213 F.3d at 710 ("We therefore will affirm the dismissal of Moore's *Bivens* claim against Valder.").

retaliatory inducement to prosecute.  547 U.S. at 265.  The presumption, once rebutted, permits the suit to proceed; it does not determine the outcome of the civil suit, as the plaintiff suggests.

Fourth, beyond upending the traditional allocation of responsibilities in criminal prosecutions, the removal of but-for causation would void a foundational element of classical tort law—a showing of cause in fact.  Absent clearer language from the D.C. Circuit or the Supreme Court regarding such a profound change in the resolution of constitutional tort claims, this Court will not presume that the requirement of but-for causation be eliminated.  To be sure, while the common law of torts does not determine the precise contours of a *Bivens* action, *see Hartman*, 547 U.S. at 258 ("[T]he common law is best understood here more as a source of inspired examples than of prefabricated components of *Bivens* Torts."), the common law does bear on such claims.  The traditional requirement of causation should not be set aside absent clear instructions to the contrary.

The instruction requiring the plaintiff to prove that the prosecution would not have been initiated without the defendant's inducement was not in error, but was mandated by *Hartman*, 547 U.S. at 262 ("Moore must show that the nonprosecuting official acted in retaliation, and must also show that he induced the prosecutor to bring charges that *would not have been initiated without his urging*." (emphasis added)), and no new trial is warranted based on the plaintiff's challenge to this jury instruction.[97]

### D.  Judicial Conduct

Finally, the plaintiff faults the Court for giving "the jury the incorrect impression that Moore's counsel had done something improper, thereby undermining the effectiveness of Moore's presentation and prejudicing the jury against Moore."  Pl.'s Mem. at 29.  Specifically,

---

[97] Moreover, as the defendants note, any error in the instruction was harmless as the plaintiff lost on every element of his *Bivens* claim, not just inducement.  *See* Defs.' Opp'n at 21.

the plaintiff points to:  (1) the Court's questioning of witnesses; (2) the provision of a jury instruction regarding the import of certain deposition questions; and (3) an instruction provided to the jury following a ten minute recess upon the conclusion of the plaintiff's summation.  *Id.* at 29–32.  Each of the plaintiff's complaints will be addressed in order below.

### 1.  *Questioning of Witnesses*

In a footnote, the plaintiff bemoans the Court's questioning of several witnesses in ways the plaintiff now deems helpful to the defense.  *See* Pl.'s Mem. at 31–32 n.15.  The plaintiff presumably banishes this argument to a footnote because of the overwhelming case law in this Circuit permitting judicial questioning.  As an initial matter, "[i]t is beyond cavil that trial judges may question witnesses."  *United States v. Winstead*, 74 F.3d 1313, 1319 (D.C. Cir. 1996).  During questioning, "[j]udges enjoy broad latitude regarding the type of questions asked and the extent of their questioning."  *United States v. Stover*, 329 F.3d 859, 868 (D.C. Cir. 2003).  The court may explore "lines of inquiry opened by one or the other of trial counsel."  *United States v. Norris*, 873 F.2d 1519, 1526 (D.C. Cir. 1989).  The Court's questioning of witnesses in this case—which includes a claim subject to a judicial determination, thus ensuring the need for judicial fact-finding—was entirely appropriate.[98]

Moreover, the plaintiff was not harmed by such questioning.  To ensure that the jury did not draw inappropriate inferences from the Court's questioning of witnesses, the jury was instructed that "[d]uring the course of the trial, I may have asked questions of a witness, to obtain information or to bring out facts or to clarify facts. You should not take my questions to witnesses as any indication of my opinion about how you should determine the facts."  Jury

---

[98]  Although the plaintiff criticizes the Court for asking questions during the plaintiff's case, the Court also asked questions during the defendants' presentation of their case.  *See, e.g.*, 7/10/14 PM Tr. At 55, 88, 90; 7/11/14 AM Tr. at 37–39; 7/14/14 PM Tr. at 35, 51, 68; 7/15/14 AM Tr. at 22, 43–44, 57, 67–68, 105; 7/16/14 PM Tr. at 53, 57–58, 71, 78–79, 101; 7/17/014 AM Tr. at 40–43.  The plaintiff has made no objection to those questions.

Instructions at 3.  The plaintiff can show neither error nor harm from the Court's questioning of any witness.

### 2.   *Instruction Concerning Deposition Questions*

Finally, the plaintiff faults the Court for reminding the jury on the ninth day of trial, and after the jury had listened to approximately twelve hours of videotaped deposition testimony, that "the questions of Counsel [and] the arguments of counsel . . . are not evidence . . .."  7/7/14 Tr. PM Tr. at 3.  The instruction stemmed from certain deposition testimony admitted and presented to the jury during the plaintiff's case-in-chief.  Prior to trial, the defendants objected to significant portions of the plaintiff's deposition designations, including general objections under Federal Rule of Evidence 611.  *See* Annex E, Joint Pretrial Statement; *see also* Joint Transcript Designation Chart, ECF No. 479-1.  In total, the plaintiff designated portions of testimony from forty-two depositions or other sworn testimony.  *See* Annex E, Joint Pretrial Statement.  Portions of the deposition testimony contained extensive leading and patently argumentative questions, which ordinarily would not have been permitted during live testimony.  For example, in one exchange, plaintiff's counsel stated in response to an answer by the witness that "I don't think the jury is going to like it either.  But I think that is what has happened.  So can you give me any other explanation of why there were four or five [postal inspectors] there, assuming there were?" *See* 7/7/14 AM Tr. at 55.

A court has an independent responsibility to "exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to . . . make those procedures effective for determining the truth."  FED. R. EVID. 611(a).  Thus, "[t]he trial judge is necessarily entrusted with a large measure of discretion to control the introduction of evidence and to assure that it is logically and understandably presented to the jury."  *Baker v. United States*, 401 F.2d 958, 987 (D.C. Cir. 1968).  The Court reasonably exercised such discretion in the present case.

The substance of the instruction—reminding the jury that questions are not evidence, only answers—is well-accepted and is a routine instruction in the District of Columbia and was presented to the jury in both the preliminary instruction and the final instructions. *See* Civil Jury Instructions for the District of Columbia 2.05 ("The questions that the lawyers ask are not evidence. A lawyer's question that contains an assertion of a fact does not provide evidence of that fact."); 6/23/2014 AM Tr. at 257; Jury Instructions at 4. Moreover, the objected-to instruction in no way implied or suggested that plaintiff's counsel had done anything improper or untoward. Indeed, the Court gave the instruction following the lunch recess and in the context of a general reminder regarding the jury's role, not as a commentary on the plaintiff's method of presentation. *See* 7/7/14 PM Tr. at 4 ("[I]n addition, I just want to remind you from the preliminary instructions that I gave you at the very beginning of the trial—two weeks have passed, so I just thought I should remind you of this—that the questions of counsel, the arguments of Counsel, are not evidence before you. It's only the response by the witness, or, in this case, the reader of the witnesses' response.").

The plaintiff cannot demonstrate any harm from a jury instruction that was an accurate and well-accepted statement of the law and that was given in such a manner as not to suggest any impropriety by the plaintiff. The plaintiff's argument fails.

### 3.   *Instruction Following Summation*

Plaintiff's counsel's closing argument was replete with impermissible appeals to the jurors' emotion. For instance, plaintiff's counsel stated that "[w]hen law enforcement officers go over the line, the conduct injures us all." 7/18/14 AM Tr. at 127. Plaintiff's counsel also argued that "if we can't trust our law enforcement personnel to play by the rules and not trample on First Amendment rights, then we're all in trouble." *Id.* at 127–28. Additionally, on two occasions, plaintiff's counsel argued that the jury should "send a message." *Id.* at 129, 131. Reflective of

his zeal in pursuing this case, plaintiff's counsel argued to the jury that "as you go over this case, you will be empowered to be sure that the defendants, rogue law enforcement officers who crossed the line, will be *sent a message* that that should not happen again." *Id.* at 23 (emphasis added). Later, plaintiff's counsel again argued that the award of punitive damages is "going to *make a big statement* about what . . . kind of behavior . . . will [be] tolerated." *Id.* at 127 (emphasis added).

Following the plaintiff's counsel's arguments, counsel for both parties were summoned to the bench to discuss the proprietary of plaintiff's counsel's summation. The Court expressed concern that plaintiff's counsel's argument had improperly appealed to the jurors' emotions beyond the four corners of the evidence presented at trial and asked the parties to draft a proposed curative instruction. Following a ten-minute recess, the defendants provided a proposal to the Court. After reading the defendants' proposed instruction, plaintiff's counsel stated that "I did not mean to, or believe I crossed the line . . . . But if the Court feels that I did, I have no objection to the Court giving [the defendants' proposed instruction]." 7/18/14 AM Tr. at 133. Upon the jury's return, the Court provided the following instruction:

> "Ladies and Gentlemen, you heard arguments in the summation on behalf of the plaintiff in this case referring to sending a message and appealing to your emotions.
>
> You're going to be instructed on the law in this case and, as I instructed you during the preliminary instructions, you are to decide this case without bias, emotion, sympathy or personal interest, and to decide this case based on the evidence presented in this case and the law as I will instruct you, not on the basis of sending a message or on the basis of any emotions.

*Id.* at 133.

Courts forbid appeals to the "golden rule" and "send a message arguments" in order "to prevent the jury from deciding a case based on inappropriate considerations such as emotion." *Caudle v. District of Columbia*, 707 F.3d 354, 360–61 (D.C. Cir. 2013). A golden rule argument

"asks 'jurors to place themselves in the position of a party.'"  *Id.* (quoting *Ins. Co. of N. Am. v. U.S. Gypsum Co.*, 870 F.2d 148, 154 (4th Cir. 1989)).  "The jury may not return a verdict based on personal interest, bias or prejudice and an argument asking it to do so is improper."  *Id.* at 359.  Such arguments permit "'the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on evidence.'"  *Id.* (quoting *Granfield v. CSX Transp., Inc.*, 597 F.3d 474, 491 (1st Cir. 2010)).  Where a party makes repeated appeals to the juror's emotional sympathies, the error is heightened and may warrant a new trial even where the court has provided curative instructions.  *See Caudle*, 707 F.3d at 361 (noting that a single argument "alone, might not be grounds for reversal" but that reversal was warranted when the party made "three objections to golden rule arguments" and a send a message argument) (emphasis omitted).  The plaintiff now argues that the Court's actions in calling a bench conference, followed by requesting and providing a curative instruction to the jury, were error, even though the plaintiff did not object to the content of the proposed instruction.  The Court's actions were appropriate and a new trial on such basis is unwarranted.

The plaintiff argues that send a message arguments are appropriate where the contested issue concerns punitive damages because deterrence is one of the purposes behind such awards. *See* Pl.'s Mem. at 30–31.  The plaintiff's argument is not without support as some courts permit such arguments in the context of punitive damages.  *See, e.g.*, *King v. Macri*, 993 F.2d 294, 298 (2d Cir.1993); *Settlegoode v. Portland Pub. Schs.*, 371 F.3d 503, 519 (9th Cir. 2004); *Nice v. ZHRI, Inc.,* 105 F. Supp. 2d 1028, 1029 (E.D. Ark. 2000).

Nevertheless, three points persuade the Court that such argument was inappropriate and warranted a curative instruction in this case.  First, the permissibility of a send a message argument in punitive damages cases is not quite as universal as the plaintiff concludes.  For

instance, in *Porter v. Cabral*, No. 04-11935, 2007 WL 602605, at *7–*8 (D. Mass. Feb. 21,

2007), the court noted its discomfort with send a message arguments, even those made in the

context of punitive damages.  Indeed, the court described send a message arguments as "at best

bad practice."  *Id.* at *8.  Like here, the court in *Porter* provided a curative instruction following

summation.  This Court agrees with *Porter* that send a message arguments raise the same

concerns regarding emotional decision-making that lead courts uniformly to forbid their use in

compensatory damages actions.  While deterrence is an appropriate consideration regarding the

size of the punitive damage award, it is not an appropriate basis for determining whether to make

a punitive damages award.  The plaintiff's counsel's arguments blurred that distinction and

created the potential for juror confusion.

Second, the D.C. Circuit in *Caudle v. District of Columbia* drew no distinction between

the propriety of send-a-message and golden rule arguments in the context of compensatory

damages and their propriety in the context of punitive damages.  Rather, the D.C. Circuit noted

that "all circuits that have considered the issue have held a golden rule argument improper if

made with respect to *damages* . . . ."  707 F.3d at 359 (emphasis added).  Admittedly, the issue

was not before the D.C. Circuit, but *Caudle* nonetheless endorsed a stronger view regarding the

impropriety of such arguments than other circuits.  For example, while some courts have

permitted send a message or golden rule arguments for purposes of determining liability, the

D.C. Circuit explicitly rejected such a distinction in *Caudle*.  *Id.* at 360 ("It is no more

appropriate for a jury to decide a defendant's liability *vel non* based on an improper

consideration than to use the same consideration to determine damages.").  This reinforces this

Court's conclusion that the plaintiff's counsel's argument was inappropriate because it suggested

an inappropriate basis for the jury's deliberation—emotion.

Third, the plaintiff's counsel's argument was not made in a singular passing, but was repeated both at the beginning and ending of the summation and was comingled with golden rule appeals.  Taken together, the summation presented an appeal for the jury to make an emotional decision and an instruction was warranted to clarify the proper basis of decision-making for the jury.  Like the argument condemned in *Caudle*, the plaintiff's counsel made repeated references to sending a message or other emotional appeals.  707 F.3d at 361.  Moreover, the plaintiff's counsel's arguments that "[w]hen law enforcement officers go over the line, the conduct *injures us all*," *see* July 18, 2014 AM Tr. at 127 (emphasis added), and "if we can't trust our law enforcement personnel to play by the rules and not trample on First Amendment rights, then *we're all in trouble*," *id.* at 127–28 (emphasis added), while not quintessential golden rule arguments, still appealed to the jurors to put themselves in the position of the injured party.  This was inappropriate and a curative instruction was necessary.  *See Caudle*, 707 F.3d at 360–361.

The Court's instruction following the plaintiff's summation was appropriate and does not warrant a new trial.[99]

---

[99] Finally, even if a curative instruction was unnecessary, any error was harmless.  The plaintiff never objected to the phrasing of the curative instruction and the instruction matches the well-accepted admonition that jurors should not base their decision-making upon emotion.  Simply put, the plaintiff cannot be harmed by a curative instruction that accurately reflects the law and that was not objected to at trial.  In fact, the jury received a subsequent instruction regarding the factors at issue when calculating punitive damages.  The instruction stated, in relevant part, that:

> If you find that the plaintiff is entitled to an award of punitive damages, then you must decide the amount of the award. To determine the amount of the award you may consider the nature of the wrong committed, the state of mind of the defendants when the wrong was committed, the cost and duration of the litigation, and any attorney's fees that the plaintiff has incurred in this case. Your award should be sufficient to punish the defendant for his conduct and to serve as an example to prevent others from acting in a similar way.

Jury Instructions at 8, ECF No. 500.  Thus, any prejudice accruing to the plaintiff was cured by the jury instruction that noted that the size of the punitive damages award (as opposed to the reason for making the award) should be sufficient to "serve as an example." *Id.*

## VII.    CONCLUSION

After a "herculean effort," *see Moore IV*, 644 F.3d at 428, and a "procedural history

portending another *Jarndyce v. Jarndyce*," *Hartman*, 547 U.S. at 256, the plaintiff received his

days in court.  While the plaintiff's claims may have been sufficient to survive the pleadings, the

trial evidence revealed the plaintiff's claims to lack any persuasive force.  Both this Court and

the jury found for the defendants on every contested issue.

On the FTCA claim, the plaintiff alleged that the Postal Inspectors provided grand jury

materials to a testifying witness in order to procure an indictment that lacked probable cause, all

in retaliation for the plaintiff's protected First Amendment activities.  The trial evidence showed,

however, that while the Postal Inspectors assisted the prosecutor in providing interview

summaries to a witness in order to refresh his recollection prior to testifying before the grand

jury, the Postal Inspectors did not provide the testifying witness with any grand jury materials.

Likewise, the trial evidence revealed that, far from lacking probable cause for an indictment, the

circumstantial evidence against the plaintiff was, as he acknowledged, "suspicious," 6/25/14 AM

Tr. at 24, and ample to support probable cause.  Finally, in perhaps the biggest change from the

plaintiff's pretrial posture, the plaintiff admitted during his trial testimony that the Postal

Inspectors were motivated to investigate and recommend an indictment against him by their

belief in the plaintiff's guilt, which belies the plaintiff's claim that the Postal Inspectors' actions

were prompted by a malicious intent.  In sum, rather than produce a smoking gun, the plaintiff's

trial evidence produced much hot air that was insufficient to sustain his claims.  As a result, and

for the reasons explained above, the Court again – as two other Judges on this Court previously

held --denies the plaintiff's FTCA claim and enters judgment in favor of the United States.

As a consequence of the plaintiff's failed FTCA claim, the plaintiff's request for a new trial on his *Bivens* claim is rendered moot.  In any event, having received one jury trial on his claim for retaliatory inducement to prosecution, the plaintiff presents no grounds that would justify a second jury trial.  Thus, even if the plaintiff's *Bivens* claim were not otherwise barred, the plaintiff would not be entitled to a new trial.

\* \* \*

As the Supreme Court noted over sixty years ago, "[t]here must be an end to litigation someday . . . ."  *Ackermann v. United States*, 340 U.S. 193, 198 (1950).  While this has no doubt been a long and arduous journey for the plaintiff, the journey was no shorter or any easier for the defendants.  For the past twenty-five years, this litigation has cast a shadow over the careers, retirements, and estates, of the Postal Inspectors targeted by the plaintiff in this suit—only to have their long ago actions and motives vindicated at trial by two separate fact-finders.  At trial, the plaintiff requested approximately one-quarter billion dollars in damages, an "astronomical" award based on his inflated career aspirations and the profound sense of wrong the plaintiff believes himself to have suffered for what he discounts as merely "look[ing] like we made some bad decisions on people."  6/25/2014 AM Tr. at 25.  Having examined the totality of the evidence presented at trial, the plaintiff not only made "bad decisions," but those bad decisions helped fund a corrupt scheme that cost taxpayers millions of dollars.  The indictment at issue in this case was not premised on retaliation or malice, but resulted from a diligent and comprehensive investigation following the corrupt payments back to their source.  In this case, the evidence led directly to the plaintiff.

For the reasons set forth above, the plaintiff's claims are denied.  An appropriate Order accompanies this Memorandum Opinion.

Date: April 17, 2015

_____
BERYL A. HOWELL
United States District Judge